UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCISCO ROMERO,<br><br>                                    Plaintiff,<br><br>v.<br><br>ATTORNEY GENERAL MERRICK B. GARLAND, acting in his official capacity; DOES 1-100,<br><br>                                    Defendants. | Case No.:  3:19-cv-02138-JAH-BGS<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 47];**<br><br>**(2) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY OF ERIC BROWN [ECF NO. 48];**<br><br>**(3) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY OF LAURIE CHUA [ECF NO. 49];**<br><br>**(4) DENYING PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY OF ANDREW SAXON, MD**<br><br>**(5) DENYING PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY** |

1

**OF LAURA FUCHS DOLAN, MBA; AND**

**(6) DENYING PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY OF DANIEL FARCAS, PHD [ECF NO. 52]**

## INTRODUCTION

This matter comes before the Court on Defendant Attorney General Merrick B. Garland's ("Defendant") motion for summary judgment; Defendant's motions to exclude from trial the expert testimony of Eric Brown and Laurie Chua; and Plaintiff Francisco Romero's ("Plaintiff") motions to exclude from trial the expert testimony of Andrew Saxon, MD, Laura Fuchs Dolan, MBA, and Daniel Farcas, PHD.  ECF Nos. 47-52.  After the parties briefed the motions, the Court deeming the motions suitable for adjudication without oral argument, took them under submission and vacated the hearing.

After careful consideration of the entire record, the parties' arguments and for the reasons set forth below, the Court **GRANTS IN PART and DENIES IN PART** Defendant's motion for summary judgment ("MSJ"); **GRANTS IN PART and DENIES IN PART** Defendant's motion to exclude expert testimony of Eric Brown ("Brown Mot."); **GRANTS IN PART AND DENIES IN PART** Defendant's motion to exclude expert testimony of Laurie Chua ("Chua Mot."); **DENIES** Plaintiff's motion to exclude expert testimony of Andrew Saxon, MD ("Saxon Mot."); **DENIES** Plaintiff's motion to exclude expert testimony of Laura Fuchs Dolan, MBA ("Dolan Mot."); and **DENIES** Plaintiff's motion to exclude expert testimony of Daniel Farcas, PHD ("Farcas Mot.").

## BACKGROUND

### I.    Factual Background

Plaintiff is an engineering technician and correctional officer who has worked at Metropolitan Correction Center ("the MCC") in San Diego since 1991.  Third Amended Complaint ("TAC") ¶ 5 (ECF No. 28); "Pl.'s Depo." at 15:7-20:16 (ECF No. 47-2.  On

May 27, 2015, while at work in the basement of the MCC, Plaintiff started sweating, coughing, feeling dizzy, and began vomiting. Pl.'s Decl. ¶ 6 (ECF No. 65-2); Pl.'s Depo at 30:6-11. Plaintiff left work and went to an urgent care facility where he was given medication for vertigo and motion sickness. Pl.'s Depo at 32:14-33:10. The next day, Plaintiff visited his primary care physician, Dr. Ellen Blando, who diagnosed Plaintiff with a viral infection in his inner ear, causing Plaintiff to experience severe vertigo. Pl.'s Decl. ¶ 7. Plaintiff took sick leave and returned to work on or about June 8, 2015. *Id*. ¶ 8; Pl.'s Depo. at 33:17-18.

Upon Plaintiff's return to work, he experienced dizziness, a scratchy throat, wheezing in his chest, coughing, and equilibrium, and memory issues. Pl.'s Decl. ¶ 8. Plaintiff told his supervisor, Noel Fenlon, that he was feeling sick. *Id*. According to Plaintiff, he also had a conversation with his coworker who told Plaintiff that his wife had similar symptoms and was sick from mold. *Id*. A few days later, Plaintiff went to a hospital emergency room because he was feeling sick again. *Id*. Plaintiff then set out mold testing kits at the MCC that he had purchased from Home Depot. *Id*. Those tests indicated the presence of mold, which Plaintiff showed to his supervisor. *Id*.; Pl.'s Depo. at 45:1-25. According to Plaintiff, his supervisor told him that a company would be hired to do mold testing at the MCC. Pl.'s Depo. at 45:21-46:2.

The following week, on June 25, 2015, Plaintiff filed a worker's compensation claim styled as a "Notice of Traumatic Injury" with the U.S. Department of Labor's Office of Workers' Compensation Programs for exposure to mold on May 27, 2015 in the MCC basement. Federman Decl. ¶ 4, ECF No. 65-3.

On or about July 13, 2015, the MCC received mold air sampling test results from an independent contractor that confirmed there was mold in the basement. Pl.'s Decl. ¶ 11. Plaintiff then spoke to Associate Warden Salazar and told him that he needed to get out of the basement because he kept getting sick. *Id*. at ¶ 12. On or about August 11, 2015, Plaintiff's workstation was moved from the basement to a first-floor conference room. *Id.*

On August 17, 2015, Plaintiff began seeing an occupation medicine physician, Dr.

Lawrence S. Pohl, in connection with his worker's compensation claim. *Id.* ¶ 15; Pl.'s Depo. at 67:4-14; Pohl Decl. ¶¶ 3, 4 (ECF No. 65-4). Dr. Pohl interviewed Plaintiff, reviewed his clinical history, examined him, and determined his symptoms "could be" attributed to the mold in the MCC's basement. Pohl Decl. ¶ 4. Dr. Pohl diagnosed Plaintiff with rhinitis, nasopharyngitis, cough, shortness of breath, memory loss, and unspecified peripheral vertigo. *Id.* Dr. Pohl determined that "it was more probable than not that [Plaintiff's] respiratory symptoms were related to the overgrowth of mold in [the MCC], and that [Plaintiff] had an allergy to molds." *Id.* Dr. Pohl prepared a report recommending that Plaintiff be accommodated at work by not working in the basement and away from mold exposure. *Id.* at ¶¶ 4-5.[1]

In late October 2015, according to Plaintiff, Associate Warden Salazar began telling him that he would have to move back to the basement. Pl.'s Decl. ¶ 17. On November 19, 2015, Plaintiff's primary care physician, Dr. Blando, referred him to have allergy testing, but he was not tested for mold allergies. *Id.* ¶ 18. Dr. Blando also wrote a letter stating that Plaintiff has

> been suffering from recurrent allergies and asthma symptoms for years. He also has developed vertigo that makes him unsteady. When transferred to his current work area [on the first floor of the MCC], away from his old workplace [in the basement], his symptoms has [sic] dramatically improved. It is therefore requested that he be allowed to stay in his current location for maintenance of his health.

Damiani Decl., Exh. 9 (ECF No. 65-5). Plaintiff provided Dr. Blando's letter to the MCC, and he remained working on the first floor. Pl.'s Decl. ¶¶ 18-19.

Between July 26, 2016 and October 14, 2016, Plaintiff visited Dr. Pohl three times because he was coughing, had nasal congestion, difficulty breathing, was feeling dizzy, unbalanced, and unable to concentrate. Pl.'s Decl. ¶¶ 30-32. Dr. Pohl referred Plaintiff to see a neurologist and otolaryngologist for Plaintiff's vertigo and memory loss as related to

---

[1] Plaintiff continued to see Dr. Pohl and his colleague, Dr. Chandri Raval, for a series of follow up appointments from August 24, 2015 to April 30, 2018. Pohl Decl. ¶¶ 6-17.

sick building syndrome.  Dr. Pohl Decl. ¶ 9; Pl.'s Decl. ¶¶ 31-32.  On October 14, 2016, Dr. Pohl wrote a letter for Plaintiff to give to the MCC, explaining he had treated Plaintiff for over a year due to issues from exposure to mold and opining Plaintiff "should not be allowed to work in areas that have been tested positive for mold by the Safety Officer or Union."  Pohl Decl. ¶ 10, Exh. 2

On October 18, 2016, Plaintiff gave Dr. Pohl's letter to the MCC's Safety Department.  Pl.'s Decl. ¶ 33.  Plaintiff also took a leave of absence and requested that the first-floor office and other areas on the first floor be tested for mold because he was continuing to feel sick.  *Id*.  According to Plaintiff, while on leave on November 2, 2016, a representative of the MCC's Safety Department called Plaintiff and stated that the basement is clear, and Plaintiff needed to return to work in the basement per the orders of Associate Warden Salazar and Mr. Fenlon.  *Id.* ¶ 34.  Plaintiff then sent an email to the Warden, Associate Warden, the MCC's Safety Department, and Mr. Fenlon, requesting accommodations for Plaintiff's disability as provided by his doctors and requested a written response.  *Id*.  Plaintiff remained on leave.

On November 18, 2016, Plaintiff reported to Dr. Pohl that he was still experiencing symptoms, but they improved with being away from the mold at the MCC for a month.  *Id*. ¶ 36; Pohl Decl. ¶ 11.  Dr. Pohl wrote another letter stating Plaintiff "should not be allowed to work in areas that may or may not have tested positive for mold.  [Plaintiff] may not walk by/below/above/next to areas that have had mold until remediation is complete.  [Plaintiff] has a very low tolerance to the physical effects of mold and this mold exposure has caused him much distress and is harmful to his medical health."  *Id.*, Exh. 3.

On November 25, 2016, Plaintiff requested leave without pay from the MCC so that he could get put on workers' compensation, which the MCC approved 28 business days after receiving the request.  Pl.'s Decl. ¶ 37.  While on leave, Plaintiff continued seeing Dr. Pohl for follow-up appointments.  *Id*. ¶¶ 39, 43.  Overall, Dr. Pohl assessed Plaintiff with Bronchospasm, Rhinitis, and exposure to mold.  Pohl Decl. at ¶ 14.  On June 7, 2017, Plaintiff visited Dr. Pohl and reported that he was feeling better overall, but still had

occasional haziness.  *Id*. ¶ 15; Pl.'s Decl. ¶ 43.  Dr. Pohl determined that Plaintiff could return to work, but needed to avoid areas where mold was present.  Pohl. Decl. ¶ 15.  On July 25, 2017, Plaintiff visited Dr. Pohl again and Dr. Pohl assessed him with exposure to mold, Rhinitis, throat irritation, and persistent headaches.  Pl.'s Decl.  ¶ 44; Dr. Pohl Decl. at ¶ 16.  Dr. Pohl determined that Plaintiff "had reached a period of maximal medical improvement but still needed future medical care in the form of medication for Rhinitis and throat irritations and follow up visits with pulmonary specialist or occupational specialist", and Plaintiff "still needed to avoid areas where mold was present."  *Id*.

On August 18, 2017, Plaintiff received a memorandum from Marco Sanchez, Union Vice President of the American Federation of Government Employees, that explained,

> the majority of identified mold found throughout the MCC has not been remediated. Approximately 80% of identified mold still exist [sic] in the building.  A large amount of mold exist [sic] in the approx. 296 plumbing closets/air plumes located throughout the building.  This remediation project is expected to start in November and last approx. 200 days plus.  I have requested to Associate Warden R. Garcia and Safety Manager J. Hendrickson (July 19, 2017) that the Union be provided with a written procedure on how these areas are going to be cleared/deemed safe for staff to work/occupy upon completion of this remediation project.  As of today no procedure or plan has been provided to the union.

Damiani Decl., Exh, 50.

On September 1, 2017, Plaintiff contacted Equal Employment Opportunity ("EEO") Counselor Jose Bautista to start the process of filing a formal complaint of discrimination, harassment, and retaliation against the Bureau of Prisons ("BOP").  Pl.'s Decl. ¶ 46.  He filed a formal complaint of discrimination and retaliation with the United States Department of Justice ("DOJ") on October 17, 2017.  Damiani Decl., Exh. 5.

On December 6, 2017, Plaintiff saw Dr. Edward C. Federman, a pulmonologist, in connection with his worker's compensation claim, at the request of the Department of Labor.  Pl.'s Decl. at ¶ 49; Dr. Federman Decl. ¶ 4.  Dr. Federman conducted an examination of Plaintiff to provide a pulmonary second opinion related to his occupational injury and illness.  Federman Decl. ¶ 4.  Dr. Federman determined that Plaintiff "had allergic asthma with mild reversibility on pulmonary function testing, consistent with

[Plaintiff's] clinical history and symptomatology, from mold exposure." *Id*. ¶ 7.  Dr. Federman also determined that Plaintiff had "mild obstructive airway disease, which explains his symptoms of coughing, wheezing, shortness of breath, and tightness in his chest. *Id*. ¶ 8.  Dr. Federman further determined that Plaintiff continues to suffer from fatigue and dyspnea (shortness of breath) with exertion; limited exercise tolerance on the basis of his coughing and wheezing; and Plaintiff's allergic asthma and mild obstructive airway disease impaired his ability to breath.  *Id*.  Based on Plaintiff's medical history and diagnostic test results, Dr. Federman determined that the most probable cause of Plaintiff's condition was workplace exposure to mold and recommended that Plaintiff avoid mold exposure.  *Id*. ¶¶ 9-10.  Dr. Federman also noted "[a] person can have a toxic reaction to mold without necessarily having an allergy to mold."  *Id*. ¶ 10.

On March 26, 2018, Plaintiff received a letter from Associate Warden Dulgov in which he proposed that Plaintiff be removed him from his position for excessive absences. Pl.'s Decl. ¶ 50; Damiani Decl., Exh. 19.  On April 25, 2018, Plaintiff met with Warden Williams regarding Associate Warden Dulgov's letter, and no action was taken to remove him.  Pl.'s Decl. ¶ 51.

Plaintiff received a letter, dated April 18, 2019, from his new supervisor, Facilities Manager Kyle Ball, demanding that Plaintiff return to work.  *Id*. ¶ 54; Damiani Decl., Exh. 30.  In response, Plaintiff sent a memorandum to the Warden and Mr. Ball, dated April 22, 2019, requesting the institution test any areas he will be working in for mold before he returned to work.  Damiani Decl., Exh. 23.  The next day, Plaintiff met with the Warden. Pl.'s Decl. ¶ 55.

On September 3, 2019, the DOJ issued a Final Agency Decision ("FAD") on Plaintiff's employment discrimination complaint against the BOP.  Damiani Decl., Exh. 17.  The DOJ found that the BOP did not fulfill its obligations to Plaintiff under the Rehabilitation Act, as the BOP did not adequately engage in the interactive process with Plaintiff to devise reasonable accommodation.  *Id*.  As such, the DOJ determined Plaintiff was subjected to disability discrimination when BOP officials failed to fully engage in the

interactive process by not responding to Plaintiff's requests for certification showing that the mold in the workplace had been remediated.  *Id.*  The DOJ instructed the BOP and Plaintiff to promptly resume the interactive process and exchange information and documentation relating to the MCC's mold remediation and Plaintiff's medical condition, to restore to Plaintiff 28 days of medical leave, and directed the BOP to submit a report on the status of the implementation of the relief ordered within 90 days of the decision.  *Id*.

## II.   Procedural History

Plaintiff originally filed a complaint against Attorney General William Barr, Federal Bureau of Prisons, Director Kathleen Hawk Sawyer, United States Department of Justice, and DOES 1-100, on November 6, 2019, for disability discrimination, failure to engage in interactive process, failure to accommodate disability, and retaliation.  ECF No. 1.  On April 13, 2020, the parties filed a joint motion for leave for Plaintiff to file a first amended complaint, which the Court granted.  ECF Nos. 9, 11.  Plaintiff then filed a first amended complaint.  ECF No. 16.

Defendants moved to dismiss Plaintiff's first amended complaint.  ECF No. 19.  The Court denied the motion to dismiss and granted Plaintiff's request for leave to file a second amended complaint to name the proper defendant.  ECF No. 24.  On May 28, 2021, Plaintiff filed a second amended complaint and the parties, later, filed a joint motion for leave for Plaintiff to file a third amended complaint, which the Court granted.  ECF Nos. 25, 26, 27).

On June 10, 2021, Plaintiff filed the operative third amended complaint ("TAC") alleging claims for disability discrimination, harassment based on disability, and retaliation.  ECF No. 28.  Defendant filed an answer.

On October 19, 2022, Defendant filed the instant motion for summary judgment ("MSJ") and two motions to exclude expert testimony from trial.   ECF Nos. 47-49. Plaintiff filed oppositions to Defendant's motions along with three motions to exclude expert testimony from trial.  ECF Nos. 50-52, 57-58, 65.  Defendant filed oppositions to Plaintiff's motions to exclude and replies in support of his motions.  ECF Nos. 54-56, 66-68.  Plaintiff did not file replies in support of his motions.

# DISCUSSION

## I.   Defendant's MSJ

### A.   Legal Standard

Summary judgment is properly granted when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).   Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   The party moving for summary judgment bears the initial burden of establishing an absence of a genuine issue of material fact. *Id*. at 323.   Where the party moving for summary judgment does not bear the burden of proof at trial, as here, it may show that no genuine issue of material fact exists by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Id*. at 325.   The moving party is not required to produce evidence showing the absence of a genuine issue of material fact, nor is it required to offer evidence negating the non-moving party's claim. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 885 (1990); *United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989).   "Rather, the motion may, and should, be granted so long as whatever is before the District Court demonstrates that the standard for the entry of judgment, as set forth in Rule 56(c), is satisfied." *Lujan*, 497 U.S. at 885 (quoting *Celotex*, 477 U.S. at 323).

Once the moving party meets the requirements of Rule 56, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).   Without specific facts to support the conclusion, a bald assertion of the "ultimate fact" is insufficient. *See Schneider v. TRW, Inc.*, 938 F.2d 986, 990-91 (9th Cir. 1991).   A material fact is one that is relevant to an element of a claim or defense and the existence of which might affect the outcome of the suit.   The materiality of a fact is thus determined by the substantive law governing the claim or defense.   Disputes over irrelevant or unnecessary

facts will not preclude a grant of summary judgment. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Anderson*, 477 U.S. at 248).

When ruling on a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] . . . ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## B. Evidentiary Objections

In conjunction with Plaintiff's opposition to the MSJ and Defendant's reply, the parties separately filed several objections to evidence in their respective briefs. Pl.'s Obj. (ECF No. 65-1); Def.'s Obj. (ECF No. 68-1). The parties both object to the other's evidence on various grounds and each moves to strike the other's evidence. *Id.* However, all the objections are "boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence." *Capitol Recs., LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1200 n.1 (C.D. Cal. 2010) (quoting *Doe v. Starbucks, Inc.*, 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009). Accordingly, the Court finds that it is "unnecessary and impractical . . . to methodically scrutinize each objection and give a full analysis of each argument raised." *Id.* Thus, to the extent that the Court discusses and relies on evidence in this Order, it finds that the evidence is admissible and overrules any objection to such evidence.

## C. Analysis

Plaintiff asserts claims for disability discrimination, retaliation, and harassment under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA"). Defendant contends Plaintiff's only potential avenue of relief is the RA because the federal government is immune from suit under the ADA and discrimination must be based on race, color, religion, sex, or national origin, not a respiratory disability or mold allergy, under Title VII. In

opposition, Plaintiff agrees that the RA is the exclusive remedy for federal employees claiming discrimination based on a disability.

Defendant argues he is entitled to summary judgment because Plaintiff cannot establish a prima facie case for disability discrimination or retaliation under the RA, and even if he could, Defendant had a legitimate, non-discriminatory reason to reject Plaintiff's request for accommodation.

**1.    Disability Discrimination**

Defendant argues Plaintiff cannot establish a prima facie case for disability discrimination.  "To state a prima facie case under the [RA], a plaintiff must demonstrate that (1) [he] is a person with a disability, (2) who is otherwise qualified for employment, and (3) suffered discrimination because of [his] disability." *Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007) (superseded by statute on other grounds).

Defendant argues Plaintiff is not disabled within the meaning of the RA.   In opposition, Plaintiff argues Defendant already admitted Plaintiff is disabled and he is, in fact, an individual with a disability.  In the alternative, Plaintiff argues Defendant regarded him as disabled.

**a.    Admission of Plaintiff's Disability Status**

Plaintiff argues the DOJ's acceptance of Plaintiff's EEO disability discrimination claim is a prior admission of a party opponent, and Defendant's failure to raise an objection regarding Plaintiff's disability status during the administrative process precludes Defendant from disputing Plaintiff is disabled.  Defendant contends the parties did not litigate the issue during the administrative process and the FAD did not make any finding regarding Plaintiff's disability status but, instead, assumed he was a qualified individual under the law.  Defendant argues that assumption has no effect in this action and does not prevent him from arguing that Plaintiff is not disabled.

This discrimination action is a civil action that requires a *de novo* review and, as such, liability is at issue.  *See Carver v. Holder*, 606 F.3d 690, 696 (9th Cir. 2010). Accordingly, Defendant is not precluded from arguing Plaintiff is not an individual with a

disability.

**b.     Person with a Disability**

The term "disability" means that the person has (1) a physical or mental impairment that substantially limits one or more major life activities, (2) a record of such an impairment, or (3) is regarded as having such an impairment.  29 C.F.R. § 1630.2(g); 42 U.S.C. § 12102(1).  "Major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others and working."[2]  29 C.F.R. § 1630.2(i); 42 U.S.C. § 12102(2)(A).  Plaintiff asserts he has a respiratory disability caused by exposure to mold.

Defendant argues the evidence demonstrates Plaintiff's alleged respiratory problems are transitory and not caused by mold.  Specifically, Defendant maintains a blood test conducted during discovery revealed that Plaintiff is not allergic to mold.  However, as Plaintiff pointed out, Defendant did not provide the blood test results.  Instead, Defendant relies on portions of Plaintiff's deposition testimony and argues Plaintiff testified that Plaintiff's understanding of the blood test results is that he is not allergic to mold.  Plaintiff objects and argues that the best evidence for the blood test is the test itself, not his interpretation, as the test on its face shows abnormal reactions to certain types of molds.  Plaintiff also argues that the testimony lacks foundation and calls for the testimony of the blood test examiner as Plaintiff is not an expert.

During his deposition, Plaintiff testified that he did a Google search and found "some random test company" to perform a blood test to determine whether he is allergic to mold.  Pl.'s Depo at 53:1-24.  He further testified that the results had "low amounts" and, according to his understanding, the "low amounts" indicated he is not allergic to mold.  *Id*. at 56:24-57:18.  There is no testimony or evidence of the name of the test company/clinic,

---

[2] These factors are not exhaustive and do not constitute a definitive checklist or test.

the date Plaintiff had the test performed, where the test was performed, who performed the test, what specifically was tested, who generated the test results, or how the test results were generated or interpreted.  The Court finds Plaintiff's deposition testimony fails to lay a proper foundation for the test results.

Defendant also contends Dr. Pohl's opinion that Plaintiff may have nasal congestion caused by mold does not support a finding that Plaintiff is disabled because Dr. Pohl performed no differential diagnosis, no allergy or other objective tests and he confirmed Plaintiff's nasal symptoms were controlled by medication and should not prevent him from working inside the MCC San Diego.  Plaintiff argues Drs. Pohl and Federman examined him and conducted tests to confirm his condition and that his condition was caused by mold exposure.

Dr. Pohl is Plaintiff's treating physician in connection with his workers' compensation claim.  Pl.'s Decl. ¶ 15; Pl.'s Depo. at 67:4-14; Pohl Decl. ¶ 4.  Dr. Pohl interviewed Plaintiff, reviewed his clinical history, examined him, and determined his symptoms, ear congestion, throat congestion, cough, chest tightness, headache, vertigo and memory loss, could be attributed to the mold in the MCC basement.  Pohl Decl.  ¶ 4.  Based on Plaintiff's symptoms, Dr. Pohl's examination of Plaintiff, and Plaintiff's clinical history, Dr. Pohl diagnosed Plaintiff with rhinitis, nasopharyngitis, cough, shortness of breath, memory loss, and unspecified peripheral vertigo.  *Id*.  Dr. Pohl relied on a mold environmental report indicating several of the areas where Plaintiff worked were positive for mold, as well as a conversation Dr. Pohl had with a person who performed mold testing at the MCC.  *Id*.  Based on the mold reports and Plaintiff's history, Dr. Pohl determined that "it was more probable than not that [Plaintiff's] respiratory symptoms were related to the overgrowth of mold in [the MCC], and that [Plaintiff] had an allergy to molds."  *Id*. While Dr. Pohl never ordered or conducted an allergy test on Plaintiff, he did review Plaintiff's allergy test that was a part of his medical records.  Pohl Depo. at 25:10-18 (ECF No. 47-3); Pohl Decl. ¶ 18.  Dr. Pohl prepared a report recommending that Plaintiff be accommodated at work by not working in the basement and away from mold exposure.

Pohl Decl. ¶ 4.  Dr. Pohl opined that since Plaintiff has memory loss and vertigo when he is in the MCC building and when he leaves the building the symptoms subside, it is more probable than not that Plaintiff's symptoms are occupationally related to the exposure to mold.  *Id*. ¶ 12.  Dr. Pohl ordered a pulmonary medicine follow-up evaluation and treatment for Plaintiff and no working around molds.  *Id*. ¶ 14.

Overall, Dr. Pohl diagnosed Plaintiff with Bronchospasm, Rhinitis, and exposure to mold.  *Id*.  Dr. Pohl explains that "Bronchospasm is when the muscles that line the airways (bronchi) in your lungs tighten. . .the airways narrow prohibiting the airflow in and out of the lungs" and, as a result, "the amount of oxygen that enters the blood and the amount of carbon dioxide that leaves the blood is limited and causes difficulty breathing."  *Id*. "Bronchospasm contributes to asthma symptoms such as wheezing and shortness of breath."  *Id*.  In arriving at his diagnosis, Dr. Pohl attests that he "examined Plaintiff's symptoms, medical history, diagnostic test results, and the mold reports from the facility to eliminate alternative causes and reached the conclusion that mold exposure at the MCC was the most probable cause of Plaintiff's condition."  *Id*. ¶ 18.  He further attests that he "used standard diagnostic techniques in gathering the information including conducting clinical tests, reviewing reports, reviewing literature on the health effects of mold exposure, and reviewing Plaintiff's report of radiographic examination, and allergy test."  *Id*.

Dr. Federman, a pulmonologist, examined Plaintiff at the request of the Department of Labor to provide a pulmonary second opinion related to his workers' compensation claim.  Federman Decl. ¶¶ 3-4.  Dr. Federman reviewed available records and interviewed and examined Plaintiff who complained of cough, shortness of breath, exercise limitation associated with wheezing, ear congestion, congestive cough with chest tightness, and worsening of symptoms when exposed to the basement of the MCC.  *Id*. ¶ 5.  Dr. Federman performed a spirometry pulmonary function test on Plaintiff which he described as "a standard diagnostic technique for a complete evaluation of the respiratory system."  *Id*. ¶ 6.  Based on the examination, spirometry results and Plaintiff's history, Dr. Federman determined that Plaintiff "had allergic asthma with mild reversibility on pulmonary

function testing, consistent with his clinical history and symptomatology, from mold exposure." *Id*. ¶ 7.  Dr. Federman also determined that Plaintiff has mild obstructive airway, which explains the coughing, wheezing shortness of breath and tightness in the chest and that Plaintiff suffers from fatigue and shortness of breath with exertion.  *Id*. at ¶ 8.  Dr. Federman further opined that Plaintiff's allergic asthma and mild obstructive airway disease impaired his ability to breathe.  *Id*.  Based on Plaintiff's medical history and diagnostic test results, Dr. Federman determined that the most probable cause of Plaintiff's condition was workplace exposure to mold and recommended that Plaintiff avoid mold exposure and he further explained that a person could have a toxic reaction to mold without having an allergy to mold.  *Id*. ¶¶ 9-10.

Defendant argues Dr. Pohl's and Dr. Federman's opinions have no evidentiary value because neither conducted any type of objective test to determine whether Plaintiff is allergic to mold.  He also argues Dr. Pohl's opinions do not support a finding that Plaintiff is disabled within the meaning of the RA because Dr. Pohl based his opinions on conversations with Plaintiff and never performed a differential diagnosis to verify the alleged allergy or respiratory illness.[3]

The Court disagrees with Defendant's assessment of Dr. Pohl's and Dr. Federman's opinions.  While Dr. Pohl testified at his deposition that he did not perform a differential diagnosis, he does explain he used standard diagnostic techniques and he examined Plaintiff and reviewed his medical history, diagnostic test results, and the mold reports for the MCC to reach the conclusion that mold exposure at the MCC was the most probable cause of Plaintiff's condition.  Pohl Decl. ¶ 18.  There is nothing to indicate that a physician is required to perform a differential diagnosis.  Defendant fails to demonstrate Dr. Pohl's use of other diagnostic tools was improper or insufficient.  Additionally, while neither Dr.

---

[3] "Differential diagnosis is 'the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings.'"  *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003) (quoting Stedman's Medical Dictionary 474 (26th Ed. 1995)).

Pohl nor Dr. Federman performed a test to determine whether Plaintiff is allergic to mold, a review of the evidence demonstrates Drs. Pohl and Federman conducted comprehensive examinations of Plaintiff and performed diagnostic tests in addition to reviewing Plaintiff's history and other relevant information in reaching their diagnoses. Based on their thorough assessments, Plaintiff was diagnosed with asthma, bronchospasm and mild obstructive airway disease which all affect Plaintiff's ability to breath, which is a major life activity. As such, the Court finds there is a genuine issue of material fact as to whether Plaintiff is disabled.

**c.   Intentional Discrimination**

In a footnote, Defendant argues summary judgment is appropriate to the extent Plaintiff seeks monetary relief because there is no evidence of intentional discrimination. To recover monetary relief under the RA, Plaintiff must prove intentional discrimination by Defendant. *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998). The standard for "intentional discrimination" under the RA is deliberate indifference which "requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that [ ] likelihood." *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1988)).

Here, Plaintiff provides evidence that Defendant was on notice by the DOJ that accommodation was required and the MCC failed to remediate the mold despite being on notice that it is dangerous to human health. This evidence includes the FAD, OHSA's Notice of Unsafe or Unhealthful Working Conditions issued on October 25, 2016, OSHA's results of its inspection of the MCC completed on May 18, 2016, Associate Warden Dulgov's March 26, 2018 letter to Plaintiff threatening to remove him from his position for "excessive absences", and Facilities Administrator Ball's April 18, 2019 letter to Plaintiff, also threatening to remove him from his position for "excessive absences." Damiani Decl., Exhs. 17, 19, 30, 42, 44. Furthermore, Plaintiff's human resources manager, James Pfannenstiel, testified in his deposition that he did not think it was "legitimate" that the cause of Plaintiff's vertigo was mold. Pfannenstiel Depo. at 37:19-

38:12; Damiani Decl., Exh. 1 (ECF No. 65-5).  The Court finds a genuine issue of material fact exists as to whether Defendant engaged in intentional discrimination.

Based on the foregoing, Defendant's motion for summary judgment on Plaintiff's disability discrimination claim is **DENIED**.

**2. Retaliation**

Defendant argues that Plaintiff cannot establish a prima facie case for retaliation.  "A prima facie case of retaliation requires a plaintiff to show: '(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two.'" *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004) (quoting *Brown v. City of Tucson*, 336 F.3d 1181, 1187 (9th Cir.2003)).

Defendant argues Plaintiff cannot establish a prima facie case of retaliation because Plaintiff did not suffer an adverse employment action.  Even if the Court finds Plaintiff's retaliation claim viable, Defendant argues, he is entitled to summary judgment to the extent Plaintiff seeks damages.  Plaintiff argues he suffered many adverse employment actions.

**a. Adverse Employment Action**

In the motion, Defendant contends Plaintiff asserts he was excluded from meetings and asked to perform menial tasks after he requested an accommodation for his alleged disability.  In opposition, Plaintiff contends he suffered numerous adverse employment actions, including, failing to take his disability and complaints seriously, refusing to engage in the interactive process, failing to accommodate his disability, causing him to go on leave without pay, causing him to stay on worker's compensation and lose a significant amount of pay, giving him a negative performance review, failing to reinstate him in his position and creating a hostile work environment.  In reply, Defendant argues none of the alleged conduct constitutes an adverse employment action.

An adverse employment action is adverse treatment that is based on a retaliatory motive and is reasonably likely to deter employees from engaging in protected activity. *Ray v. Henderson*, 217 F.3d 1234, 1242-43 (9th Cir. 2000).  The employment action must be non-trivial, final and lasting to constitute an adverse employment action. *Brooks*, 229

F.3d at 928-930.  Plaintiff demonstrates he made multiple requests to work in a mold free environment that were not addressed by management.  Damiani Decl. Exhs. 16, 55, 75, 76, 81, 82, 83.  He also attests he was assigned tasks outside his scope of work, was glared at, "mad dogged", ignored, accused of faking his health problems and coworkers stopped carpooling with him.  Pl.'s Decl. ¶¶ 22-29.  Plaintiff also points to evidence demonstrating he was placed on leave without pay which resulted in his salary being reduced.  Pl.'s Decl. ¶¶ 37, 38.    Additionally, he provides letters from management threatening to remove him from his position for excessive absences.   Damiani Decl. Exhs. 19, 30.

As noted by Defendant, Plaintiff was placed on leave without pay upon his request, and, therefore, this act lacks a retaliatory motive.   Plaintiff's contention that he was assigned tasks outside his scope of work, glared at, ignored, accused of faking his health problems and coworkers stopped carpooling with him, generally, do not rise to adverse employment actions.  *See Brooks v. City of San Mateo*, 229 F.3d 917, 928-929 (9th Cir. 2000) (Noting the badmouthing and ostracism alone do not constitute an adverse employment decision). While a negative performance review may qualify as an adverse employment action, Plaintiff fails to provide any evidence that he received a negative performance review.  However, he provides letters in which management recommends he be removed from his position due to excessive absences which may be reasonably likely to deter an employee from engaging in a protected activity.  Additionally, Plaintiff contends Defendant created a hostile work environment.  "A hostile work environment claim relies on a series of separate acts that collectively are so severe and offensive that they alter the conditions of plaintiff's employment." *Williams v. Modly*, 796 F. App'x 378, 380–81 (9th Cir. 2020) (citing *Nat'l Ry. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)). Drawing all inferences from the facts in the light most favorale to Plaintiff, the Court finds a genuine issue exists as to whether the various acts collectively are reasonably likely to deter Plaintiff or other employees from requesting accommodations for alleged disabilities. *See Matsushita*, 475 U.S. at 587.

//

**b.     Availability of Damages**

Citing *Ferguson v. City of Phoenix*, 157 F.3d 668 (9th Cir. 1998); *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261 (9th Cir. 2009); *McCoy v. Dep't of Army*, 789 F. Supp. 2d 1221 (E.D. Cal. 2011); and *Caldwell v. Del Toro*, 2022 WL 1719132 (W.D. Wash. May 27, 2022), Defendant contends the Court should grant summary judgment to the extent Plaintiff seeks damages for his retaliation claim.   Plaintiff does not respond to this argument.

In *Ferguson*, the Ninth Circuit held that the remedies for violations of the RA are coextensive with those of the ADA and are both linked to Title VI of the Civil Rights Act of 1964.  157 F.3d at 673.  The court further held that statutory law requires that the RA and ADA "remedies be construed the same as remedies under Title VI."  *Id*. (citing 42 U.S.C. § 12133; 29 U.S.C. § 794a(a)(2); 42 U.S.C. § 2000d, *et seq.*).   Later, in *Alvarado*, the Ninth Circuit held that compensatory damages are not available for retaliation claims under the ADA.  588 F.3d at 1270.  From *Ferguson* and *Alvarado*, the district court for the Western District of Washington in *Caldwell* reasoned that because the remedies for violations of the ADA and RA are coextensive with each other as determined in *Ferguson*, it follows that compensatory damages are not available under the RA.  2022 WL 1719132, at *1.  Seeing no reason to stray from the analysis in *Alvarado* and recognizing a district court split within the Ninth Circuit on whether compensatory damages are available under the RA for retaliation claims,[4] the *Caldwell* court held that "compensatory damages are not available for retaliation claims against either private or public entities under the [RA] in [the Ninth Circuit]."  *Id.* at *2.

The Court is persuaded by and adopts the sound reasoning of *Caldwell*. Accordingly, the Court finds compensatory damages are not available for retaliation claims

---

[4] *Caldwell*, 2022 WL 1719132, at *1 (Discussing district courts that rely on the private-public distinction to conclude monetary damages are available for RA retaliation claims versus those district courts that follow the holding in *Alvarado* that does not distinguish between public and private entities in holding that compensatory damages are not available for retaliation claims under the ADA).

under the RA.   Defendant's MSJ as to Plaintiff's retaliation claim for compensatory damages is **GRANTED**.

### 3.     Essential Job Function

Defendant argues, even if Plaintiff makes prima facie claims for discrimination and retaliation, the BOP had a legitimate, non-discriminatory reason to reject Plaintiff's request to work outside the building.   Defendant contends the BOP declined Plaintiff's request to work off-site because responding to emergencies at the MCC is an essential job function, and it is not required to eliminate an essential job function to accommodate Plaintiff's alleged disability.

In opposition, Plaintiff argues he is a qualified individual who was able to perform all the essential functions of his position with an accommodation.   He contends physically responding to emergencies at the institution is not an essential function of his job.   Even if it is an essential function, he could perform the function with the reasonable accommodation of mold remediation.   Plaintiff further contends Defendant's argument that responding to emergencies is an essential function is not credible because it would prevent disabled workers from working in the facility.

Once Plaintiff establishes a prima facie case of retaliation, the burden shifts to Defendant to demonstrate a legitimate, non-discriminatory reason for the adverse employment action.   *Coons*, 383 F.3d at 887 (citing *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000)).   If Defendant meets this burden, Plaintiff must show that Defendant's proffered reason was a pretext.   *Id.*   Additionally, to prevail on his discrimination claim, Plaintiff must demonstrate he is a "qualified individual", meaning he is able to perform the essential functions of the position with or without reasonable accommodation.   *Buckingham v. US*, 998 F.2d 735, 740 (9th Cir. 1993).   It is Defendant's burden to provide evidence of the essential job functions.   *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 991 (9th Cir. 2007).

Defendant maintains an essential part of Plaintiff's position is responding to emergencies which requires physical presence at the MCC.   Defendant provides the job

description for an engineering technician, Plaintiff's official title, in support.   The job description provides that an engineering technician functions as an engineering advisor to the facilities department and provides administrative support to the facility manager. "Engineer Tech. Position Description", Def's Exh. D at 4 (ECF No. 47-5).   In that capacity, an engineering technician

> plots results of all field surveys and prepares them for tracing and reproduction. He/she works up sketches, drawings of existing structures, and rough drafts of proposed projects as a basis for production of finished drawings.   Drawings may have to be drawn by hand or with computer-aided design work.   Completes plans for proposed projects; such as new structures, building alterations, and shop work to be performed at the local level with institution funds. Completes computer-aided drawings to be submitted to the regional office for approval and funding.   Prepares such working drawings as required to enable personnel engaged in construction projects to proceed with their work, furnishes additional instructions as requested by employees and inmates about work steps, and assists journeyman mechanics in the interpretation of blueprints when necessary.   Collects construction data and samples for testing and analysis.

Along with all other correction instution employees, the engineering technician is responsible for maintaining security of the institution.   *Id*. at 5.   The responsibility is described as preceding "all others required by this position and are performed on a regular and recurring basis."   *Id*.   In addition, an engineering technician handles "custody and supervision of inmates, responding to emergencies and institution disturbances, participating in fog and escape patrols, and assuming correctional officer posts when necessary."   *Id*.

Written job descriptions and an employer's judgment are evidence as to whether a particular function is essential.   29 C.F.R. § 1630.2(n)(3).   However, "an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description." *Rohr v. Salt River Project Agric. Imp. & Power Dist.*, 555 F.3d 850, 864 (9th Cir. 2009) (quoting *Cripe v. City of San Jose*, 261 F.3d 877, 887 (9th Cir. 2001)).   Evidence of the amount of time performing the function, the consequences of not requiring the employee to perform it and

the work experience of past employees and current employees in similar jobs are also considered when determining whether a function is essential.  29 C.F.R. § 1630.2(n)(3). Essential functions are "the fundamental job duties of the employment position. . . but "does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1).

In support of his contention that physically responding to emergencies is not an essential function, Plaintiff points to the testimony of James Pfannenstiel who served as the MCC's human resources manager from 1999 through September 2017.  He testified that responding to an emergency does not mean an employee must "physically fight", just that the employee must respond "in some form or format" to help control inmates. Pfannenstiel Depo. at 143:12-17.  Additionally, Plaintiff attests he responded to only three to four emergencies during the time he worked as an engineering technician.  Romero Decl. ¶ 4.  He further attests that the usual response during an emergency is that notification is first made to staff who carry radios.  *Id*.  If the emergency is not resolved by those staff members, only then are non-radio carrying staff notified by telephone.  *Id*.

The Court finds there is a genuine issue of material fact as to whether physically responding to emergencies is an essential function of the position of engineering technician.   Additionally, Defendant fails to address Plaintiff's request for mold remediation.

**4.   Harassment**

Defendant moves the Court for entry of judgment in his favor "on each of the claims contained in Plaintiff's Third Amended Complaint." MSJ at 2, 12.  In opposition, Plaintiff points out that Defendant does not specifically address his harassment claim.   In reply, Defendant's sole mention of Plaintiff's harassment claim is in a brief footnote that argues Plaintiff's harassment claim fails for the same reasons as his other claims because harassment is simply another form of discrimination and retaliation under these circumstances.  As the party moving for summary judgment, Defendant bears the initial burden of establishing an absence of a genuine issue of material fact, or an absence of evidence to support the non-moving party's case.  *Catrett*, 477 U.S. at 323-25.  The Court

finds that Defendant has not met that initial burden as to Plaintiff's harassment claim. Accordingly, Defendant's MSJ as to Plaintiff's harassment claim is **DENIED**.

**II.  Motions to Exclude Expert Testimony from Trial**

Defendant moves to exclude from trial the expert testimony of Eric Brown and Laurie Chua.  Plaintiff moves to exclude from trial the expert testimony of Andrew Saxon, Laura Fuchs Dolan, and Daniel Farcas.

Under the Federal Rules of Evidence, an expert may testify when it will assist "the trier of fact to understand the evidence or to determine a fact in issue."  FED. R. EVID. 702. Rule 702 requires that the expert's testimony: (1) be based on "sufficient facts or data," (2) "is the product of reliable principles and methods," and (3) the expert provides a "reliable application of the principles and methods to the facts of the case."

The Supreme Court has set forth several factors that may be used in evaluating the propriety of expert opinions, including: (1) whether the expert's theory can be, or has been, tested; (2) whether the theory has been subject to peer review or publication; (3) the technique's known potential rate of error; and (4) the level of theory or technique's acceptance in the community.  *See Daubert v. Merrel Dow Pharmaceuticals*, 509 U.S. 579, 593-94 (1993).  These factors are not exhaustive and do not constitute "a definitive checklist or test." *Id.* at 593.  Rather, they are meant to be helpful in evaluating the admissibility of expert testimony, as the Supreme Court has emphasized the "flexible" nature of the inquiry.  *Id.* at 594; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).  *Kumho Tire* expanded the application of *Daubert* factors to non-scientific testimony "based on 'technical' and 'other specialized' knowledge." *Kumho Tire*, 526 U.S. at 141.

Proponents of the expert witness testimony have the burden of demonstrating the testimony is admissible. *Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

//

//

**A.     Defendant's Motions to Exclude**

**1.     Dr. Eric Brown**

Plaintiff intends on calling Dr. Brown, an industrial hygienist, to testify regarding the extent of mold at the MCC, the hazards associated with mold levels similar to those at the MCC, proper detection and remediation of the mold, and related topics.  Defendant argues that Dr. Brown's opinions should be excluded because they violate Federal Rule of Civil Procedure 26, are not supported by reliable foundation or methodology, are permeated with argument and speculation and contain unqualified medical opinions.

**a.     Exclusion Pursuant to Fed. R. Civ. P. 26**

Defendant argues that Dr. Brown's opinions violate Rule 26 because his expert report does not contain a complete statement of all the opinions he intends to express at trial.  Instead, Defendant contends, Dr. Brown verbally supplemented his report with additional opinions at his deposition and never provided a written supplemental report containing all his opinions.  In response, Plaintiff argues Defendant fails to identify any opinions Dr. Brown made that were not included in his report and maintains all opinions are contained in his report.

A witness who will provide expert testimony at trial must produce a written report containing, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them" as well as "the facts or data considered by the witness in forming them[.]"  FED. R. CIV. P. 26(a)(2)(B).  A party who has made a disclosure under Rule 26(a) "must supplement or correct its disclosure . . . in a timely manner if the party learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." FED. R. CIV. P. 26(e)(1).  A party's duty to supplement disclosures "extends both to information included in the [expert] report and to information given during the expert's deposition." FED. R. CIV. P. 26(e)(2).  However, "[a] party may not cure a failure to disclose an expert opinion in a written report by supplementing the expert's disclosure with later deposition testimony."

*Foshee v. Zuniga*, 2021 WL 1947560, at *8 (N.D. Cal. May 14, 2021) (citing *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008)).  "[W]hile an expert may expand or explain information contained in his or her report during oral testimony, the expert cannot testify as to new opinions not contained in the expert report, even if such opinions were expressed in deposition testimony." *Hambrook v. Smith*, 2016 WL 4084110, at *3 (D. Haw. Aug. 1, 2016) (citing *Chiriboga v. Nat'l R.R. Passenger Corp.*, 2011 WL 2295281, at *5 (N.D. Ill. June 9, 2011)).

Here, Defendant provides portions of Dr. Brown's deposition transcript where he testified, towards the beginning of his deposition, that his report does not contain a complete statement of all the opinions he intends to offer on the reports of Dr. Saxon and Dr. Farcas, and that he would be providing those opinions verbally through deposition testimony.  Brown Depo. at 6:12-8:17 (ECF No. 48-5).  However, Plaintiff's opposition attached other portions of the deposition transcript not provided by Defendant in which Dr. Brown testified that he was changing his prior testimony to instead reflect that all his opinions about Dr. Saxon's report are contained in his report.  Brown Depo. at 20:23-21:19 (ECF No. 57-1).  Even though Dr. Brown did not have Dr. Saxon's report at the time Dr. Brown's report was finalized, he explained that the contents of his report can be correlated and used to address all of Dr. Saxon's opinions.   While there is no testimony from Dr. Brown stating that all his opinions about Dr. Farcas's report are contained in his report, Plaintiff, in his opposition, maintains Dr. Brown's report, similarly, contains all his opinions that contradict those of Dr. Farcas.

Defendant fails to point to any opinion testimony that is not contained in Dr. Brown's report.  Based upon Dr. Brown's testimony and Plaintiff's contention that all Dr. Brown's opinion are contained in his report, the Court finds that Dr. Brown's opinions do not violate Rule 26.

**b.    Reliable Methodology**

Defendant contends Dr. Brown did not conduct an inspection of the MCC or perform any test but, instead, reviewed documents he received from Plaintiff in forming his

opinions.  Defendant further contends Dr. Brown's opinion that hazardous sources of mold remained in the building is speculative because he cites to no reports or other data.

Plaintiff argues Dr. Brown cites to ample evidence of mold being present in the facility to support his opinion.  He contends Dr. Brown did not perform any testing because any current testing would be irrelevant as Plaintiff has not been inside the facility since 2016.

Courts have broad latitude in determining how to test an expert opinion's reliability. *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (citing *Mukhtar v. California State University, Hayward*, 299 F.3d 1053, 1064 (9th Cir. 2002)). The reliability of some expert testimony may focus upon personal knowledge or experience rather than the *Daubert* factors.  *Kumho Tire*, 526 U.S. at 150.  Expert opinion testimony is reliable "if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (quoting *U.S. v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)).

Dr. Brown received his Doctor of Public Health from the University of California, Los Angeles with a specialization in industrial hygiene and has a Master of Public Health degree and a Bachelor of Arts degree in pre-medicine/philosophy.  Brown CV at 5-7 (ECF No. 57-1).  He is certified as an industrial hygienist by the American Board of Industrial Hygiene and is one of four industrial hygiene experts on a twelve-person expert advisory panel that evaluates and recommends updates to the California OSHA permissible exposure limits.  *Id*.  He owns an industrial hygiene consulting firm that provides industrial hygiene consulting services in microbiological hazards such as mold and indoor air quality issues.  *Id*.

In his report, Dr. Brown explains his opinion regarding the industry standards is determined by his observation and experience with remediation "as conducted by the vast majority of public agencies and private institutions."  Brown Report ¶ 4 (ECF No. 48-4). He further explains in reaching his opinions in the instant matter, he reviewed sampling reports, remediation reports, estimates, memos, complaints from 2015-2020, the amended

complaint, Plaintiff's medical records and medical recommendations, the parties' correspondence, OSHA citations and responses, Plaintiff's job description and human resources-related documents and, in light of his "twenty-five years of experience conducting and managing small to large scale mold remediation projects around the country," he evaluated the information and considered it "from the standpoint of an internal health and safety response. *Id.* at 10.  He further lists peer-reviewed publications that support his opinion. *See id.* at 4, 10-11.

The Court finds Dr. Brown's testimony regarding the industry standard for mold remediation which is based on his significant experience and knowledge as an industrial hygienist is reliable and not speculative.

**c.    Use of Terms "Negligence" and "Gross Negligence"**

Defendant maintains Dr. Brown improperly accuses Defendant of negligence when he opines that the occupants of the MCC building were being exposed to elevated levels of mold based upon grossly negligent inspections and remediation.  In response, Plaintiff contends Dr. Brown uses "negligence" and "gross negligence" in the colloquial sense rather than as a legal term and, therefore does not amount to a legal conclusion.  He argues Dr. Brown is not instructing the jury on what result to reach, especially because Plaintiff does not assert a negligence claim.  Plaintiff further contends Dr. Brown provides specific reasoning for his belief that Defendant was negligent or grossly negligent, namely because Defendant fell below the standard of care.

According to his report, Dr. Brown opines the MCC "has multiple ongoing documented ventilation and water intrusion issues, creating chronic, long-term areas of toxic, allergenic, and/or opportunistic mold growth" and suffered short-term water loss events "that have created additional areas of this hazardous mold growth."  Brown Report ¶ 1.  He further opines that industry standard for water loss and subsequent mold growth requires (a) an inspection "by a qualified individual to determine the scope of remediation", (b) "[m]old remediation conducted by a qualified company, separate from the inspection company", and (c) inspection of the site after remediation is complete.  *Id.* ¶ 4.

Additionally, he opines "there were many clear deviations" from the industry standard for inspecting a water loss and subsequent mold growth, "to the point of gross negligence (as worker health and safety was obviously affected by these deviations)" and "grossly negligent deviations" from industry standards for remediation and post-remediation activities which resulted in "a number of hazardous sources of mold contamination" remaining in the building. *Id*. ¶¶ 5-8. Dr. Brown also refers to a recommendation to clean surfaces contaminated with mold with disinfection solutions as "negligent and outside industry standards." *Id*. ¶ 11.

Experts are prohibited from providing an opinion on legal conclusions or ultimate issues of law. *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017). "This prohibition of opinion testimony on an ultimate issue of law recognizes that, '[w]hen an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.'" *Id*. (citing *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)). Plaintiff does not assert a claim for negligence and, therefore, Dr. Brown is not substituting his judgment for the jury. However, use of the terms "negligence" and "gross negligence" neither assists a jury in understanding the evidence or determining a fact in issue and risks confusing a jury. As such, the Court finds it appropriate to permit Dr. Brown to testify regarding industry standards and whether Defendant met those standards but not whether Defendant was negligent.

## d.   Character and Motive

Defendant also argues Dr. Brown improperly attacks the character and motive of witnesses. Plaintiff argues Defendant mischaracterizes Dr. Brown's testimony. He contends Dr. Brown does not directly address the witnesses' credibility, which is not at issue. Instead, Plaintiff argues, Dr. Brown discusses the proper steps for mold testing and remediation and the steps taken by Defendant, and provides opinions on the knowledge and expertise of the MCC's management.

In his report, Dr. Brown states

[i]n October 2016, Facilities claimed that Penicillium present was from bread and coffee, and claims that there was no health risk.  The fact that claims of this ludicrous nature were written and communicated illustrates how obviously unqualified individuals were making grossly-negligent health-based exposure decisions.

Brown Report ¶ 11.  He also states a Workplace Mold memo from Dr. Cohen in 2021 was "misleading and an obvious attempt to downplay the dangerous role mold can have on building air quality."  *Id*.  Opinions regarding motive, state of mind or intent are generally outside the scope of expert testimony because a jury is capable of drawing inferences from the evidence and drawing its own conclusion as to credibility. *United States v. Binder*, 769 F.2d 595, 602 (9th Cir.1985) (overruled on other grounds by *United States v. Morales*, 108 F.3d 1031, 1035 (9th Cir.1997) (*en banc*) ("Expert testimony should not be permitted if it concerns a subject improper for expert testimony, for example, one that invades the province of the jury."); *see also Siring v. Oregon State Bd. of Higher Educ. ex rel. E. Oregon Univ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013) (listing cases in which courts excluded expert testimony regarding the defendant's or witnesses' state of mind, intent, motive).  Accordingly, Dr. Brown is precluded from testifying as to opinions on witnesses' state of mind, intent or motive.

**e.  Medical Opinions**

Defendant contends Dr. Brown's report include medical opinions he is not qualified to make.  In opposition, Plaintiff maintains Dr. Brown relies on Plaintiff's doctors' medical diagnoses and argues Dr. Brown is qualified to discuss the health effects mold can have on a person.  In reply, Defendant argues Dr. Brown's opinions do not merely relate to the health effects mold but draws a specific link between Plaintiff's alleged health problems and the condition of the MCC.

As an industrial hygienist with about 25 years of work experience in the environmental health and safety field, a doctorate degree and master's degree in public health, and a bachelor's degree in pre-medicine/philosophy, the Court finds that Dr. Brown is qualified to testify generally as to the health effects of mold.  However, the Court finds that Dr. Brown is not a medical doctor or expert qualified to interpret Plaintiff's medical

records and give expert opinions that are medical in nature and specific to Plaintiff.

Accordingly, the Court **GRANTS IN PART and DENIES IN PART** Defendant's motion to exclude from trial the expert testimony of Eric Brown.  The Court **GRANTS** Defendant's motion to exclude Dr. Brown's "negligence" opinions; opinions on witnesses' state of mind, intent or motive; and medical opinions about Plaintiff's condition.  Defendant's motion is otherwise **DENIED**.

**2.    Laurie Chua**

Plaintiff intends to call Ms. Chua, a human resources professional, to testify regarding the interactive process and normal and customary practices on accommodating disabled persons.  She will also testify regarding her opinion on whether Defendant followed normal and customary practices and its own policies following Plaintiff's accommodation request.

Defendant seeks an order excluding Ms. Chua's opinions from trial as unreliable.  Specifically, Defendant argues Ms. Chua fails to identify the source of the "customary and standard" practices for which she will testify other than her own experience which, Defendant argues, lacks foundation.  Defendant contends Ms. Chua conducted no independent investigation or research and bases her opinions on her experience with no explanation as to how her experience lead to the conclusions she reached, why that experience is a sufficient basis for her opinions, and how her experience is reliably applied to the facts.  Defendant further contends Ms. Chua makes unsupported assumptions and ignores evidence that does not fit her conclusions.  Defendant argues her report is an improper attempt to argue Plaintiff's case based on selective evidence and her experience.

In opposition, Plaintiff argues Ms. Chua explains the customary and standard human resource practices are based on what professionals do on a daily basis and the Equal Employment Opportunity Commission ("EEOC") and Society for Human Resource Management ("SHRM") provide guidance on those standard practices.  Plaintiff contends Ms. Chua talks about the spirit of the ADA based on its legislative history and its purpose and she relies on the Defendant's accommodation policies in forming her opinions as to

whether Defendant met the standard set out in those policies.

In reply, Defendant argues permitting an expert to testify regarding "human resources practices" is not necessary or helpful.

Ms. Chua received her Bachelor of Business Administration in human resource management and labor relations in 1992 from University of Arkansas At Little Rock and has more than 25 years experience working as a human resources professional.  Chua CV at 24-27 (ECF No. 57-1).  As a human resources professional, she is experienced with disability discrimination, sexual harassment, and other workplace employment practices. *Id.* at 24.  Ms. Chua is an active member of the SHRM which certified her as a senior HR professional.  *Id.*  She  is the owner of an HR consulting business focused on employer coaching and guidance, employment policies and practices, and performance management and termination guidance since 2016 and provided HR expert witness analysis for both plaintiffs and defendants in employment-related litigation in the areas of disability accommodation management, wrongful termination, and medical leave management.  *Id.*

In her report, Ms. Chua explains that during her experience as an human resources professional she was responsible for ensuring that management and employees understood the standards of behavior in the workplace to prevent harassment, discrimination, and retaliation which included compliance with the ADA and the RA.  Chua Report at 3 (ECF No. 49-3).  She further explains she was asked to opine on whether the MCC followed normal and customary practices and its own policies when addressing Plaintiff's disability accommodation request and whether it violated normal and customary practices and its own anti-discrimination, anti-harassment, and anti-retaliation policies after receiving Plaintiff's requests for accommodation and complaints related to workplace discrimination, harassment and retaliation.  *Id.* at 4.

She goes on to opine:

1) MCC did not comlply with its 2019 The DOJ Reasonable Accommodation Policy Statement nor with its 2016 Department of Justice Federal Bureau of Prisons Program Statement on Accommodations, nor with the 2016 DOJ Final Decision, nor within customary and standard human resource practices, nor with conducting the

interactive process in the spirit of the law to enable Mr. Romero with equal access to the benefits of being employed.

2) MCC San Diego Bureau of Prisons did not act in accordance with its own policies, nor within customary and standard human resource practices in providing Mr. Romero with a safe work environment, free from harassment, discrimination, and retaliation.

*Id*. at 5.  Her report discusses what the ADA requires of employers and the DOJ's guidance for compliance with the ADA with regard to reasonable accommodations and undue hardship.  Ms. Chua evaluates witness testimony and the facts of the case in forming her opinions regarding the essential job functions of Plaintiff's position and Defendant's unwillingness to accommodate Plaintiff.  She also discusses Defendant's failure to follow their policies or industry standards to ensure Plaintiff was not harassed, discriminatied nor retailiated against.

Ms. Chua's significant experience and knowledge supports the reliability of her opinions.  *See Kumho Tire*, 526 U.S. at 150; *Primiano*, 598 F.3d at 565.  Additionally, her testimony regarding customary and standard human resources practices, the EEOC and SHRM guidelines, and the MCC's policies is relevant, would be helpful to the jury and is not prejudicial.   Additionally, the information she used and assumptions she made in reaching her opinion may be impeached on cross-examination.  Hangarter, 373 F.3d at 1018 n.14

However, the Court finds some of her purported testimony contains legal and factual conclusions.  Rather than aiding the jury, these opinions impermissibly substitutes her judgment for theirs.  *Diaz*, 876 F.3d at 1197.  Additionally, any direction on the "spirit of the law" invades the province of the Court which is tasked with instructing the jury on the applicable law.  *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004).  Opinion testimony of this character is inadmissible.  Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's motion to exclude Ms. Chua's opinion testimony.

//

**B.      Plaintiff's Motions to Exclude**

**1.      Andrew Saxon, MD**

Defendant intends to have Dr. Saxon, a doctor specializing in clinial immunology and allergy, testify that Plaintiff's medical issues are not due to exposure to molds he may have experienced when working at the MCC.  Plaintiff seeks an order excluding his testimony as unqualified, unreliable, irrelevant and prejudicial.

**a.      Qualifications**

Plaintiff argues Dr. Saxon has no relevant knowledge, skill, experience, training, or education in mold sampling and testing and his numerical approach to airborne spore levels and the hazard they possess is inaccurate and outside his area of expertise.  He contends Dr. Saxon is not an industrial hygienist, does not understand the outside ambient mold levels, and has no experience in reading and interpreting air sampling reports.  As such, he argues Dr. Saxon should not be permitted to testify or render an opinion regarding the level of mold in the MCC, the proper sampling of mold, and whether the mold levels in the MCC caused Plaintiff to suffer health effects.  He further argues Dr. Saxon is not qualified to speak to whether his medical issues were caused by mold because it involves a risk assessment and an exposure assessment for which Dr. Saxon is unqualified.

Defendant argues Dr. Saxon is more than qualified to provide testimony regarding the health effects of mold in general and the specific health problems Plaintiff alleges were caused by mold at the MCC.

According to his expert report, Dr. Saxon received his medical degree in 1972 from Harvard, completed his residency in internal medicine at Habor General Hospital in Los Angeles in 1975, and his post-doctoral training in immunology in the Department of Microbiology and Immunology at UCLA School of Medicine in 1977.  Saxon Report at 1 (ECF No. 50-2).[5]  Dr. Saxon is a licensed physician and is board certified in (1) internal

---

[5] Neither party provided Dr. Saxon's CV, however, the first page of his expert report includes his qualifications.  *See* ECF No. 50-2, Exh. A.

medicine by the American Board of Internal Medicine, (2) allergy and immunology by the American Board of Allergy and Immunology, and (3) diagnostic laboratory immunology by the American Board of Diagnostic Laboratory Immunology. *Id*. Dr. Saxon founded the Division of Clinical Immunology and Allergy in the Department of Medicine at UCLA in 1977 and served as its Chairman for 30 years, and founded the UCLA Asthma, Allergy, and Immunologic Disease Center and served as Director until he retired. *Id*.

Dr. Saxon has published over 190 scientific papers in peer-reviewed journals, served as Editor in Chief of Clinical Immunology and served on peer-review funding committees for the National Institutes of Health and other organizations. *Id*. He explains he is a co-author of the American College of Occupational & Environmental Medicine ("ACOEM") prior Position Statement entitled, "Adverse Human Health Effects Associated with Molds in the Indoor Environment." *Id*. ACOEM represents more than 6,000 physicians and other health care professionals and is the nation's largest medical society of individuals specializing in the field of occupational and environmental medicine. *Id*. He is also a co-author of the American Academy of Allergy Astham and Immunology's ("AAAAI") prior official Position Statement entitled, "The Health Effects of Molds." *Id*. According to Dr. Saxon, the AAAI, with over 5,000 members, is the nation's largest medical subspecialty society specifically dealing with the allergic and immune aspects of mold exposures. *Id*.

Additionally, Dr. Saxon previously testified as a medical expert, including in the Southern District of California. *See* Def's Opp'n at 3 (ECF No. 54) (citing *Padilla v. United States*, No. 17cv1182-BAS, 2021 WL 8532468 (S.D. Cal. Feb. 21, 2021) (providing expert testimony that the plaintiff's alleged lung disease was not caused by mold in his workplace); *McGuire v. Sec'y of Health & Hum. Servs.*, No. 10-609V, 2015 WL 6150598, at *4-5 (Fed. Cl. Sept. 18, 2015) ("Dr. Saxon was qualified as an expert in immunology and diagnostic immunology. His testimony demonstrated that among the people who testified, he was the most knowledgeable about immunology and diagnostic immunology.").

Dr. Saxon is a recognized and qualified expert on the immunological effects of mold

on people's health.  Contrary to Plaintiff's argument, Dr. Saxon is not purporting to be an expert in mold sampling and testing.  He reviewed the testing information provided by others and opines on the levels as relevant to Plaintiff's health.  The Court finds that Dr. Saxon has vast clinical experience, which provides him with extensive knowledge of the forms of disease that occur in humans related to mold and mold exposure.   Based on the foregoing, the Court finds that Dr. Saxon is qualified to testify as an expert witness at trial as to the health effects of mold on Plaintiff.

**b.   Reliability**

Plaintiff argues Dr. Saxon fails to demonstrate the use of any scientific method in reaching his conclusion that Dr. Pohl and Dr. Pearle, both of whom treated Plaintiff, were incorrect in their diagnoses of Plaintiff and never examined, treated or spoke with Plaintiff.  He further argues Dr. Saxon made improper credibility determinations of the treating doctors and did not consider the known or potential rate of error for any of his opinions.  Additionally, Plaintiff contends Dr. Saxon impermissibly opines on Plaintiff's subjective beliefs and has "lost his objectivity" after years of testifying for the defense in mold cases.

Defendant contends Dr. Saxon prepared a detailed medical chronology based on Plaintiff's deposition testimony, medical records, and other documents and argues, along with Dr. Saxon's training and experience, which is a reliable methodology endorsed by numerous courts.  Defendant further contends Plaintiff mischaracterizes Dr. Saxon's mold sampling and maintains Dr. Saxon did not discuss the proper way to collect samples but reviewed and relied on several air sampling tests conducted at the MCC to reach his conclusion that the levels observed were unlikely to cause Plaintiff any adverse health effects.  Defendant also argues Plaintiff's complaint that Dr. Saxon has testified primarily for the defense is a subject for cross-examination, not exclusion.

Dr. Saxon explains in his report that "[t]he basis of [his] testimony includes his education, clinical and basic science training, experience, and review of both basic and clinical studies regarding humans and the immune system" including "basic studies performed in the test tube and in animals regarding mold and related substances," his

"research in human and animal immune reactivity" and "reading in the areas of immunology which includes allergy, autoimmunity, cancer of the immune systems." Saxon Report at 3.  Dr. Saxon also explains his opinions are also based on research, a review of the exhibits, and his clinical experience including the diagnosis and management of patients with immunological related disorders.  *Id.*  Dr. Saxon also relied on literature relating to mold/fungal-related illness in humans, related position statements, guidelines for indoor air quality, articles, environmental records, and case-specific materials including the parties' document productions and deposition testimony.  *Id.* at 3-4.

Dr. Saxon's review of Plaintiff's medical records, deposition testimony and other relevant materials, review of extensive relevant literature and his experience and training render his opinion sufficiently reliable.  *See Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir. 1998), *as amended* (Nov. 12, 1998) (Finding physician's opinion which was based his knowledge, experience, training and education and his review of medical records was not inadmissible even though he did not physically examine the plaintiff); *see also Hopkins v. Dow Corning Corporation*, 33 F.3d 1116, 1125 (9th Cir. 1994) (Concluding expert medical opinion based on review of medical records, clinical experience and relevant studies and literature was a scientifically valid methodology).  Additionally, Dr. Saxon makes credibility determinations and provides no opinion on the proper collection of mold samples.

The Court further finds that the fact that Dr. Saxon has previously testified primarily for the defense is a subject for cross-examination, not a basis for exclusion.  *See U.S. v. Preciado-Gomez*, 529 F.2d 935, 942 (9th Cir. 1976) (Determining the bias of an expert may be examined during cross-examination); *Pat. Category Corp. v. Target Corp.*, 2008 WL 11336468, at *2 (C.D. Cal. July 17, 2008) ("An expert's alleged biases goes to the weight to be afforded to his or her testimony, not to its admissibility.').

**c.    Relevancy and Prejudice**

Plaintiff argues that Dr. Saxon's opinions regarding whether Plaintiff may have been allergic to his dog is irrelevant, and Plaintiff's hyperlipidemia, hypertension, alcohol

consumption, and obesity are irrelevant, as the purpose of raising these issues is to impugn Plaintiff's character.  Defendant argues Dr. Saxon's opinions, which include an analysis of other potential allergens and Plaintiff's overall health, are directly relevant to the issues in this matter.

Dr. Saxon is prepared to testify that Plaintiff's health issues relating to his alleged disability are not the result of mold exposure at the MCC.  *See* Saxon Report at 4, 8 (ECF No. 50-2, Exh. A).   A logical fact-finding inquiry in deciding whether Plaintiff's health issues are the result of mold exposure is the probable alternative causes of Plaintiff's health issues.  Thus, Dr. Saxon's opinions related to alternative causes of Plaintiff's health issues are relevant.  The Court will not make credibility determinations as it is the province of the jury to decide how much weight to give to Dr. Saxon's testimony.  *Anderson*, 477 U.S. at 255.  Thus, the Court finds Dr. Saxon's opinions are relevant and not prejudicial.

For the reasons discussed, Plaintiff's motion to exclude from trial the testimony of Dr. Saxon is **DENIED**.

## 2. Laura Fuchs Dolan, MBA

Ms. Dolan, an economist, was retained by Defendant to rebut the opinions of Plaintiff's damages expert.  Plaintiff seeks to exclude Ms. Dolan opinions as beyond the scope of her rebuttal designation and argues she is not qualified to make determinations regarding Plaintiff's disability.

### a. Scope of Opinion

Plaintiff argues Ms. Dolan's report goes beyond the scope of Rule 26.  Specifically, he argues Ms. Dolan opines that Plaintiff could seek alternative employment outside of the DOJ and discusses the unemployment rates and duration during 2018 in support of her opinion and she subtracts the earnings and benefits Plaintiff received to determine his offset earnings.  Plaintiff argues these are beyond the scope of her rebuttal report because they do not rebut any opinion addressed by Paul Zimmer's expert report for which she was designated to rebut.

Defendant argues Ms. Dolan's report properly addresses the failure of Plaintiff's

1  damages expert to account for mitigation.  Because the methodology Mr. Zimmer used to

2  make that calculation is flawed, Defendant argues, Ms. Dolan's use of the correct

3  methodology to determine the reasonable value of Plaintiff's economic loss is a proper

4  rebuttal opinion.

5  Rule 26 of the Federal Rules of Civil Procedure requires parties to disclose if expert

6  testimony "is intended solely to contradict of rebut evidence on the same subject matter

7  identified by another party['s]" expert report.  Fed. R. Civ. P 26(a)(2)(D)(ii).  Rebuttal

8  expert testimony is limited "to attacking the theories offered by the [other party's] experts."

9  *Int'l Bus. Machines Corp. v. Fasco Indus., Inc.*, 1995 WL 115421, *3 (N.D. Cal. Mar. 15,

10  1995).  "The test of whether an expert's opinion constitutes rebuttal or a 'new' opinion,

11  however, is not 'whether a rebuttal expert employs new testing or methodologies' but

12  instead, whether 'a rebuttal attempts to put forward new theories outside the scope of the

13  report it claims to rebut.'"  *Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.*, 340 F.

14  Supp. 3d 934, 995 (N.D. Cal. 2018) (quoting *Wadler v. Bio-Rad Labs., Inc.*, 2016 WL

15  6070530, *3 (N.D. Cal. Oct. 17, 2016)).  "[A] district court has broad discretion in deciding

16  what constitutes proper rebuttal evidence." *Rent-A-Ctr., Inc. v. Canyon Television &*

17  *Appliance Rental, Inc.*, 944 F.2d 597, 601 (9th Cir. 1991) (citing *Datamatic Servs., Inc. v.*

18  *United States*, 909 F.2d 1029, 1033 (7th Cir.1990)).

19  Plaintiff contends Defendant is improperly using Ms. Dolan as an mitigation expert.

20  However, contrary to Plaintiff's assertion[6], he is required to mitigate damages.  *See Caudle*

21  *v. Bristow Optical Co.*, 224 F.3d 1014, 1020 (9th Cir. 2000), as amended on denial of reh'g

22  (Nov. 2, 2000) (citing 42 U.S.C. § 2000e–5(g)(1));  *Gotthardt v. Nat'l R.R. Passenger*

23  *Corp.*, 191 F.3d 1148, 1157 (9th Cir. 1999) ("A court awarding front pay should consider

24  a plaintiff's ability to mitigate her damages by finding other employment in the future.");

25  *Ford Motor Co. v. E.E O.C.*, 458 U.S. 219, 231 (1982).  Ms. Dolan's discussion regarding

26

27

28  [6] Plaintiff suggests Ms. Dolan's opinion regarding mitigation is irrelevant because his employment was not terminated.

mitigation addresses "a potential flaw" in Mr. Zimmer's calculation of damages which fails to discuss mitigation.  As such, Ms. Dolan's rebuttal opinion does not exceed the scope of Rule 26.

**b.   Qualifications**

Plaintiff argues Ms. Dolan is not qualified to make the determination that Plaintiff did not have a disability and by accepting Dr. Saxon's report regarding Plaintiff's disability status as true over other witnesses' testimony, Ms. Dolan is an advocate for Defendant's cause.  As such, Plaintiff argues, Ms. Dolan's opinion is inadmissible under Rule 702 as an improper evaluation of witness credibility.  He further argues there is no indication that Ms. Dolan is a qualified vocational expert to determine what if any jobs he could have gotten during the relevant time.

Defendant argues Ms. Dolan is qualified to provide the opinions contained in her rebuttal report.  Defendant contends Ms. Dolan calculated Plaintiff's alleged economic damages based on two undisputed facts: (1) Plaintiff suffers no symptoms or other ill effects that prevent him from working when he is not physically present in the MCC; and (2) Plaintiff has not obtained any alternative employment since October 18, 2016.  Defendant contends Ms. Dolan is not opining on any liability issues and her citation to Dr. Saxon's report makes no difference to her economic calculations.

In her report, Ms. Dolan explains she is a principal with Dolan|Xitco which provides litigation support, financial analysis and expert testimony, and she has a bahelor's degree and a masters degree in Business Administration from Loyola Marymount University.  Dolan Report at 1 (ECF No. 51-2, Exh. E).  She also explains she provided expert testimony regarding claims of economic loss in federal court, various California state superior courts, and state superior courts in Alaska, Arizona, Hawaii, Nevada, North Carolina, Oregon, and Washington.  *Id*.  Ms. Dolan opines that based on her understanding of Dr. Saxon's opinion that Plaintiff's complaints are not due to exposure to mold or other materials he may come into contact with while working at the MCC, there is no economic loss.  *Id*. at 3-4.  She further opines that, assuming Plaintiff is unable to work at the MCC due to mold exposure,

Plaintiff was capable of seeking alternative employment outside of the DOJ and, based on research from the Bureau of Labor Statistics she calculated potential economic loss to rebut Mr. Zimmer's opinion.  *Id*. at 4-5.  Ms. Dolan explains how she reaches her opinion including information on loss of earnings and benefits, offset earnings and worker's compensation benefits.  *Id*. at 5-9.

Ms. Dolan's report does not make a determination as to whether Plaintiff has a disability nor does she make witness credibility determinations.  Instead, she makes certain assumptions based on other's opinions and information received regarding Plaintiff's claims.  Ms. Dolan's use of assumptions does not make her opinions inadmissible.  *See Mighty Enters., Inc. v. She Hong Indus. Co.*, 745 F. App'x 706, 709 (9th Cir. 2018) (citing *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013). Rather, the information used and assumptions made may be impeached on cross-examination.  Hangarter, 373 F.3d at 1018 n.14 (quoting Children's Broad. Corp. v. Walt Disney Co., 357 F.3d 860, 865 (8th Cir. 2004)).

Accordingly, Plaintiff's motion to exclude the testimony of Ms. Dolan is **DENIED**.

## 3.   Daniel Farcas, PHD

Defendant designated Dr. Farcas, an industrial hygienist employed by the MCC, as a non-retained expert to respond to the opinions of Plaintiff's mold expert, Dr. Brown, and to provide opinions regarding the environmental safety conditions and mold levels at the MCC.  Plaintiff argues that Dr. Farcas's opinions should be excluded on the grounds that he is not qualified as a mold expert, and his opinions are irrelevant, unreliable and prejudicial.

### a.   Qualifications

Plaintiff argues that Dr. Farcas does not have the required knowledge, skill, experience, training or education to qualify as an expert regarding the mold levels at the MCC.  Specifically, Plaintiff argues that Dr. Farcas only has "a few years" of experience conducting mold testing, has never had any specific education in mold testing beyond taking a five-day mold inspection class, has never worked under an expert mentor and he

has never testified in court or been designated as an expert. Plaintiff further contends Dr. Farcas does not have requisite knowledge of the facts of the case and admits he is not qualified to have any expert opinions regarding the health effects of mold.

In opposition, Defendant contends Dr. Farcas is qualified to provide expert testimony as to Plaintiff's allegation that the MCC was infested with mold and was unsafe, given his experience and background.

Dr. Farcas received his doctorate degree in 2015 from West Virginia University with a major in human and community development and a minor in industrial hygiene. Farcas CV at 5 (ECF No. 52-2). Dr. Farcas also has a master's degree in forestry with a minor in chemistry, and a bachelor's degree in chemistry with a minor in biochemistry. *Id*. at 6. He has more than 20 years of experience in conducting scientific research and leading production teams in various fields, including public health, infection control, nanotechnology, mold remediation, silica, and asbestos including work as an industrial hygienist with the BOP, Windjammer Environmental, LLC, and Hillis-Carnes Engineering Associates, and work at the Center for Disease Control and Prevention and Cira and Associates Consulting, LLC. *Id*. at 1-4. As an industrial hygienist, Dr. Farcas has inspected workplace premises and tested indoor air quality levels for assessing nuisances like mold to identify and evaluate hazardous work operations and conditions. *Id*. at 1-3. He has also authored or co-authored numerous scientific manuscripts in peer-reviewed journals and books in the field of industrial hygiene and safety. *Id*. at 1, 6-7.

In his current position as an industrial hygienist with the BOP, Dr. Farcas "works jointly with [BOP] environmental and safety personnel, along with Federal Prison Industry's staff to prevent and/or detect and resolve concerns with industrial hygiene including but not limited to exposure to chemicals and physical forces." *Id*. at 1.

Based on his education and experience, the Court finds that Dr. Farcas is qualified to testify as an expert at trial about the mold levels at the MCC.

**b. Reliability**

Plaintiff argues that Dr. Farcas's opinions are not based on reliable and generally

accepted methodologies. Specifically, Plaintiff argues that he fails to compare the initial sampling with any post-remediation sample, and he relies solely on air sampling from EMLab that states it is not to be used as a sole outdoor/indoor comparison. Additionally, Plaintiff argues that Dr. Farcas's opinion stating, if there are less mold spores inside than outside then it is acceptable, is not a generally accepted standard in the industry, as there are a number of different factors that must be considered. Plaintiff further contends Dr. Farcas is not an objective expert as evidence by review of sampling taken prior to remediation efforts, failure to conduct his own sampling and that he was required, as an employee, to provide testimony.

In opposition, Defendant contends Plaintiff's argument that Dr. Farcas' methodologies are unreliable because Dr. Brown's testimony disagrees with the methods amounts to a difference of opinion which does not justify exclusion. Defendant similarly argues Plaintiff's suggestion that Dr. Farcas is not an objective expert is an improper basis to exclude his testimony because alleged bias goes to the weight, not the admissibility of his opinions.

Plaintiff cites no authority for his argument that Dr. Farcas's opinions are not based on reliable and generally accepted methodologies and industry standards beyond Dr. Brown's disagreement. Plaintiff's expert's challenges to Dr. Farcas' methodology is properly addressed on cross-examination and does not support exclusion. Additionally, alleged bias goes to the weight, not the admissibility of his opinions, and is appropriately addressed during cross-examination. *Preciado-Gomez*, 529 F.2d at 942.

For the reasons discussed, Plaintiff's motion to exclude from trial the testimony of Dr. Farcas is **DENIED**.

## **CONCLUSION AND ORDER**

For the foregoing reasons IT IS HEREBY ORDERED:

1.   Defendant's motion for summary judgment, (ECF No. 47), is **GRANTED IN PART and DENIED IN PART**. Defendant's motion as to Plaintiff's retaliation claim for compensatory damages is **GRANTED**. Defendant's

MSJ is otherwise **DENIED**.

2.     Defendant's motion to exclude expert testimony of Eric Brown, (ECF No. 48), is **GRANTED IN PART and DENIED IN PART**.  The Court **GRANTS** Defendant's motion to exclude Dr. Brown's "negligence" opinions, opinions on witnesses' state of mind, intent or motive and medical opinions about Plaintiff's condition.  Defendant's motion is otherwise **DENIED**.

3.     Defendant's motion to exclude expert testimony of Laurie Chua, (ECF No. 49), is **GRANTED IN PART AND DENIED IN PART**.  The motion is **GRANTED** as to legal and factual conclusions.  The motion is otherwise **DENIED**.

4.     Plaintiff's motion to exclude expert testimony of Andrew Saxon, MD, (ECF No. 50), is **DENIED**.

5.     Plaintiff's motion to exclude expert testimony of Laura Fuchs Dolan, MBA, (ECF No. 51), is **DENIED**.

6.     Plaintiff's motion to exclude expert testimony of Daniel Farcas, PHD, (ECF No. 52), is **DENIED**.

DATED:  March 13, 2024

_____

JOHN A. HOUSTON
UNITED STATES DISTRICT JUDGE