1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT

9          SOUTHERN DISTRICT OF CALIFORNIA

10

11   | FRANCISCO ROMERO,                    | Case No.:  3:19-cv-02138-JAH-DTF
12   |                    Plaintiff,         |
                                              **ORDER ON MOTIONS IN LIMINE.**
13   | v.                                   |
                                              **ECF Nos. 92, 93, 94, 95, 96, 97, 98, 99,**
14   | MERRICK B. GARLAND, Attorney         | **100, 101, 102, 103, 105,**
15   | General of the United States, et al.,|
16   |                    Defendants.        |

17

18                          __BACKGROUND__

19          Plaintiff is an engineering technician and correctional officer who has worked at

20   Metropolitan Correction Center ("the MCC") in San Diego since 1991.  ECF No. 28

21   ("TAC").   On May 27, 2015, while at work in the basement of the MCC, Plaintiff started

22   sweating, coughing, feeling dizzy, and began vomiting.   Pl.'s Decl. ¶ 6 (ECF No. 65-2);

23   Pl.'s Depo at 30:6-11.   Plaintiff left work and went to an urgent care facility where he was

24   given medication for vertigo and motion sickness.  Pl.'s Depo at 32:14-33:10.     The next

25   day, Plaintiff visited his primary care physician, Dr. Ellen Blando, who diagnosed Plaintiff

26   with a viral infection in his inner ear, causing Plaintiff to experience severe vertigo.   Pl.'s

27   Decl. ¶ 7. Plaintiff took sick leave and returned to work on or about June 8, 2015.  *Id.* ¶ 8;

28

Pl.'s Depo. at 33:17-18.

Upon Plaintiff's return to work, he experienced dizziness, a scratchy throat, wheezing in his chest, coughing, and equilibrium, and memory issues.    Pl.'s Decl. ¶ 8. Plaintiff told his supervisor, Noel Fenlon, that he was feeling sick.    *Id.*    According to Plaintiff, he also had a conversation with his coworker who told Plaintiff that his wife had similar symptoms and was sick from mold.    *Id.*    A few days later, Plaintiff went to a hospital emergency room because he was feeling sick again.    *Id.*    Plaintiff then set out mold testing kits at the MCC that he purchased from Home Depot.    *Id.*    Those tests indicated the presence of mold, which Plaintiff showed to his supervisor.    *Id.;* Pl.'s Depo. at 45:1-25.    According to Plaintiff, his supervisor told him that a company would be hired to do mold testing at the MCC.    Pl.'s Depo. at 45:21-46:2.

The following week, on June 25, 2015, Plaintiff filed a worker's compensation claim styled as a "Notice of Traumatic Injury" with the U.S. Department of Labor's Office of Workers' Compensation Programs for exposure to mold on May 27, 2015, in the MCC basement.    Federman Decl. ¶ 4, ECF No. 65-3.

On or about July 13, 2015, the MCC received mold air sampling test results from an independent contractor that confirmed there was mold in the basement.    Pl.'s Decl. ¶ 1.    Plaintiff then spoke to Associate Warden Salazar and told him that he needed to get out of the basement due to his becoming sick there.    *Id.* at ¶ 12.    On or about August 11, 2015, Plaintiff's workstation was moved from the basement to a first-floor conference room.    *Id.*

Plaintiff then spoke to Associate Warden Salazar and told him that he needed to get out of the basement because he kept getting sick.    *Id.* at ¶ 12.    On or about August 11, 2015, Plaintiff's workstation was moved from the basement to a first-floor conference room.    *Id.*

On August 17, 2015, Plaintiff began seeing an occupational medicine physician, Dr.

2

Lawrence S. Pohl, in connection with his worker's compensation claim. *Id.* ¶ 15; Pl.'s Depo. at 67:4-14; Pohl Decl. ¶¶ 3, 4 (ECF No. 65-4).   Dr. Pohl interviewed Plaintiff, reviewed his clinical history, examined him, and determined his symptoms "could be" attributed to the mold in the MCC's basement.   Pohl Decl. ¶ 4.   Dr. Pohl diagnosed Plaintiff with Rhinitis, nasopharyngitis, cough, shortness of breath, memory loss, and unspecified peripheral vertigo.   *Id.*   Dr. Pohl determined that "it was more probable than not that [Plaintiff's] respiratory symptoms were related to the overgrowth of mold in [the MCC], and that [Plaintiff] had an allergy to molds."   *Id.*   Dr. Pohl prepared a report recommending that Plaintiff be accommodated at work by not working in the basement and away from mold exposure. *Id.* at ¶¶ 4-5.[1]

In late October 2015, according to Plaintiff, Associate Warden Salazar began telling him that he would have to move back to the basement.   Pl.'s Decl. ¶ 17.   On November 19, 2015, Plaintiff's primary care physician, Dr. Blando, referred him to have allergy testing, but he was not tested for mold allergies.   *Id.* ¶ 18.   Dr. Blando also wrote a letter stating that Plaintiff has

> been suffering from recurrent allergies and asthma symptoms for years. He also has developed vertigo that makes him unsteady. When transferred to his current work area [on the first floor of the MCC], away from his old workplace [in the basement], his symptoms has [sic] dramatically improved. It is therefore requested that he be allowed to stay in his current location for maintenance of his health.

Damiani Decl., Exh. 9 (ECF No. 65-5).   Plaintiff provided Dr. Blando's letter to the MCC, and he remained working on the first floor.   Pl.'s Decl. ¶¶ 18-19.

Between July 26, 2016 and October 14, 2016, Plaintiff visited Dr. Pohl three times because he was coughing, had nasal congestion, difficulty breathing, was feeling dizzy,

---

[1] Plaintiff continued to see Dr. Pohl and his colleague, Dr. Chandri Raval, for a series of follow up appointments from August 24, 2015 to April 30, 2018.  Pohl Decl. ¶¶ 6-17

3:19-cv-02138-JAH-DTF

unbalanced, and unable to concentrate.   Pl.'s Decl. ¶¶ 30-32.   Dr. Pohl referred Plaintiff to see a neurologist and otolaryngologist for Plaintiff's vertigo and memory loss as related to sick building syndrome. Pohl Decl. ¶9; Pl.'s Decl. ¶¶ 31-32.   On October 14, 2016, Dr. Pohl wrote a letter for Plaintiff to give to the MCC, explaining he had treated Plaintiff for over a year due to issues from exposure to mold and opining Plaintiff "should not be allowed to work in areas that have been tested positive for mold by the Safety Officer or Union." Pohl Decl. ¶ 10, Exh. 2.

On October 18, 2016,   Plaintiff gave Dr. Pohl's letter to the MCC's Safety Department. Pl.'s Decl. ¶ 33.   Plaintiff also took a leave of absence and requested that the first-floor office and other areas on the first floor be tested for mold because he was continuing to feel sick.   *Id.* According to Plaintiff, while on leave on November 2, 2016, a representative of the MCC's Safety Department called Plaintiff and stated that the basement is clear, and Plaintiff needed to return to work in the basement per the orders of Associate Warden Salazar and Mr. Fenlon.   *Id.* ¶ 34.   Plaintiff then sent an email to the Warden, Associate Warden, the MCC's Safety Department, and Mr. Fenlon, requesting accommodations for Plaintiff's disability as provided by his doctors and requested a written response.   *Id.*   Plaintiff remained on leave.

On November 18, 2016, Plaintiff reported to Dr. Pohl that he was still experiencing symptoms, but they improved with being away from the mold at the MCC for a month.   *Id.* ¶ 36; Pohl Decl. ¶ 11.   Dr. Pohl wrote another letter stating Plaintiff "should not be allowed to work in areas that may or may not have tested positive for mold. [Plaintiff] may not walk by/below/above/next to areas that have had mold until remediation is complete. [Plaintiff] has a very low tolerance to the physical effects of mold and this mold exposure has caused him much distress and is harmful to his medical health."   *Id., * Exh. 3.

On November 25, 2016, Plaintiff requested leave without pay from the MCC so that he could get put on workers' compensation, which the MCC approved 28 business

3:19-cv-02138-JAH-DTF

days after receiving the request.   Pl.'s Decl. ¶ 37.   While on leave, Plaintiff continued seeing Dr. Pohl for follow-up appointments.   *Id.* ¶¶ 39, 43.   Overall, Dr. Pohl assessed Plaintiff for Bronchospasm, Rhinitis, and exposure to mold.   Pohl Decl. at ¶ 14.   On June 7, 2017, Plaintiff visited Dr. Pohl and reported that he was feeling better overall, but still had occasional haziness.   *Id.* ¶ 15; Pl.'s Decl. ¶ 43.   Dr. Pohl determined that Plaintiff could return to work, but needed to avoid areas where mold was present.   Pohl Decl. ¶ 15.   On July 25, 2017, Plaintiff visited Dr. Pohl again and Dr. Pohl assessed him for exposure to mold, Rhinitis, throat irritation, and persistent headaches.   Pl.'s Decl. ¶ 44; Dr. Pohl Decl. at ¶ 16.   Dr. Pohl determined that Plaintiff "had reached a period of maximal medical improvement but still needed future medical care in the form of medication for Rhinitis and throat irritations and follow up visits with pulmonary specialist or occupational specialist", and Plaintiff "still needed to avoid areas where mold was present."   *Id.*

On August 18, 2017, Plaintiff received a memorandum from Marco Sanchez, Union Vice President of the American Federation of Government Employees, that explained,

> the majority of identified mold found throughout the MCC has not been remediated. Approximately 80% of identified mold still exist [sic] in the building. A large amount of mold exist [sic] in the approx. 296 plumbing closets/air plumes located throughout the building. This remediation project is expected to start in November and last approx. 200 days plus. I have requested to Associate Warden R. Garcia and Safety Manager J. Hendrickson (July 19, 2017) that the Union be provided with a written procedure on how these areas are going to be cleared/deemed safe for staff to work/occupy upon completion of this remediation project. As of today, no procedure or plan has been provided to the union.

Damiani Decl., Exh. 50.

On September 1, 2017, Plaintiff contacted Equal Employment Opportunity ("EEO") Counselor Jose Bautista to start the process of filing a formal complaint of discrimination, harassment, and retaliation against the Bureau of Prisons ("BOP").   Pl.'s Decl. ¶ 46.   He filed a formal complaint of discrimination and retaliation with the United States Department of Justice ("DOJ") on October 17, 2017.   Damiani Decl., Exh. 5.

3:19-cv-02138-JAH-DTF

On December 6, 2017, Plaintiff saw Dr. Edward C. Federman, a pulmonologist, in connection with his worker's compensation claim, at the request of the Department of Labor.   Pl.'s Decl. at ¶ 49; Dr. Federman Decl. ¶ 4.   Dr. Federman conducted an examination of Plaintiff to provide a pulmonary second opinion related to his occupational injury and illness.   Federman Decl. ¶ 4.   Dr. Federman determined that Plaintiff "had allergic asthma with mild reversibility on pulmonary function testing, consistent with [Plaintiff's] clinical history and symptomatology from mold exposure." *Id.* ¶ 7.   Dr. Federman also determined that Plaintiff had "mild obstructive airway disease, which explains his symptoms of coughing, wheezing, shortness of breath, and tightness in his chest. *Id.* ¶ 8. Dr. Federman further determined that Plaintiff continues to suffer from fatigue and dyspnea (shortness of breath) with exertion; limited exercise tolerance on the basis of his coughing and wheezing; and Plaintiff's allergic asthma and mild obstructive airway disease impaired his ability to breath.   *Id.*   Based on Plaintiff's medical history and diagnostic test results, Dr. Federman determined that the most probable cause of Plaintiff's condition was workplace exposure to mold and recommended that Plaintiff avoid mold exposure.   *Id.* ¶¶ 9-10.   Dr. Federman also noted "[a] person can have a toxic reaction to mold without necessarily having an allergy to mold." *Id.* ¶ 10.

On March 26, 2018, Plaintiff received a letter from Associate Warden Dulgov in which he proposed that Plaintiff be removed from his position for excessive absences.   Pl.'s Decl. ¶ 50; Damiani Decl., Exh. 19.   On April 25, 2018, Plaintiff met with Warden Williams regarding Associate Warden Dulgov's letter, and no action was taken to remove him.   Pl.'s Decl. ¶ 51.

Plaintiff received a letter, dated April 18, 2019, from his new supervisor, Facilities Manager Kyle Ball, demanding that Plaintiff return to work.   *Id.* ¶ 54; Damiani Decl., Exh. 30.   In response, Plaintiff sent a memorandum to the Warden and Mr. Ball, dated April 22, 2019, requesting the institution test any areas he will be working in for mold before he

1 returned to work.   Damiani Decl., Exh. 23.   The next day, Plaintiff met with the Warden.
2 Pl.'s Decl. ¶ 55.

3        On September 3, 2019, the DOJ issued a Final Agency Decision ("FAD") on
4 Plaintiff's employment discrimination complaint against the BOP.   Damiani Decl., Exh.
5 17.   The DOJ found that the BOP did not fulfill its obligations to Plaintiff under the
6 Rehabilitation Act, as the BOP did not adequately engage in the interactive process with
7 Plaintiff to devise reasonable accommodation.   *Id.*   As such, the DOJ determined Plaintiff
8 was subjected to disability discrimination when BOP officials failed to fully engage in the
9 interactive process by not responding to Plaintiff's requests for certification showing that
10 the mold in the workplace had been remediated.   *Id.*   The DOJ instructed the BOP and
11 Plaintiff to promptly resume the interactive process and exchange information and
12 documentation relating to the MCC's mold remediation and Plaintiff's medical condition,
13 to restore to Plaintiff 28 days of medical leave, and directed the BOP to submit a report on
14 the status of the implementation of the relief ordered within 90 days of the decision.   *Id.*

15 **I.   Procedural History**

16        Plaintiff originally filed a complaint against Attorney General William Barr, Federal
17 Bureau of Prisons, Director Kathleen Hawk Sawyer, United States Department of Justice,
18 and DOES 1-100, on November 6, 2019, for disability discrimination, failure to engage in
19 interactive process, failure to accommodate disability, and retaliation.   ECF No. 1.   On
20 April 13, 2020, the parties filed a joint motion for leave for Plaintiff to file a first amended
21 complaint, which the Court granted.   ECF Nos. 9, 11.   Plaintiff then filed a first amended
22 complaint.   ECF No. 16.

23        Defendants moved to dismiss Plaintiff's first amended complaint. ECF No. 19.   The
24 Court denied the motion to dismiss and granted Plaintiff's request for leave to file a second
25 amended complaint to name the proper defendant.   ECF No. 24.   On May 28, 2021,
26 Plaintiff filed a second amended complaint and the parties, later, filed a joint motion for
27
28

leave for Plaintiff to file a third amended complaint, which the Court granted.    ECF Nos. 25-27.

On June 10, 2021, Plaintiff filed the operative third amended complaint ("TAC") alleging claims for disability discrimination, harassment based on disability, and retaliation.    ECF No. 28.  Defendant filed an answer.

On October 19, 2022, Defendant filed a motion for summary judgment ("MSJ") and two motions to exclude expert testimony from trial.  ECF Nos. 47-49.  On March 13, 2024, the Court issued an order granting in part and denying in part Defendant's MSJ.  *See* ECF No. 73.    The Court granted Defendant's MSJ as to Plaintiff's retaliation claim for compensatory damages and denied it as to Plaintiff's other claims.  *Id.* at 20.

On November 22, 2024, the Parties filed a combined twelve motions *in limine.  See* ECF Nos. 92-102, 105.   An opposition was filed in response to each of the motions and several also warranted replies.

## **LEGAL STANDARD**

There is no express authority in either the Federal Rules of Civil Procedure or the Federal Rules of Evidence for motions *in limine,* but such motions are recognized in practice and in case law.   *See Ohler v. United States,* 529 U.S. 753, 758 (2000); *United States v. Cook,* 608 F.2d 1175, 1186 (9th Cir. 1979).  Authority for these motions may also be implied through "the court's inherent power to manage the course of trials."   *Luce v. United States,* 469 U.S. 38, 41 (1984).   A motion *in limine* is "any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered."    *Id.* at 40.   The purpose of a motion *in limine* is to avoid the futile attempt to "unring the bell" when highly prejudicial evidence is offered and then stricken at trial.  *See McEwen v. City of Norman, Okla.,* 926 F.2d 1539, 1548 (10th Cir. 1991). The trial court has broad discretion to grant or deny motions *in limine* and the decision is rarely disturbed on appeal.   *United States v. Rambo,* 74 F.3d 948, 955 (9th Cir. 1996);

8

1    *Galindo v. Tist,* 971 F.2d 1427, 1429 (9th Cir. 1992).   A decision on a motion *in limine* is

2    not binding on the trial judge; the decision may be altered based on evidence presented at

3    trial.   *Ohler,* 529 U.S. at 758.     Thus, an objection may be made (or the evidence may

4    be offered) at trial even if it falls within the scope of the court's *in limine* ruling.   *See*

5    *United States v. Connelly,* 874 F.2d 412,416 (7th Cir. 1989).

**DEFENDANT'S MOTIONS IN LIMINE**

**I.  Defendant's Motion to Exclude Final Agency Decision (ECF No. 92)**

    **A. Factual Background**

       Prior to this lawsuit, Plaintiff participated in an administrative process to resolve the

issues between him and the MCC.   As part of that administrative process, on September 3,

2019, the Department of Justice issued a Final Agency Decision ("FAD").   The FAD found

Plaintiff "was subjected to disability discrimination when BOP officials failed to fully

engage in the interactive process by not responding to [Plaintiff's] repeated requests for

certification showing that the mold in the workplace had been remediated."   However, the

FAD also concluded Plaintiff was not entitled to compensatory damages because there was

no evidence of "bad faith".

       The FAD instructed the Parties to resume the interactive process, requiring the DOJ

to provide Plaintiff with the most recent mold remediation certification and requiring

Plaintiff to provide the DOJ with medical documentation detailing the threshold of mold

that affects his condition.   Defendant claims it complied with the FAD and Plaintiff did

not. Plaintiff filed this lawsuit on November 6, 2019.

    **B. Discussion**

       Defendant argues the FAD should be excluded, first, because the Plaintiff chose to

reject the FAD and subject his claim to *de novo* review by filing this lawsuit, and second,

because it has the potential to cause delay and prejudice against Defendant in violation of

FRE 403.   ECF No. 92.   Each issue will be discussed in turn.

9

1

### i.  Whether Plaintiff Can Use FAD After Choosing to File Lawsuit

2

3    Defendant argues Plaintiff cannot use the FAD as a sword or shield because Plaintiff

4    "chose to reject the FAD when he filed this lawsuit, exposing every element of his claims

5    to de novo review."  ECF No. 92 ("MIL 1 ") at 3.   In support, Defendant cites a myriad of

6    cases demonstrating courts are to review agency decisions *de novo* when a federal

7    employee challenges an administrative disposition of his discrimination claim.    *Id.*

8    Defendant cites to *Carver v. Holder,* where the Ninth Circuit held "[A] civil action

9    [challenging a FAD] must be de novo, putting at issue both the [administrative agency's]

10   liability determination - i.e., its decision that an agency has acted in a discriminatory

11   manner -  and its finding with regard to remedies."   606 F.3d 690, 696 (9th Cir. 2010).

12   Plaintiff does not contest that his claims are subject to *de novo* review.  This Court

13   acknowledged that "[t]his discrimination action is a civil action that requires a *de novo*

14   review" in its Order Granting in Part and Denying in Part Defendant's Motion for

15   Summary Judgment.   ECF No. 73 at 11.   The fact that Plaintiff's action is entitled to

16   *de novo* review and the FAD is not binding in this lawsuit does not automatically

17   preclude the FAD from being admissible.   *See Plummer v. Western Int'l Hotels Co.,*

18   656 F.2d 502, 504 (9th Cir. 1981) (reversing the district court's exclusion of an EEOC

19   reasonable cause determination as evidence of discrimination, and holding "while prior

20   administrative determinations are not binding, they are admissible evidence").

21   Therefore, the Court looks to FRE 403 considerations to determine whether the FAD

22   is admissible in this case.

### ii.  Whether FAD is Unfairly Prejudicial Under FRE 403

23   Defendant argues the admission of the FAD would require Defendant to

24   "attempt to expose the weaknesses of the report," which may "confuse or mislead the

25   jury and result in an undue waste of time."  MIL 1 at 5.  Defendant further claims the

26   FAD creates "substantial prejudice by allowing Plaintiff to argue that discrimination

27

28

has already been established and is likely to mislead the jury into believing they have no duty to independently evaluate the evidence." *Id.* at 4-5.  Finally, Defendant argues the FAD will create a "trial within a trial" as to "what the FAD means, what evidence was in front of the Adjudication Officer when the FAD was decided, and whether the relief ordered was appropriate."  *Id.* at 5.  Plaintiff fails to directly respond to Defendant's prejudice argument, but Plaintiff does distinguish most of Defendant's cases, asserting that the cases involve decisions made by a third-party administrative agency (such as the EEOC), whereas here, the administrative agency responsible for the FAD is the Defendant.   ECF No. 108 ("MIL 1 Opp'n") at 4.

FRE 403 allows the court to exclude relevant evidence only if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time or needlessly presenting cumulative evidence."  Though the Ninth Circuit held the district court erred in excluding the EEOC's probable cause determination in *Plummer,* it later drew a distinction between the potential for unfair prejudice when introducing a probable cause determination as opposed to a FAD.  Defendant cites the followingf cases to support its argument that any probative value of the FAD is substantially outweighed by the risk of unfair prejudice.

In *Gilchrist v. Jim Slemons Imports, Inc*., the plaintiff began working for the defendant as a car salesman but was later promoted to manager.  803 F.2d 1488, 1491 (9th Cir. 1986).  After ten years, the defendant consolidated two of its locations into one and decided only one of the managers was necessary to operate both locations.  *Id.*  The defendant consequently terminated the plaintiff, who was 58 years of age, after which the plaintiff sued for age-based discrimination. At trial, the district court admitted an EEOC letter of violation, which determined the defendant had "discriminated against" the plaintiff. Id. at 1499.  On appeal, the Ninth Circuit distinguished its holding in *Plummer*

(that plaintiffs have a right to introduce an EEOC probable cause determination in Title VII lawsuits), holding letters of violation pose a greater risk of prejudice because "a jury may find it difficult to independently [evaluate] evidence of age discrimination after being informed that the EEOC has already examined and found a violation." Id. at 1500. However, in light of the district judge's instruction that "[t]he letter need be given no greater weight than any other evidence in deciding the age discrimination claim" and that "[you], the jury, and not the EEOC are the sole judges of whether or not there was a violation," the Ninth Circuit found no error. Id.

In *Beachy v. Boise Cascade Corp.,* the plaintiff worked for the defendant as an accountant. 191 F.3d 1010, 1011-12 (9th Cir. 1999). Thirteen years into her employment, the plaintiff was involved in an automobile accident that caused serious injuries. Id. at 1012. Shortly thereafter, the defendant began posing reprimands for plaintiff's poor attitude and performance at work, eventually leading to an unfavorable annual performance review and her termination. Id. Before trial, the plaintiff sought to exclude an Oregon Bureau of Labor and Industries "Notice of Dismissal," the equivalent of a FAD, that determined the agency would not proceed with her case. Id. at 1014. The plaintiff argued the agency decision would be 1) unfairly prejudicial and 2) confuse the jury. Id. at 1015. The trial court admitted the agency decision over the plaintiff's objection. Id. On appeal, the Ninth Circuit distinguished its holding in *Plummer* (that plaintiffs have a right to introduce an EEOC probable cause determination in Title VII lawsuits), holding: "[t]here is a much greater risk of unfair prejudice involved in introducing a final agency ruling as opposed to a probable cause determination, because a jury might find it difficult to evaluate independently evidence of discrimination after being informed of the investigating agency's final results." Id. at 1015 (citing *Gilchrist v. Jim Slemons Imports, Inc.,* 803 F.2d 1488, 1500 (9th Cir. 1986)). Nevertheless, the Ninth Circuit affirmed the

3:19-cv-02138-JAH-DTF

judgment of the district court, explaining any error in admitting the agency decision was harmless.  *Id.* at 1016.

In *EEOC v. Manville Sales Corp.,* the plaintiff worked for the defendant as a fiberglass sales representative.   27 F.3d 1089, 1091 (5th Cir. 1994).    Later, the defendant hired a new manager, who decided that the area covered by three sales representatives could be covered effectively by only two.   *Id.*    The new manager decided the plaintiff would be the sales representative to be terminated and the remaining two would absorb his territory.  *Id.* at 1092.  Plaintiff filed a complaint with the EEOC, claiming his termination was motivated by age discrimination.   *Id.*    At trial, the district court granted the defendant's request to exclude a "letter of violation" from the EEOC.   *Id.*    On appeal, the Fifth Circuit agreed with the Ninth Circuit's holding in *Gilchrist* that a letter of violation "represents a determination by the EEOC that a violation of the Act has occurred and thus results in a much greater possibility of unfair prejudice" and that "[t]he probative value of a letter of violation may not, in every case, outweigh the potential for prejudice."   *Id.* at 1095 (quoting *Gilchrist v. Jim Slemons Imports, Inc.,* 803 F.2d 1488, 1500 (9th Cir. 1986)).   The Fifth Circuit then upheld the district court's decision to exclude the letter, explaining there was no abuse of discretion.  *Id.*

In *Lang v. Kohl's Food Stores, Inc.,* the plaintiff represented a class of women working in the bakery and deli departments of the defendant's grocery store, who sued defendant by asserting they were paid less than the male-dominated produce department workers.   217 F.3d 919, 922 (7th Cir. 2000).    Before trial, the plaintiff obtained a favorable motion in limine decision excluding an EEOC report that determined there was no discrimination.  *Id.* at 926.   However, at trial, the plaintiff's counsel opened the door and put the report at issue.  *Id.*   At that point, the district judge informed the jury that the EEOC had made a determination that the defendant had not discriminated

against the plaintiffs. *Id.* at 926. At the plaintiff's request, the judge also informed the jury that the EEOC rescinded its determination for reconsideration. *Id.* However, the plaintiff filed the lawsuit before the EEOC issued a new determination. *Id.* Upon appeal, the Seventh Circuit found "[d]ecisions by public bodies do not vanish into thin air or become un-documents [sic] when parties ask for reconsideration or settle their differences." *Id.* at 927. The Seventh Circuit went on to explain that "[d]oubtless there was a risk that the jury would overestimate the significance of the EEOC's ruling; this is why such conclusions generally are not admitted (on behalf of either side) in jury trials." *Id.* Nevertheless, the Seventh Circuit affirmed the verdict because the plaintiff opened the door and because the district judge's instructions "ensured that the jury focused on ... the right questions." *Id.* at 927-28.

In *Amantea-Cabrera v. Potter,* the plaintiff had a confrontation with a male co-worker in which the man deliberately pushed a large metal mail cart toward the plaintiff, who was pregnant at the time. 279 F. 3d 746, 748 (9th Cir. 2002). The plaintiff later filed a sex discrimination claim with the EEOC. *Id.* The plaintiff alleged that, in similar incidents, management followed internal investigative protocols and suspended the alleged aggressor pending the results of the investigation, none of which occurred in her incident. *Id.* The Administrative Law Judge issued a recommended decision finding there was discrimination because of sex. The defendant rejected the ALJ findings in its own Final Agency Decision. *Id.* At a *de novo* jury trial to determine damages only, the district judge excluded the EEOC decision that determined there was discrimination. *Id.* at 749. On appeal, the Ninth Circuit again distinguished *Plummer* and cited to *Gilchrist,* explaining district courts have discretion to determine admissibility of EEOC decisions and orders, unlike EEOC probable cause determinations. *Id.* Therefore, the district court's decision to exclude the EEOC decision was affirmed as failing to rise to an abuse of discretion.

3:19-cv-02138-JAH-DTF

In *Arizona, Dep't of L., C.R. Div. v. ASARCO, L.L.*C., the plaintiff worked as a laborer for a mining company. 844 F. Supp. 2d 957, 961 (D. Ariz. 2011). The plaintiff reported to management that there were pornographic drawings in the restroom, including one that identified her. *Id.* The plaintiff alleged her supervisor sexually harassed her. *Id.* After no action was taken by management, the plaintiff felt compelled to quit. *Id.* Before trial, the defendant filed a motion in limine to exclude a reasonable cause determination from the State of Arizona, which found there was evidence of discrimination and harassment. *Id.* at 980. The district court found that, because the State of Arizona was a party to the case, the reasonable cause determination "simply vouch[ed] for the [State's] litigation position, which both reduces its probative value and increases its potential for prejudice." *Id.* at 981. In light of this tipping of the scales, the district court excluded the reasonable cause determination. *Id. But see Heyne v. Caruso*, 69 F.3d 1475, 1482-1484 (9th Cir. 1995) (holding that district court's decision to exclude the Nevada Equal Rights Commission's probable cause determination was reversible error).

Defendant also illustrates and discusses at length *Sulton v Lahood*, 2009 WL 3815764 (S.D.N.Y. Nov. 6, 2009). In *Sulton*, the plaintiff brought an employment discrimination claim against the Federal Aviation Administration ("FAA") after his application for a position as an air traffic controller was denied. *Id.* at *1. The plaintiff filed an administrative claim with the Department of Transportation ("DOT"), which issued an FAD, finding the "plaintiff had been discriminated against on the basis of race." *Id.* There, like here, the plaintiff sought *de novo* adjudication of his dispute, which meant the FAD ceased to be dispositive. *Id.* The district court granted the defendant's motion in limine to exclude the FAD, explaining, "the FAD does not make it more or less probable that defendant discriminated against plaintiff. To conclude otherwise undermines the concept of *de novo* review by the trier of fact." *Id.* at *2, and even if the FAD had probative

3:19-cv-02138-JAH-DTF

value, "it would be substantially outweighed by the dangers of unfair prejudice to the defendant and jury confusion." *Id.*

Plaintiff argues that another S.D.N.Y case, *Accely v. Consol. Edison Co. of NY, Inc.,* 2023 WL 3045795 (S.D. N. Y. Apr. 20, 2023) is more analogous to the instant case.   First, according to Plaintiff, *Accely* is distinct from the other cases cited by Defendant above because it did not involve an agency decision.  Instead, it involved a corporate investigation conducted by the defendant, which concluded the defendant had violated defendant's Equal Employment Opportunity Policy.  *Id.* at *1-2.  The defendant moved to have the decision excluded on the grounds that it would "impermissibly tell the jury what result to reach," confuse the jury because the report found violations of the defendant's policy rather than violations of the law and created "multiple mini-trials within" the trial.  *Id.* at *2.  The district court found the report was clearly relevant, the circumstances of the report's preparation suggested it was reliable, the report was not dispositive and the jury could decide (based on all the evidence) whether to accept its findings and whether to conclude the defendant violated the law.  *Id.* at *3.  Furthermore, the district court concluded the report satisfied the party-opponent statement exception to the rule against hearsay as to the corporation.  *Id.*

This Court finds that *Accely* is highly persuasive.  In addition to the issued raised in *Accely* being the same in this case, the investigative report was prepared by the defendant as in *Gilchrist* and the instant case, and the report satisfied the party-opponent statement exception to the rule against hearsay, which makes it, under the facts here, merely probative as opposed to the third-party EEOC and other entity determinations in the majority of cases cited by the defendant, and because it represents the only example, like the instant motion, of an investigative report that was prepared by the defendant.   This Court finds the FAD is admissible, with curative and/or final instructions relating to how the jury utilizes this evidence in light of all the evidence introduced at trial.   Defendant's motion is DENIED.

1  **II. Defendant's Motion to Exclude Alleged Economic Damages (ECF No. 93)**

2  　　**A. Factual Background**

3  　　　Plaintiff hired an economic expert, Paul Zimmer, to calculate Plaintiff's damages.

4  Mr. Zimmer compiled a report, which contains two scenarios.　The first totals Plaintiff's

5  economic loss "without reduction for workers' compensation," and the second scenario

6  totals Plaintiff's economic loss "with reduction for workers' compensation."　The totals

7  in these scenarios are $1,016,821 and $693,508, respectively, representing a $323,313

8  difference.

9  　　**B. Discussion**

10  　　　Defendant moves the Court to bifurcate Plaintiff's economic damages claims, as

11  they are an equitable remedy.　ECF No. 93 ("MIL 2") at 2.　In the alternative, Defendant

12  moves the Court to limit the testimony of Plaintiff's economic expert because the expert's

13  report "does not take into account the hundreds of thousands of dollars in workers'

14  compensation payments Plaintiff has received pursuant to the Federal Employees

15  Compensation Act (FECA)."　*Id.*　In opposition, Plaintiff argues that even if the economic

16  damages claims are bifurcated, the economic expert's testimony about his lost wages and

17  employment benefits will be necessary for the jurors to understand his compensatory

18  damages, which the jury will decide.　ECF No. 109 ("MIL 2 Opp'n") at 3.　Plaintiff

19  explains the reasons for his "reputational injury, mental anguish, emotional distress, and

20  loss of job responsibilities stem from the loss of income and employment benefits." *Id.*

21  　　**i.  Bifurcation of Economic Damages**

22  　　　Under FRCP 42(b), the Court may "[f]or convenience, to avoid prejudice, or to

23  expedite and economize, ... order a separate trial of one or more separate issues[.]"　In

24  claims brought against government agencies for workplace discrimination and retaliation,

25  back pay and front pay are both equitable remedies to be determined by the court.　*See Lutz*

26  *v. Glendale Unified High School,* 403 F.3d 1061 (9th Cir. 2005) ("there is no right to have

27

28

3:19-cv-02138-JAH-DTF

a jury determine the appropriate amount of back pay under Title VII, and thus the ADA ... back pay remains an equitable remedy to be awarded by the district court in its discretion"); *Gladle v. U.S. Dep't of Veterans Affs.,* 2020 WL 6743734, at *1 (C.D. Cal. Nov. 16, 2020) *(Lutz* applies to claims under the Rehabilitation Act as well); *Dykzeul v. Charter Commc'ns, Inc.,* 2021 WL 4522545, at *9 (C.D. Cal. Feb. 3, 2021) (acknowledging only the Court determines the award of back pay and front pay under Title VII).

These decisions are consistent with a traditional understanding of the collateral source rule. Under the collateral source rule, "benefits received by the plaintiff from a source collateral to the defendant may not be used to reduce that defendant's liability for damages." 1 DAN B. DOBBS, LAW OF REMEDIES § 3.8(1) at 372-73 (2d ed. 1993). The Ninth Circuit has held the collateral source rule does not apply to workers' compensation from federal agencies because the benefits are "ultimately paid entirely by [the agency] and thus are not derived from a collateral source." *McLean v. Runyon,* 222 F.3d 1150, 1156 (9th Cir. 2000) (explaining "PECA workers' compensation benefits are paid from an Employees' Compensation Fund (ECF), which is ultimately reimbursed entirely by the appropriate federal agency or instrumentality for each payment made for an injury to one of its employees"). Therefore, there is no windfall if Plaintiff's damages are offset by his workers' compensation benefits. *See Id.*

In *Mort v. DeJoy,* 2022 WL 3229298 (E.D. Cal. Aug. 10, 2022), a United States Postal Inspector sued for discrimination and retaliation after he was terminated. During motions in limine, the plaintiff sought to exclude all evidence of the retirement benefits he received after his termination. *Id.* at *13. There, like here, the economic damages claims were left for the court to decide. *Id.* at *14. Therefore, the district court held evidence of the plaintiff's retirement benefits received after termination only related to the non-economic damages to be decided by the jury "if [the plaintiff] claims the state of his

finances, due to his firing, caused him emotional distress damages." *Id.* The court confirmed that where the plaintiff did not make that claim, the evidence could not be presented to the jury unless "some other basis for the admission of the evidence" became apparent. *Id.*

Here, Plaintiff claims: "[i]n order to have an accurate understanding of Mr. Romero's lost wages and benefits and his future lost wages and benefits, the trier of fact must know the gross amount before any deductions for worker's [sic] compensation payments." MIL 2 Opp'n at 3. However, Plaintiff fails to explain why the jury needs to know the gross amount. Plaintiff asserts Mr. Zimmer cannot discuss the scenario which accounts for and deducts the workers' compensation benefits without first discussing the scenario which does not deduct the workers' compensation benefits. Plaintiff also fails to offer any explanation as to why the lost wages cannot be discussed using only the model that accounts for the workers' compensation benefits he received.

Accordingly, the Court GRANTS Defendant's motion to exclude Plaintiff's economic loss without reduction for the worker compensation payments he received. Because compensatory damages are unavailable for Plaintiff's ADA and RA claims, *see* Summary Judgment Order, ECF No. 73 at 19-20, the only damages available to Plaintiff at this stage appear to be (1) economic damages including back pay and/or front pay under the ADA, (2) incidental losses Plaintiff may have incurred, including penalties and prejudgment interest on damages accrued, and (3) reasonable attorney's fees. *See e.g. Barrios v. Cal. Interscholastic Fed'n*, 277 F.3d 1128, 1134 (9th Cir. 2002) (holding that "[t]he ADA, specifically 42 U.S.C. § 12205, permits the 'prevailing party' to seek attorneys' fees and costs," and that "[t]he Supreme Court has held that a prevailing plaintiff under a statute so worded 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.' *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).").

3:19-cv-02138-JAH-DTF

1    Because Plaintiff's overall economic loss, before reduction of the worker

2    compensation payments he received, is not relevant to any determination the jury will make

3    regarding damages, such evidence shall be bifurcated for the Court's sole determination.

4    **ii. Plaintiff's Request for Reconsideration**

5    In addition to opposing Defendant's MIL in his Opposition, Plaintiff also attempts

6    to relitigate the issue of compensatory damages for his retaliation claim, an issue this Court

7    already decided in its Order Granting in Part and Denying in Part Defendant's Motion for

8    Summary Judgment.   *See* ECF No. 73 at 19-20.  Civil Local Rule 7.1.i.2 requires any

9    motion for reconsideration (1) be filed within twenty-eight days after the entry of the ruling,

10   and (2) be accompanied by an affidavit specifying what new facts and circumstances exist.

11   Plaintiff failed to comply with both requirements and his attempt at revisiting the issue is

12   entirely improper. *See Lauzon v. Ford Motor Co.,* 718 F.3d 556, 561 (6th Cir. 2013)

13   ("[A]llowing a party to litigate matters" in a motion in limine "that have been or should

14   have been resolved at an earlier stage not only allows those dissatisfied with the court's

15   initial ruling a chance to relitigate, but also deprives their opponents of the procedural

16   protections that attach at summary judgment"); *Dominguez v. City of Los Angeles,* 2018

17   WL 6164278, at *11 (C.D. Cal. Oct. 9, 2018) (denying a motion *in limine* as "nothing more

18   than an attempt to relitigate the Court's Summary Judgment Order"); *Am. Airlines Flow-*

19   *Thru Pilots Coal. v. Allied Pilots Assoc.,* 2018 WL 11365515, at *1 (N.D. Cal. June 28,

20   2018) (explaining motions *in limine* are a procedural mechanism to "limit in advance

21   testimony or evidence in a particular area," not "relitigate matters presented in [a] motion

22   for summary judgment").

23   Accordingly, Plaintiff disguising an untimely request for reconsideration will not be

24   entertained.  Defendant's request for bifurcation is GRANTED at this stage without

25   prejudice, but it may be re-considered by the Court at a later stage based upon arguments

26   received by the parties if there exists damages in the case to be decided by the jury.  The

27

28

3:19-cv-02138-JAH-DTF

1  Court will have a better grasp on the viability of bifurcation between liability and damages

2  after considering the proposed joint pretrial order to be filed in this proceeding and hearing

3  argument at a future status conference on this matter.

4

5  ### III.    Motion to Admit LabCorp Test Report (ECF No. 94)[2]

6  ### A. Factual Background

7       Before filing this lawsuit, Plaintiff had not been tested to determine if he was allergic

8  to mold.   ECF No. 94 ("MIL 3") at 2-3.   In October 2021, Plaintiff took a voluntary test

9  involving a blood draw from a clinic.  *Id.* at 3.   The results indicated Plaintiff is not allergic

10  to mold.   *Id.*[3]    Defendant subpoenaed LabCorp, the company responsible for testing

11  Plaintiff's blood, and eventually received a copy of the results from LabCorp, along with

12  a declaration from LabCorp's Records Administrator.   *Id.*   The declaration states the lab

13  report is a "true and correct" copy of Plaintiff's results and was prepared by LabCorp

14  employees "in the ordinary course of business, at or near the time of the acts, conditions, or

15  events recorded."  *Id.*

16  ### B. Discussion

17       Defendant moves to allow admission of the LabCorp test results.   Defendant argues

18  the report falls under the Business Records exception to the rule against hearsay contained

19  in FRE 803(6).   MIL 3 at 3.   Plaintiff opposes the motion, asserting "the source of

20  information or the method or circumstances of preparation indicate a lack of

21  trustworthiness."   Fed. R. Evid. 803(6)(E).

22

23  _____

24  [2] Defendant's third motion *in limine* seeks to admit the same evidence that Plaintiff seeks
    to exclude in his first motion *in limine. See* ECF No. 99.

25  [3] According to Defendant, Plaintiff failed to share a copy of the results with his attorney

26  prior to his deposition on May 19, 2022, and Defendant did not receive a copy until June 7,

27  2022.

28

3:19-cv-02138-JAH-DTF

To satisfy the "Records of a Regularly Conducted Activity" exception to the rule against hearsay, Defendant must demonstrate (1) "the record was made at or near the time by - or from information transmitted by - someone with knowledge"; (2) "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit"; (3) "making the record was a regular practice of that activity"; (4) "all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification"; and (5) "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6).

Defendant cites in support, *Shelton v. Consumer Prod. Safety Comm'n,* 277 F.3d 998, 1010 (8th Cir. 2002), where the Eighth Circuit acknowledged laboratory test reports typically constitute business records that comply with FRE 803(6). Thus, the *Shelton* Court held such "records are deemed admissible, unless problems of untrustworthiness appear." *Id.* As an example, Defendant illustrates *United States v. Farmer,* 820 F. Supp. 259 (W.D. Va. 1993). In *Farmer,* the defendant was arrested for driving under the influence of alcohol after she caused a collision on a federal roadway. *Id.* at 261. Within an hour of the accident, the defendant consented to a blood draw at an emergency room. *Id.* The defendant was convicted at trial before a magistrate judge. *Id.* at 266. On appeal to the district court, the defendant challenged the court's admission of the blood alcohol test results under Rule 803(6), *id.* at 264, as well as the trustworthiness of the blood test. The district court laid out the legal framework for establishing a blood test is trustworthy:

> Establishing a chain of custody is one form of proof sufficient to support a finding that evidence is trustworthy. *Fed. R. Evid.* 901(a). *See United States v. Howard-Arias,* 679 F.2d 363, 366 (4th Cir.), *cert. denied,* 459 U.S. 874, 103 S. Ct. 165, 74 L. Ed. 2d 136 (1982). The prosecution need prove only a rational basis from which one could conclude that the Certificate of Analysis reflected an analysis of Appellant's blood. *United States v. Natale,* 526 F.2d 1160, 1173 (2nd

Cir. 1975), *cert. denied,* 425 U.S. 950, 96 S. Ct. 1724, 48 L. Ed. 2d 193 (1976). Proof of the connection of the blood sample to Appellant may be made by circumstantial evidence. *United States v. Kubiak,* 704 F.2d 1545, 1552 (11th Cir.), *cert. denied,* 464 U.S. 852, 104 S. Ct. 163, 78 L.Ed.2d 149 (1983). "The ultimate question," according to the Fourth Circuit, is whether the authentication testimony is sufficiently complete so as to make it "improbable that the original item had been exchanged with another or otherwise tampered with." *Howard-Arias,* 679 F.2d at 366.

*Farmer,* 820 F. Supp. at 265. The *Farmer* court upheld the magistrate judge's decision to admit the blood test into evidence. *Id.* at 266.

Plaintiff distinguishes *Farmer* in his Opposition, pointing out that, in *Farmer*, a law enforcement officer was present for the blood draw and marked the vial with the defendant's name, the defendant's social security number, and the date alongside his own initials. ECF No. 110 ("MIL 3 Opp'n") at 2-3. In reply, Defendant points out that while the Ninth Circuit has yet to explicitly hold evidence of chain of custody is not required to satisfy Rule 803(6), other circuits have adopted the reasoning presented by the Fourth Circuit in *Thomas v. Hogan,* 308 F.2d 355 (4th Cir. 1962), finding that:

> "Human life will often depend on the accuracy of the entry, and it is reasonable to presume that a hospital is staffed with personnel who competently perform their day-to-day tasks. To this extent at least, hospital records are deserving of a presumption of accuracy even more than other types of business."

*Thomas,* 308 F.2d at 361; *see also Pieters v. B-Right Trucking, Inc.,* 669 F. Supp. 1463, 1465 (N.D. Ind. 1987) (rejecting plaintiff's state law-based argument that chain of custody must be proven to admit a blood test, and affirming Rule 803(6) "does not impose an additional requirement that chain of custody be demonstrated"); *Ortiz v. Adams,* 2018 WL 3410027, at *5-6 (D.N.J. July 13, 2018) (rejecting plaintiff's argument that chain of custody must be demonstrated for a blood test result to satisfy Rule 803(6)); *Stroud v. Roper Corp.,* 1990 WL 115610 (S.D.N.Y. Aug. 9, 1990) (holding a hospital blood test record is entitled to a "strong presumption" of reliability,

3:19-cv-02138-JAH-DTF

and that presumption "obviate[s] any need to demonstrate chain of custody"). *See also Rivers v. Union Carbide Corp.,* 426 F.2d 633, 637-39 (3d Cir. 1970) (citing *Thomas* extensively and concluding the district court erred by excluding a hospital record); *Ballou v. Henri Studios, Inc.,* 656 F.2d 1147, 1154-55 (5th Cir. 1981) (where plaintiff drove automobile involved in collision, trial court's exclusion of hospital records noting results of plaintiff's blood test was reversible error as the "question [of] whether proponent of evidence has proved an adequate chain of custody goes to weight rather than admissibility").

The proponent of the evidence has the burden of establishing the predicate foundation to satisfy the requirements for the business records exception under FRE 803(6). Plaintiff argues that <u>no witness</u> will be able to testify as to the Lab Corp test's authenticity, that "[n]one of the doctors or technicians involved in the purported testing will be called at trial and none of them were named as witnesses in this case." ECF No. 99 at 5. Defendant responds by contending that the Lab Corp test is a business record, ECF No. 125 at 2-3, and Defendant has also argued that the Lab Corp test, "[a]s a document identified by Plaintiff in his deposition and produced by Plaintiff in discovery" is authentic as a document offered by a party-opponent. ECF No. 106 at 2.

Accordingly, the Court will GRANT Defendant's motion to admit the Lab Corp results, contingent upon Defendant laying the proper foundation at trial and/or pursuant to statutory authority under the Federal Rules of Evidence at a future status conference. At the status conference, Plaintiff may also present argument on the admissibility of the Lab Corp test and any authentication objections for the Court to evaluate. While Plaintiff has raised the issues of hearsay, lack of authentication, undue prejudice, and no expert designated to testify on the Lab Corp test, the Court may seek additional briefing at a future status conference on whether a *Daubert* hearing is required for admission of the Lab Corp test, whether the Lab Corp test may be self-authenticating under the Federal Rules of

Evidence, and whether Defendant failed to designate an appropriate expert to testify on the Lab Corp test under the case's discovery timeline.  In the event of the admission of the document(s), Plaintiff may cross-examine or call a witness to testify relating to the issues pertinent to the Lab Corp test, including the  source of information relied upon by LabCorp and/or the circumstances of preparation indicating a lack of trustworthiness of the blood test.

IV.    **Defendant's Motion to Exclude Other Employees' Health Conditions (ECF No. 95)**

    **A. Rule 26 Disclosures**

    As an initial matter, Defendant's motion seeks to exclude testimony from witnesses Plaintiff failed to disclose.  Defendant contends that Plaintiff "disclosed a dozen witnesses for the first time in the proposed Pretrial Order, listing a vague, identical description of testimony for each."  ECF No. 129 ("MIL 4 Reply") at 2.  Defendant argues Plaintiff violated Federal Rule of Civil Procedure 26(a)(l)(A)(ii) by failing to disclose twelve witnesses —Aaron Jackson, Randy Rusch, Tom Bock, Kevin Costa, Roy Hernandez, Jack Orr, Robert Gankiewicz, Michael Tan, Sergio Zuniga, Karen Banks, Paz Lopez, and Edward Peterman—in "Plaintiff's Initial or Amended Disclosures, or Plaintiff's discovery responses" prior to listing them on the proposed Pretrial Order.    ECF No. 95 ("MIL 4") at 7; MIL 4 Reply at 4.  Plaintiff does not respond to this argument.  ECF No. 111 ("MIL 4 Opp'n").

    Federal Rule of Civil Procedure 26(a)(1)(A) provides that:

> [A] party must, without awaiting a discovery request, provide to the other parties:  (i) the name and, if known, the address and telephone number of each individual likely to have discoverable  information - along with the subjects of that information - that the disclosing party may use to support its claims or defense, unless the use would be solely for  impeachment[.]

    In addition, the party must supplement or correct its disclosure in a timely manner if

it learns the initial disclosure was incorrect or incomplete.  FED. R. CIV. P. 26(e)(l).  If a party fails to provide information or identify a witness under Rule 26(a) or (e), the party "is not allowed to use that information or witness to supply evidence on a motion, . . . unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(l).  The noncompliant party bears the burden of showing a lesser sanction is better under the circumstances, and that party must "'avail himself of the opportunity to seek a lesser sanction' by formally requesting one from the district court." *Merch. v. Corizon Health, Inc.,* 993 F.3d 733, 741 (9th Cir.2021) (quoting *Vanderberg v. Petco Animal Supplies Stores, Inc.,* 906 F.3d 698, 705 (8th Cir. 2021)).

A district court has "wide discretion" regarding discovery, and that discretion is "particularly wide" when a party moves for exclusion under Rule 37(c)(l).    *Ollier v. Sweetwater Union High Sch. Dist.,* 768 F.3d 843, 862 (9th Cir. 2014).   The Ninth Circuit has held that evidentiary exclusions are a harsh sanction, particularly when the exclusion is fatal to a claim.  *R & R Sails, Inc. v. Ins. Co. of Pa.,* 673 F.3d 1240, 1247 (9th Cir. 2012).  Therefore, when engaged in the harmlessness inquiry under Rule 37(c)(1), the court is required to consider "whether the claimed noncompliance involved willfulness, fault, or bad faith" and "the availability of lesser sanctions."  *Id.*   In deciding whether to exclude evidence under Rule 37, "district courts have identified several factors to guide the determination of whether substantial justification and harmlessness exist, including (1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of trial; and (4) bad faith or willfulness in not timely disclosing the evidence."  *Liberty Ins. Corp. v. Brodeur*, 41 F.4th 1185, 1192 (9th Cir. 2022) (citations omitted).

///

///

26

3:19-cv-02138-JAH-DTF

### iii. Undisclosed Witnesses

While this Court "is not required to sort through the record" to identify any evidence or argument not directly submitted to the Court to support the claims or defenses of either party, *U.S. Wholesale Outlet & Distrib., Inc. v. Innovation Ventures, LLC*, 89 F.4th 1126, 1138 (9th Cir. 2023) (citations omitted), the Court notes that of the twelve prospective witnesses listed by Defendant, which Plaintiff presents in the proposed Pretrial Order, three of these witnesses—Aaron Jackson, Tom Bock, and Kevin Costa—were previously disclosed in Plaintiff's First Set of Interrogatory Responses. *See* MIL 4, Exh. 6; *see also U.S. Wholesale Outlet*, 89 F.4th at 1138 ("There may have been a needle—or even many needles—in the haystack []. It was not the district court's job to hunt for them."); *Angelo v. Thomson Int'l, Inc.,* 2024 WL 3202513, at *19 (E.D. Cal. June 27, 2024) (granting motion *in limine* to exclude undisclosed witnesses where "Plaintiffs provide[d] no information as to when or how these witnesses were disclosed"). The motion is therefore DENIED as to these three previously disclosed witnesses.[4]

As to the nine undisclosed witnesses, Plaintiff does not proffer a reason for the nondisclosure or otherwise respond to Defendant's argument that the untimely disclosure of these witnesses would unfairly prejudice Defendant, including because fact discovery has long closed and Defendant is unable to depose or seek discovery from these witnesses in anticipation of trial. MIL 4 at 7-8; *see generally* MIL 4 Opp'n. Absent a showing by Plaintiff that the nondisclosure is harmless or substantially justified, the Court GRANTS

---

[4] The Court expects the Parties to accurately and clearly disclose information to the Court, which is also part of counsel's ongoing duty of candor under the California Rules of Professional Conduct. *See* Rule 3.3. A party's failure to respond to an argument, or to present clear and accurate information, is sanctionable conduct that may result in an adverse ruling by the Court pursuant to Rule 11.

3:19-cv-02138-JAH-DTF

Defendant's motion to exclude testimony from the undisclosed witnesses[5] pursuant to Rule 37(c)(1).

## B. Health Testimony of Former MCC Employees

Defendant also seeks to exclude testimony of health conditions, including "statements regarding [] personal health conditions" and "health complaints," from sixteen former MCC employees "designated to testify pursuant to Rule 26 about their own personal illnesses, which they believe were caused by mold exposure at MCC." MIL 4 at 3-4. Specifically, Defendant seeks to exclude witness testimony from "Adrian Cornist, Sam Potter, Gary Horton, Martha Davis, Deanna Cosso, Aaron Jackson, Tom Bock, Kevin Costa, Robert Pau, Roy Hernandez, Edna Robertson, Michael Tan, Sergio Zuniga, Paz Lopez, Michelle Navarro, Sammy Orozco." MIL 4 at 4 n.1. Because the Court has already excluded testimony from Roy Hernandez, Michael Tan, Sergio Zuniga, and Paz Lopez pursuant to Rule 37(c)(1) due to Plaintiff's nondisclosure of these witnesses, *see supra* Section IV (A)(i) (Undisclosed Witnesses), the Court's analysis here will only apply to the remaining twelve witnesses.[6]

Defendant claims these twelve Rule 26 designated witnesses should be excluded because their testimony is irrelevant to the claims and defenses in this case and would be unfairly prejudicial to the Defense. MIL 4 at 3. Defendant claims none of these witnesses worked "closely with Mr. Romero or in the same office within the MCC." *Id.* at 4. Defendant also claims "[t]here is no evidence that any other individual sought medical treatment, was diagnosed with a mold-related illness, or requested workplace

---

[5] Randy Rusch, Roy Hernandez, Jack Orr, Robert Gankiewicz, Michael Tan, Sergio Zuniga, Karen Banks, Paz Lopez, and Edward Peterman.

[6] Adrian Cornist, Sam Potter, Gary Horton, Martha Davis, Deanna Cosso, Aaron Jackson, Tom Bock, Kevin Costa, Robert Pau, Edna Robertson, Michelle Navarro, and Sammy Orozco.

3:19-cv-02138-JAH-DTF

accommodations as a result." *Id.*   Defendant argues that the testimony would constitute hearsay, would be speculative and unfounded, and constitutes expert testimony subject to Rule 702. *Id.*

Plaintiff opposes the motion, contending the motion is "vague, ambiguous, and overbroad."   MIL 4 Opp'n at 2.  Plaintiff also argues that Defendant is attempting to exclude a broad category of evidence: "evidence of non-party employees' personal health conditions."   MIL 4 Opp'n at 2.

### i.  Vague, Ambiguous, and Overbroad

"'Motions in limine . . . do not lie to exclude broad categories of evidence.'   Rather, they 'must specifically identify the evidence at issue and state with specificity why such evidence is inadmissible.'"   *Bahra v. City of San Bernadina,* 2021 WL 3914042, at *4 (C.D. Cal. June 24, 2021) (citations omitted).

The Court agrees with Defendant's assertion that Plaintiff provided "vague, identical description[s]" of the twelve witnesses' testimony in the proposed Pretrial Order.   It is unclear how Defendant could be more specific in his motion seeking to exclude these witness' testimony as irrelevant, prejudicial, and hearsay when the description contained only vague, boiler plate descriptions of what the witnesses would be called to testify to.

### ii.  Lay Witness Testimony

Defendant also argues Plaintiff's plan to elicit testimony "about health problems associated with mold in the workplace" from the twelve former MCC employees would constitute improper medical diagnoses and opinions from lay witnesses.   MIL 4 at 5.

Under Federal Rule of Evidence 701, a lay witness may provide opinions that are "(a) rationally based on the witness's perception; (b) helpful to understanding the witness' testimony or to determine a fact in issue; and (c) not based on scientific, technical, or specialized knowledge within the scope of Rule 702."

3:19-cv-02138-JAH-DTF

The Ninth Circuit has held "lay witness testimony is 'incompetent' when it consists of a medical diagnosis, because 'medical diagnoses are beyond the competence of lay witnesses' to make." *Tobeler v. Colvin,* 749 F.3d 830, 833 (9th Cir. 2014); *see also Stevenson v. Holland,* 504 F. Supp. 3d 1107, 1121 (E.D. Cal. 2020) ("the Ninth Circuit has stated that explaining medical diagnoses is beyond the competence of lay witnesses").   Additionally, not only can lay witnesses not opine about medical diagnoses, they also cannot relay statements from treating physicians regarding diagnoses.   *See Gilmore v. Lockard,* 2017 WL 11604670, at *1 (E.D. Cal. Feb. 17, 2017) (where the district court ordered the plaintiff "may not personally testify regarding a diagnosis, opinions, inferences or causation, and may not offer any opinions or inferences from any medical records"); *Exmundo v. Scribner,* 2014 WL 4249133, at *1 (E.D. Cal. Aug. 27, 2014) ("As to Plaintiff's medical conditions, he may not testify as to any medical matter which requires scientific, technical, or other specialized knowledge, which generally includes any ultimate diagnosis [and] a cause and effect relationship.").

However, a witness may testify as to their "perception of symptoms," including physical and mental conditions, response to symptoms, and other personal knowledge "based upon [their] own perceptions."   *Stevenson,* 504 F. Supp. 3d at 1121. Therefore, the Court orders that the twelve witnesses are limited to testifying about their own perceptions regarding their health (excluding any medical opinions or diagnoses) and their personal experiences with management, relevant motives, and discrimination-related matters regarding workplace accommodations.

### iii. 401 Relevance and 403 Prejudice

Defendant argues that the twelve former employees' testimony is irrelevant because none of them worked closely with Mr. Romero or shared the same office space as him.   MIL 4 at 4.  Defendant also claims there is no evidence that any of these

3:19-cv-02138-JAH-DTF

witnesses sought medical treatment, were diagnosed with a mold-related illness, or requested workplace accommodations as a result.  *Id.*  Therefore, Defendant contends, "the evidentiary value of such testimony . . . is lacking."  *Id*.  In opposition, Plaintiff argues the testimony of other employees who witnessed or experienced the mold problem and the Defendant's inaction, then lodged their own individual complaints with Defendant are relevant to show Defendant's "biased policies, discriminatory animus, and retaliatory intent."  MIL 4 Opp'n at 3-4.  Plaintiff also draws an analogy with the "Me Too" movement to demonstrate evidence of similarly situated employees is probative of Defendant's discriminatory intent.  *Id.*

"Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  "Evidence which is not relevant is not admissible."  Fed. R. Evid. 402.  Relevant evidence may still "be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.

The Ninth Circuit has held "evidence of an employer's sexual harassment of female employees other than the plaintiff . . . were relevant to a discriminatory discharge claim[.]"  *Heyne v. Caruso*, 69 F.3d 1475, 1480 (9th Cir. 1995); *see also Brown v. Simpson Strong-Tie Co.,* 2022 WL 2135340, at *2 (E.D. Cal. May 16, 2022) ("the Ninth Circuit has held that in discrimination and retaliation cases, plaintiffs may rely upon comparisons with 'similarly situated employees' if the comparison supports an inference that retaliation was the motive"); *Howard v. Raytheon Co.,* 2011 WL 13177257, at *3 (C.D. Cal. Mar. 28, 2011) (explaining "Me Too" evidence is not per se admissible, but its admissibility is determined "within the context of the case").  In addition, the Eighth Circuit has held that, while in other cases circumstantial evidence of an employer's unflattering history and work

31

3:19-cv-02138-JAH-DTF

practices may be prejudicial, in a discrimination case such evidence may be "critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive." *Hawkins v. Hennepin Tech. Ctr.,* 900 F.2d 153, 155 (8th Cir. 1990) (citing *Estes v. Dick Smith Ford, Inc.,* 856 F.2d 1097, 1103 (1988)).   The Seventh Circuit has also allowed plaintiffs to present testimony from other women who experienced sexual harassment in the workplace to demonstrate a pattern of harassment.   *See, e.g.*, *Horn v. Duke Homes,* 755 F.2d 599 (7th Cir. 1985).   The United States Supreme Court has clarified the "question whether evidence of discrimination by other supervisors is relevant in an individual [discrimination] case is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Sprint/United Mgmt. Co. v. Mendelsohn,* 552 U.S. 379, 387-88 (2008).

In this case, according to the proposed Pretrial Order, the twelve witnesses will only testify to their "health concerns related to the mold, requests for accommodation, and the defendant's disregard of those complaints, requests, and concerns," with the exception of Deanna Cosso.  MIL 4 Reply at 3 (citing MIL 4 Opp'n at 3-4).   Therefore, Defendant claims these witnesses are not analogous to "Me Too" testimony because there is no indication they will testify to "any allegation of discrimination based on an alleged disability[.]"  MIL 4 Reply at 4.   In other words, Defendant argues they are not similarly situated, and therefore, are not relevant.  Indeed, Plaintiff is bringing claims for disability discrimination and retaliation, and Plaintiff does not argue these witnesses experienced discrimination or retaliation.   Instead, Plaintiff claims these witnesses are relevant because they show "others were afraid to come forward for fear of retaliation, which in turn supports [Plaintiff's] claims."   MIL 4 Opp'n at 5.

Ultimately, Defendant's Rules 401 and 403 arguments require a fact-intensive analysis to enable the Court to decide whether the testimony of these witnesses would have a tendency to make any fact of consequence more or less probable, and to decide whether

3:19-cv-02138-JAH-DTF

the probative value of such testimony would be substantially outweighed by the risk of unfair prejudice or other FRE 403 considerations. At present, the Court does not have sufficient facts to engage in this analysis, including because Plaintiff has only provided deficient boilerplate descriptions of what the witnesses would testify to.

### iv. Cumulative Evidence

Finally, Defendant argues the testimony of these witnesses is cumulative. MIL 4 at 6. Defendant argues Plaintiff "listed a nearly identical description of the expected testimony from the sixteen complainants." *Id.* Plaintiff does not respond to this argument. *See* MIL 4 Opp'n. "Evidence is 'cumulative' when it adds very little to the probative force of the other evidence in the case, so that if it were admitted its contribution to the determination of truth would be outweighed by its contribution to the length of the trial…" *United States v. Kizeart,* 102 F.3d 320, 325 (7th Cir. 1996).

"As a practical matter, the court [has discretion] to impose some limitation on the number of witnesses testifying about a particular fact. . . [which is] left to the sound discretion of the judge." *Loux v. United States*, 389 F.2d 911, 917 (9th Cir. 1968). A court's decision to allow multiple witnesses to testify about different aspects of the facts at issue does not lead to cumulative witness testimony where "each [witness] provided independent and valuable corroborating evidence." *United States v. Henry*, 560 F.2d 963, 965-966 (9th Cir. 1977) (rejecting challenge that witnesses called at trial were cumulative). The key analysis under a court's discretion to strike witnesses as "cumulative" is whether the witness will testify, again, to the same "particular fact" at issue, *Loux*, 389 F.2d at 917, or whether the witness will provide additional and broader facts that provide "independent and valuable corroborating evidence" for the plaintiff. *Henry*, 560 F.2d at 965-966.

At this stage, the Court is unable to strike witnesses from trial based on cumulativeness, because the full scope of their testimony–including the relevant dates, facts, and personal circumstances to which they will be testifying–is not known in detail to

3:19-cv-02138-JAH-DTF

the Court.

### C. Conclusion

The Court GRANTS in part Defendant's motion and EXCLUDES testimony from the witnesses that were not timely disclosed pursuant to Rule 26.  As for the witnesses that were properly disclosed, the Court DENIES WITHOUT PREJUDICE Defendant's motion to exclude the testimony of these witnesses, contingent upon Plaintiff providing additional briefing containing sufficient information to adequately show the nature of the witness' testimony, including that the testimony is not cumulative.  Defendant may also provide additional briefing in response.

## V. Defendant's Motion to Exclude Testimony of Plaintiff Witness Deanna Cosso (ECF No. 97)

Defendant in ECF No. 97 seeks to exclude evidence of witness Deanna Cosso's discrimination case under Rule 404(b), asserting her testimony constitutes "me too" propensity evidence and is therefore more prejudicial than probative. ECF No. 97 at 4-7. Defendant outlines several factual differences to argue that Cosso is not a similarly-situated employee to Plaintiff, and that Cosso's testimony fails to meet the standard for evidence of a discriminatory pattern or practice.

Plaintiff responds in opposition by contending that Cosso's testimony would corroborate a pattern of "disability-related animus," "discriminatory atmosphere" and "corporate mindset" surrounding accommodation requests by the Defendant.  ECF No. 113 at 2-3.  Plaintiff argues that Cosso's case is "nearly identical" to his cased based on the similar manner in which Defendant purportedly engaged in disability discrimination involving long-time employees.  *Id.*

Plaintiff points out that Cosso was a long-term employee at the MCC who served in her position for 14 years.  ECF No. 113 at 2.  Plaintiff contends Cosso was "forced into

3:19-cv-02138-JAH-DTF

retirement" in 2020 due to alleged discrimination, harassment, and retaliation based on her disability. *Id.* Despite having a chronic asthmatic condition and providing a physician's note requiring an N95 mask, Defendant: (1) forced her to use unpaid leave while awaiting accommodations; (2) failed to engage in a good-faith interactive process by delaying responses; and (3) offered inadequate job modifications that constituted retaliation, including placement in a high-traffic phone room designated for employees accused of misconduct (making her ineligible for overtime/holiday pay), altered shift hours that would worsen her symptoms, and denied a physician-recommended N95 mask. *Id.* at 2-3, ECF No. 97-1 at 1-12. Plaintiff argues that the same warden of the MCC responsible for disability accommodations from 2018 to 2021 refused to interact and reasonably accommodate either Plaintiff or Cosso's requests for accommodations. ECF No. 113 at 2. Plaintiff contends that, like in his case, Cosso was unable to accept the conditions provided by the MCC, even though Plaintiff has decided to retain his employment at the MCC and Cosso decided to retire instead of returning to work. *Id.*

The United States Supreme Court has indicated that the "question whether evidence of discrimination by other supervisors is relevant in an individual case is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Sprint. v. Mendelsohn*, 552 U.S. 379, 387-88, (2008).

Under Federal Rule of Evidence 404(b), district courts possess wide discretion in determining the admissibility of evidence of prior acts when offered for purposes other than proving character or propensity. Evidence of prior acts may be admitted, however, to prove "motive," "intent," and "absence of mistake." FED. R. EVID. 404(b)(2). An employer's treatment of similarly situated employees is relevant to whether the organization had an "atmosphere" of condoned discrimination in the workplace which "increases the likelihood of retaliation for complaints in individual cases." *Hawkins v.*

*Hennepin Tech. Ctr.*, 900 F.2d 153, 156 (8th Cir. 1990). "[S]uch background evidence may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an <u>unlawful motive</u>." *Id.* at 155 (citation and quotation omitted) (emphasis added). "Factors that courts consider in the inquiry include (1) whether past discriminatory or retaliatory behavior is close in time to the events at issue in the case, (2) whether the same decisionmaker was involved, (3) whether the witness and plaintiff were treated in the same manner, and (4) whether the witness and plaintiff were otherwise similarly situated." *Hayes v. Sebelius*, 806 F. Supp. 2d 141, 144-145 (D.D.C. 2011). The district court has the discretion to admit "me too" evidence of employers' "past discriminatory or retaliatory behavior toward other employees" based upon its factual determination of the relevance of such evidence. *Id.* at 143.

The Supreme Court's decision in *Sprint* is highly relevant and persuasive to the issue of Cosso's testimony in the instant motion. In *Sprint*, the district court and court of appeals arrived at different conclusions on the relevance of employee testimony where those employees did not work for the exact same supervisors within an organization. 552 U.S. at 382. Sprint argued before the district court that only employees with the "same supervisors" could be "similarly situated" with plaintiff, and that other employee testimony was not relevant and unfairly prejudicial. *Id.* Plaintiff responded by arguing that age discrimination was pervasive at Sprint. The Supreme Court resolved the issue by holding:

> "The question whether evidence of discrimination by other supervisors is relevant in an individual ADEA case is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case. Applying Rule 403 to determine if evidence is prejudicial also requires a fact-intensive, context-specific inquiry. Because Rules 401 and 403 do not make such evidence *per se* admissible or *per se* inadmissible, and because the inquiry required by those Rules is within the province of the District Court in the first instance, we vacate the judgment of the Court of Appeals and remand the case with instructions

to have the District Court clarify the basis for its evidentiary ruling under the applicable Rules."  552 U.S. at 388.

The determination requires the district court to conduct a fact-intensive, context-specific balancing test between the probative and prejudicial nature of the testimony.  To assess the probative value, courts base their analysis on the facts of a given case and how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Hayes*, 806 F. Supp. 2d at 144.

As noted by the Defendant, there are four factors outlined in *Hayes* that the Court may consider in determining relevancy, namely: (1) time proximity (2) similar decisionmakers (3) similar treatment and (4) "whether the witness and plaintiff were otherwise similarly situated."  *Hayes*, 806 F. Supp. 2d at 143. The context-specific nature of me-too evidence in discrimination cases, however, necessarily means there is no admissibility "rule" or "analysis" per se that can be mechanically applied from prior cases.

Multiple parallels exist between Cosso's and Romero's cases that suggest a discriminatory pattern: both were long-term employees at the MCC (Cosso: 14 years; Romero: 23 years) with respiratory conditions who allegedly faced discrimination from the same supervisory chain (direct supervisor, Warden, Associate Wardens, Human Resources Manager). Both experienced MCC's failure to follow physician recommendations, unreasonable work environment assignments that would exacerbate their conditions, extended unpaid leave pending accommodations, inability to return to work despite job capability, and placement in disciplinary areas as part of the MCC's proposed job modifications. After requesting accommodations, both employees allege they were isolated and shunned by their respective departments as a result, and both filed formal EEO complaints following over a year of experiencing aforementioned discrimination, harassment, and retaliation.

In their response to this motion, Plaintiff clarifies they seek to use Ms. Cosso's testimony to demonstrate <u>a pattern or practice</u> of discrimination and retaliation at the MCC and to demonstrate that "others were similarly retaliated against.".  ECF No. 113 at 4.  The cause of each employee's respiratory condition may not be dispositive in a discrimination claim, since both employees possessed qualifying disabilities requiring accommodation.  ECF No. 97-1.  Ms. Cosso, however, does allege in the separate FAD that she experienced mold-related sinus injuries, read a 2012 DOJ letter stating the MCC had sick building syndrome, and witnessed other employees experiencing physical ailments from mold exposure.  ECF No. 92-1 at 12.

Finally, there are facts that are notably absent or different between the two cases.  Specifically, the Court does not know how long and to what extent Warden Williams was involved as the lead warden involved in both disputes and a key decisionmaker.  The Court also does not know whether Plaintiff was eligible for administrative leave, or whether the nature of Ms. Cosso's "isolation and shunning" was factually different from or similar to Plaintiff's.

And, even if one of Cosso's supervisors is different, *Spirit* counsels that discrimination engaged by others may support Plaintiff's theory of discrimination by his supervisor based upon factors including how closely-related the two employees are with respect to their treatment by the Defendant, whether the Defendant treated employees seeking disability accommodations in a similar way, and whether Defendant has a pattern of discrimination related to Plaintiff's circumstances and his theory of the case.  Where the defendant is an organization, evidence of other employees' treatment and organizational failures in human resources and/or disability accommodations may be highly relevant to the specific employee's claim, because an "atmosphere" of condoned discrimination or significant organizational deficiencies in the workplace "increases the likelihood of retaliation for complaints in individual cases."  *Hawkins*, 900 F.2d at 156.  Employees that

38

are "closely related" in cases of discrimination do not require their cases to be so directly aligned as to exactly mirror one another.

Accordingly, upon examining the proffered testimony of Cosso and how closely related it is in material ways to Plaintiff's circumstances and theory of the case, the Court finds that the probative value of Cosso's testimony outweighs any undue prejudice. Defendant's motion to exclude Cosso's testimony is DENIED. The Court will consider proposed curative and/or final jury instructions to alleviate any undue prejudice to the Defendant.

## VI. Defendant's Motion to Exclude General Evidence of Mold Within MCC (ECF No. 96)

### A. Factual Background

Defendant seeks to exclude "general evidence of mold" found in the MCC. ECF No. 96 ("MIL 5"). Defendant contends that Plaintiff worked specifically in the "facilities office" in the lower basement of the MCC and worked almost exclusively at his desk. *Id.* at 2. However, Defendant claims many of Plaintiff's "thousands of pages of correspondence, memoranda, and reports of suspected mold" relate to "locations of the facility where Plaintiff did not work." *Id.* at 4. Exhibit 3 attached to Defendant's Motion lists the specific Plaintiff's exhibits Defendant seeks to exclude. These exhibits include:

- Email correspondence with the Associate Warden regarding lab results from spore traps dated 10/27/2016;

- Email from Associate Warden regarding a Notice of Unsafe or Unhealthful Working Conditions dated 11/3/2016;

- Email from Associate Warden regarding OSHA Inspection No. 1148475 dated 11/21/2016;

- Call record regarding "Clarification of Building Mold" dated 12/20/2016;

3:19-cv-02138-JAH-DTF

- Email from Associate Warden regarding mold dated 5/16/2017;

- Letter from Union VP dated 8/18/2017;

- Log of Reported Unsafe or Unhealthful Conditions recorded by Jack Orr dated 10/16/2017;

- Letter from Union VP dated 2/14/2018

- FBP memo for All Environmental & Safety Compliance Administrators regarding workplace mold dated 6/11/2015;

- FBP memo for All Environmental & Safety Compliance Administrators regarding workplace mold dated 12/15/2021;

- MQC San Diego Workplace Mold Issues reporting from June 2015 to November 2016;

- Logs of Reported Unsafe or Unhealthful Conditions recorded 2017, 2019, and 2020.

- ECF No. 96-3 ("MIL 5, Exh. 3").

### B. Discussion

Defendant argues the aforementioned exhibits regarding mold in the MCC should be excluded as "irrelevant, unfairly prejudicial to the defense, hearsay, and improper opinion testimony."   MIL 5 at 6.   Defendant claims mold is only relevant to this case to the extent that Plaintiff claims to be legally disabled based on his exposure and sensitivity to mold, yet many of Plaintiff's "thousands of pages of correspondence, memoranda, and reports of suspected mold" relate to "locations of the facility where Plaintiff did not work." *Id.* at 4.

In opposition, Plaintiff argues that Defendant's motion would exclude broad categories of evidence which include "thousands of pages of correspondence, memoranda, and reports of suspected mold in locations of the facility where Plaintiff did not work." ECF No. 112 at 2.   He argues the evidence Defendant seeks to exclude is "vague,

3:19-cv-02138-JAH-DTF

ambiguous, and overbroad." He also contends that the evidence is highly probative of Defendant's intent and cover-up of the MCC's mold issue.

Defendant's motion refers to a number of examples of evidence that may be subject to Rules 401 and 801 regarding admissibility, including among others, Plaintiff's exhibits 6, 16, and 17, relating to a 2012 Mold Survey Report, a log reflecting a list of 16 distinct complaints concerning asbestos, signage present within a medical unity, elevator, and door, the inspection of exhaust fans, ventilation, and the presence of rust on shower heads, among others. ECF No. 96 at 4, ECF No. 96-3 at 1-2. Defendant alleges these exhibits contain hearsay within hearsay and are thus inadmissible under Rule 801(D)(2). In support of its argument that evidence of mold in locations where Plaintiff did not work is not relevant, Defendant makes reference to the expected testimony of its expert witness, Dr. Saxton, who will testify that, in the areas in and around Plaintiff's office, there were low levels of mold, ECF No. 96 at 5-6, and that Plaintiff does not have an expert qualified to opine on how mold in remote locations of the MCC could cause Plaintiff's medical symptoms. *Id.* at 7.

Plaintiff objects to Defendant's argument and contends that mold in the MCC, beginning three years before Plaintiff began working there, is admissible to demonstrate its presence before he began his employment until the last day of his work at the MCC, including the mold sampling test results received by the MCC on or about June 2015, reflecting the MCC's knowledge of mold between 2012 and 2015, at or about the time Plaintiff first obtained medical assistance relating to his symptoms, followed by Plaintiff's complaint to Associate Warden Salazar and the latter's action to move Plaintiff's office to the first floor at the MCC in August 2015. In addition, the evidence Defendant seeks to exclude may not necessarily be limited to his desk and workplace in the basement or the alternative conference room converted to a temporary office. For example, Dr. Pohl's letters to management of the MCC, dated October 14, 2016 and November 18, 2016,

3:19-cv-02138-JAH-DTF

indicate that Dr. Pohl may testify that areas other than the limited areas suggested by the Defendant may be areas of mold growth contributing to Plaintiff's overall mold exposure, including areas within which Plaintiff walks in, above, and/or below, that may impact his symptoms and cause related requests for testing in those areas relevant. Dr. Brown's testimony on occupational hazards associated with mold exposure, and how mold exposure occurs, may also corroborate Dr. Pohl's testimony on Plaintiff's symptoms generated by cumulative mold exposure to areas other than his desk.

In addition, knowledge of mold in the MCC is expected to be presented by a co-worker's photographs of mold within the MCC, who Plaintiff asserts was later reprimanded for taking the photographs in an effort by Defendant, according to Plaintiff, of concealing the existence of mold in the workplace and of utilizing concealment measures to support false statements that no mold existed in the MCC to counter Plaintiff's evidence of the existence of mold in the MCC. This Court notes this particular evidence may be admissible to challenge or rebut Defendant's evidence relating to its denials of mold being present in certain locations in the MCC, where Plaintiff had access in order to perform his work, as well as to evidence Defendant's knowledge and intent with respect to discrimination, harassment, and retaliation. At a minimum, this evidence is admissible as circumstantial evidence under Rule 404(b)(2), an evidentiary rule of inclusion for permitted uses, not exclusion.

The same or similar analysis applies to Plaintiff's evidence supporting his claims relating to, as examples: a notice sent to Defendant in May 2016 regarding black mold growing throughout the MCC; an October 20216 notice by OSHA regarding unsafe and unhealthy work conditions; statements made by the Safety Manager in December 20, 2016; mold conditions as reported by a Union Vice-President on or about August 16, 2017 relating to the MCC's lack of mold remediation efforts; and various meetings between Plaintiff and upper-line supervisors and managers, and their statements made along with

their actions or inactions to request and implement accommodations made by Plaintiff and his treatment physicians, including Drs. Blando and Pohl.

Defendant also contends that Dr. Brown cannot opine on Plaintiff's medical condition to explain how mold in remote locations of the MCC could have caused Plaintiff's symptoms, because Dr. Brown purportedly lacks the qualifications to do so. In support, Defendant cites this Court's Summary Judgment Order granting in part Defendant's motion to exclude certain aspects of Dr. Brown's testimony. Plaintiff opposes Defendant's contention that Dr. Brown should be excluded as an expert witness on this front. For the reasons stated in Plaintiff's opposition, and based on the Court's prior Summary Judgment Order on the issue, the Court finds that Defendant understates Dr. Brown's qualifications to testify as an expert witness and overstates or misstates the Court's order limiting his testimony at trial.

In the Court's Summary Judgment Order, the Court ruled on the admissibility of Dr. Brown's expert testimony. The Court found:

"As an industrial hygienist with about 25 years of work experience in the environmental health and safety field, a doctorate degree and master's degree in public health, and a bachelor's degree in pre-medicine/philosophy, the Court finds that Dr. Brown is qualified <u>to testify generally as to the health effects of mold</u>. However, the Court finds that Dr. Brown is not a medical doctor or expert qualified to interpret Plaintiff's medical records and give expert opinions that are medical in nature and specific to Plaintiff." ECF No. 73 at 29-30 (emphasis added).

While Dr. Brown may not testify specifically as to Plaintiff's medical condition, or provide medical opinions as to the casual connection between exposure to mold and the development of Plaintiff's medical condition, Dr. Brown is an occupational health and safety expert who may testify generally to the health effects of mold and whether the mold present in one location of the MCC could have exposed Plaintiff to an

3:19-cv-02138-JAH-DTF

occupational health and safety risk in the areas in which Plaintiff worked or accessed. It is well within Dr. Brown's expertise to testify on whether Plaintiff may have been exposed to mold at the MCC, and the routes of such exposure, during Plaintiff's employment at the MCC and whether the occupational risks remained at the MCC as relevant to Defendant's theory that there was no occupational harm present to prevent Plaintiff's return to work. But it is beyond Dr. Brown's expertise to opine on whether occupational mold exposure at the MCC caused the development of Plaintiff's medical symptoms.

Dr. Brown's opinions, including but not limited to, his expert testimony that the MCC "has multiple ongoing documented ventilation and water intrusion issues, creating chronic, long-term areas of toxic, allergenic, and/or opportunistic mold growth," Brown Report at ¶ 1, the short-term water loss events "that have created additional areas of this hazardous mold growth," *id.*, and "a number of hazardous sources of mold contamination," *id.* at ¶¶ 5-8, are relevant to Plaintiff's disability and claims for discrimination, harassment, and retaliation, including the purported failure by the Defendant to provide reasonable accommodations to Plaintiff and terminate his employment.[7] Dr. Brown's testimony on (1) proper detection and remediation of the mold, including how mold may travel from one location to another through ventilation, shared walls, etc., (2) factual disputes regarding mold detection analyses conducted at Plaintiff's area of work, (3) factual disputes regarding the overall scope of mold exposure Plaintiff faced, and (4) whether the MCC and Plaintiff's work site met occupational health and safety standards to allow Plaintiff to safely return to work, are

---

[7] The Court in its Summary Judgment Order ruled that Dr. Brown may not testify that these instances, taken together, demonstrate "negligence" or "gross negligence" by the MCC. ECF No. 73 at 27-28.

3:19-cv-02138-JAH-DTF

all relevant for the same reasons.

Plaintiff contends that Dr. Brown will be providing testimony based on his expertise in industrial hygiene and occupational health and safety.  MIL 5 Opp'n at 5-6.  Dr. Brown, a member of a 12-person panel that advises the California Occupational Health and Safety Administration, <u>may</u> "testify regarding the extent of indoor mold at the MCC San Diego, the hazards associated with mold levels similar to those at the MCC San Diego, the proper detection and remediation of the mold, and related topics as outlined in his extensive report," *Id.* at 5, subject to the scope considerations discussed *supra*.  Plaintiff contends that Mr. Brown's expert testimony will show that Defendant's claim that MCC was safe for Plaintiff to return to was false.  *Id.* at 6.  For all reasons stated above, the Court agrees with Plaintiff's position on the scope of Dr. Brown's testimony.

Plaintiff also contends that a number of other documents sought to be excluded by the Defendant in the instant motion corroborates or supports Dr. Brown's expert opinions and challenges Defendant's claim that it was safe for Plaintiff to return to work.  The Court's rationale herein addresses only the specific arguments presented by Defendant in the instant motion.  And Defendant does not address the specific applicability of exceptions to the hearsay rule or other applicable evidentiary rules, including as stated Rule 404(b) regarding admissibility, in light of the very broad categories of evidence Defendant is seeking to exclude.

Evidence of mold located within the areas Plaintiff was assigned to perform his duties within the MCC, and evidence of mold located in additional areas that could generate occupational hazard risks at the locations in which Plaintiff performed his duties, are relevant to support Plaintiff's claims.  The broad band of evidence Plaintiff seeks to admit, however, is not boundless.  Instead, it is based on Plaintiff's ability to bring in such evidence under 404(b) and/or as relevant evidence under 401, including

3:19-cv-02138-JAH-DTF

evidence relied on by his expert witnesses.  On the other hand, Defendant does not argue what specific items of evidence are irrelevant or why specific items are not admissible.  For example, Defendant argues "these documents and statements contain hearsay within hearsay and are thus, in admissible," MIL 5 at 5, but offers no further explanation or support for this argument.

Accordingly, Defendant's MIL 5 is DENIED without prejudice.

### C. Conclusion

The relevance standard is a low burden to meet, and evidence of mold within the MCC is  relevant to Plaintiff's theory of disability and MCC's discriminatory motive and retaliatory intent.   Plaintiff may rely on Dr. Brown to testify on whether mold in different areas of the MCC could have exposed Plaintiff to occupational health and safety risks.

However, the scope of that evidence in terms of proximity to Plaintiff's work environment should be explained to reduce undue prejudice to the Defendant.  In addition, Plaintiff left the MCC on October 18, 2016, and never returned.  Plaintiff seeks to introduce tests that are dated years later, including tests from 2018, 2019, 2020, and 2021.  Because a portion of the later tests are relevant for Plaintiff's theory of the extent of mold issues faced by MCC, and, in part, reasons for MCC's purported retaliatory conduct, the Court will permit the Plaintiff to introduce tests dated from 2018 to January 1, 2020, but not onwards, as relevant to the persistent mold issue MCC faced.

With respect to the identified documents and evidence specifically addressed by the Defendant in its motion, subject to the Court's further review of the scope of this evidence and its relevance, the Court finds the probative value as to each exhibit and other evidence outweighs any undue prejudice to the Defendant under a Rule 403 analysis.  The Court will also entertain proposed curative and/or final jury instructions to ensure the jury makes its decision based upon all of the evidence.

///

3:19-cv-02138-JAH-DTF

### **PLAINTIFF'S MOTIONS IN LIMINE**

**I.  Plaintiff's Motion to Exclude LabCorp Documents (ECF No. 99)**

Plaintiff's first motion in limine seeks to exclude the LabCorp documents that demonstrate Plaintiff is not allergic to mold.  This issue was already addressed by Defendant's third motion in limine.  *See* MIL 3.  Therefore, the Court rules consistently on the Parties' motions as addressed above and will resolve any further issues regarding witness introduction and authenticity at the same time at a future date.  Plaintiff's motion is DENIED.

**II. Plaintiff's Motion to Exclude Defendant's Experts' Reports (ECF No. 100)**

Plaintiff moves to exclude Defendant's Exhibits S, T, and U, which are the reports of Defendant's retained experts, as inadmissible hearsay.  Defendant intends to offer testimony from "Dr. Andrew Saxon, MD, a licensed physician specializing in Clinical Immunology and Allergy; Laura Dolan, MBA, an economic expert; and Daniel Farcas, an Industrial Hygienist."  ECF No. 115 ("MIL 9 Opp'n") at 1.  Defendant explains it marked for identification purposes various documents, including expert reports and deposition transcripts, but does not plan to introduce them unless for impeachment or by way of a future stipulation.  *Id.* at 2.  Plaintiff did not file a Reply.

Because Defendant does not plan to offer these reports or depositions as evidence in its case-in-chief, Plaintiff's motion is DENIED as moot and without prejudice.  Defendant may introduce contents from the report on cross-examination or re-direct, but may not enter into evidence the expert reports themselves.

///

///

3:19-cv-02138-JAH-DTF

III.    **Plaintiff's Motion to Exclude Mold Test Reports (ECF No. 101)**

**A. Factual Background**

- Defendant's Exhibit A is an inspection report summarizing the results of an October 1, 2015, inspection and air sampling by S.M. Inspections, signed by Sean Myers.

- Defendant's Exhibit B is a Mold Report from October 5, 2015, signed by Pam Hui of EMLab P&K, reflecting laboratory results of mold spore trap testing.

- Defendant's Exhibit C is another mold test results from EM Lab P&K, LLC, for the MCC lock shop.

- Defendant's Exhibit I is an Environmental Consulting mold report from October 25, 2015, signed by Kent R. Wells.

All of these reports reflect testing of mold conditions in the MCC by professionals.

**B. Discussion**

Plaintiff moves to exclude these exhibits on the grounds they constitute inadmissible hearsay, and they lack foundation and authenticity. ECF No. 101 ("MIL 10") at 1.

**i.    Hearsay**

Plaintiff claims these exhibits constitute inadmissible hearsay. Hearsay is not admissible unless provided otherwise by a federal statute, the Federal Rules of Evidence, or the Supreme Court. Fed. R. Evid. 802. Hearsay is any out of court statement being offered for the truth of the matter asserted. Fed. R. Evid. 801(c). Defendant claims these mold test results fall under the "Records of a Regularly Conducted Activity" exception to the Rule Against Hearsay, as discussed below.

**ii.   Authenticity**

Plaintiff argues Defendant's Exhibits A, B, C, and I cannot be authenticated because Defendant cannot establish chain of custody demonstrating the mold spore samples were collected properly from the MCC and maintained "with proper procedures sufficient to

3:19-cv-02138-JAH-DTF

provide reliable evidence for the jurors." MIL 10 at 3. Further, Plaintiff argues Defendant has not named an expert from EM Lab P&K, LLC, to authenticate the lab results for Exhibits B and C. *Id.* at 5.

Authentication of evidence is satisfied when "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Evidence is considered authentic when the party asserts "the original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court." Fed. R. Evid. 902(11). To satisfy the Rule 803(6)'s "Records of a Regularly Conducted Activity" exception to the rule against hearsay, Defendant must demonstrate (1) "the record was made at or near the time by – or from information transmitted by – someone with knowledge"; (2) "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit"; (3) "making the record was a regular practice of that activity"; (4) "all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification"; and (5) "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6).

Here, each of these reports was prepared by professional testing companies and laboratories in their regular course of business. ECF No. 117 ("MIL 10 Opp'n") at 5. Plaintiff has not offered any argument to suggest otherwise. Defendant claims it has "listed witnesses in the Pretrial Order to testify regarding the authenticity of each report or otherwise provide a certification if Plaintiff persists in these make-work objections." *Id.* at 6. However, Plaintiff states, and Defendant does not directly refute, that Defendant has listed Mr. Myers and Mr. Wells as witnesses to authenticate Exhibits A and I, but

Defendant has not listed Ms. Hui or any other witness to authenticate the EM Lab P&K, LLC, reports marked as Defendant's Exhibits B and C.  MIL 10 at 5.

In the event the Defendant is unable to authenticate the EM Lab reports, the Court may exclude the reports.  *See N.L.R.B. v. First Termite Control Co., Inc.*, 646 F.2d 424, 427 (9th Cir. 1981) (holding Rule 803(6) requires a custodian or other qualified witness to insure "the presence of some individual at trial who can testify to the methods of keeping information," and if "the witness is not knowledgeable … he or she cannot be subjected to meaningful cross-examination").  Accordingly, the Court DENIES Plaintiff's motion, contingent on Defendant's ability to authenticate the EM Lab reports.

## IV.    Plaintiff's Motion to Limit Use of Deposition Transcripts (ECF No. 102)

Plaintiff moves the Court to "limit[] Defendant's use of depositions transcripts, other than Mr. Romero's transcript, [for] impeachment of witnesses or in lieu of the testimony of witnesses who are unavailable to testify at the time of trial."  ECF No. 102 ("MIL 11") at 1.  Defendant claims the motion is premature and "[s]everal of the witnesses deposed in this case no longer reside in the San Diego area and their availability to travel to testify at trial will depend on when the trial takes place."  ECF No. 116 ("MIL 11 Opp'n") at 2.  It appears the Parties agree on this point.  Plaintiff is essentially requesting the Court to issue an advisory opinion on the use of deposition transcripts, which is not necessary at this stage.  The Court accordingly DENIES Plaintiff's motion without prejudice.

## V. Plaintiff's Motion to Prevent Defendant Arguing Failure to Mitigate Damages (ECF No. 105)

Plaintiff asks the Court to exclude Ms. Dolan's testimony and Defendant's argument that Plaintiff failed to mitigate his damages.  ECF No. 105 ("MIL 12") at 1.  Plaintiff argues "there is no statutory provision nor common law principle providing for a duty to mitigate damages where the plaintiff has not been discharged."  *Id.* at 2.  Plaintiff also argues the

issue is not relevant to a determination of liability in this case. *Id.* Plaintiff contends that introduction at trial of testimony on Plaintiff's failure to mitigate his damages would be highly prejudicial and would unnecessarily confuse the jury because failure to mitigate is not relevant to Plaintiff's claims for disability, retaliation, harassment, and/or discrimination. *Id.* at 3-4.

Defendant argues that testimony of mitigation is relevant to the equitable remedy analysis the Court will decide after the liability stage. ECF No. 107 at 4 ("Plaintiff's alleged economic damages are equitable remedies that must be determined solely by the Court.") (emphasis added). Defendant points to caselaw that supports its position that equitable remedies like back pay and front pay are evaluated and determined by the Court, not the jury. *Id.* (contending, "[a]s a matter of law, mitigation is always part of an equitable remedy analysis."). Elsewhere, Defendant has argued to bifurcate the issue of damages, so that the jury may be able to focus first on deciding the issue of liability before the Court decides the damages. *See* ECF No. 93 at 2.

"[T]here is no right to have a jury determine the appropriate amount of back pay under Title VII, and thus the ADA, even after the Civil Rights Act of 1991." *Lutz v. Glendale Union High Sch.*, 403 F.3d 1061, 1069 (9th Cir. 2005). "Instead, back pay remains an equitable remedy to be awarded by the district court in its discretion." *Id.* "Because it is an equitable remedy, back pay is subject to a duty to mitigate damages." *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 492 (5th Cir. 2001). "A court awarding front pay should consider a plaintiff's ability to mitigate her damages by finding other employment in the future." *Gotthardt v. Nat'l R.R. Passenger Corp.*, 191 F.3d 1148, 1157 (9th Cir. 1999). In determining back pay and/or front pay, district courts consider "any relevant factors, including the plaintiff's duty to mitigate and the availability of employment opportunities" in arriving at the final damages amount. *Madison v. IBP, Inc.*, 149 F. Supp. 2d 730, 785 (S.D. Iowa 1999).

3:19-cv-02138-JAH-DTF

In this Court's Summary Judgment Order, the Court held that Ms. Dolan's testimony was relevant to the equitable damages analysis of back pay and/or front pay in this matter. ECF No. 73 at 38-39. Because this determination is made solely by the Court, the Court agrees with Plaintiff's argument that expert testimony on mitigation damages will unnecessarily confuse the jury and prejudice the Plaintiff, because Plaintiff duty to mitigate is not relevant to his claim of disability or Defendant's liability for discrimination, retaliation, and/or harassment. In addition, the Court has ordered the bifurcation of damages in this matter, in its decision on Defendant's MIL in ECF No. 93. Plaintiff's motion is GRANTED.

## CONCLUSION

For the above reasons, the Court HEREBY ORDERS:

1. Defendant's Motion to Exclude Final Agency Decision (ECF No. 92) is DENIED;

2. Defendant's Motion to Exclude Alleged Economic Damages (ECF No. 93) is GRANTED;

3. Defendant's Motion to Admit LabCorp Test Report (ECF No. 94) is GRANTED;

4. Defendant's Motion to Exclude Other Employees' Health Conditions (ECF No. 95) is GRANTED in part and DENIED in part;

5. Defendant's Motion to Exclude Testimony of Plaintiff Witness Deanna Cosso (ECF No. 97) is DENIED;

6. Defendant's Motion to Exclude General Evidence of Mold Within MCC (ECF No. 96) is DENIED;

7. Plaintiff's Motion to Exclude LabCorp Documents (ECF No. 99) is DENIED;

8. Plaintiff's Motion to Exclude Defendant's Experts' Reports (ECF No. 100) is DENIED;

9. Plaintiff's Motion to Exclude Mold Test Reports (ECF No. 101) is DENIED;

3:19-cv-02138-JAH-DTF

10. Plaintiff's Motion to Limit Use of Deposition Transcripts (ECF No. 102) is
    DENIED; and

11. Plaintiff's Motion to Prevent Defendant Arguing Failure to Mitigate Damages
    (ECF No. 105) is GRANTED.


**IT IS SO ORDERED.**


DATED: September 30, 2025

_____
JOHN A. HOUSTON
UNITED STATES DISTRICT JUDGE

53

3:19-cv-02138-JAH-DTF