1
2
3
4
5
6
7                     UNITED STATES DISTRICT COURT
8                   SOUTHERN DISTRICT OF CALIFORNIA
9

10   FRANCISCO ROMERO,                    Case No.:  3:19-cv-02138-JAH-DTF
                         Plaintiff,
11                                        **AMENDED ORDER ON**
12   v.                                   **MOTIONS IN LIMINE**

13   MERRICK   B.   GARLAND,   Attorney   **ECF Nos. 92, 93, 94, 95, 96,**
14   General of the United States, et al.,  **97, 98, 99, 100, 101, 102, 103,**
                         Defendants.       **105**
15
16
17                           **BACKGROUND**

18        Plaintiff is an engineering technician and correctional officer who has worked at the

19   Metropolitan Correction Center ("the MCC") in San Diego since 1991.    ECF No. 28

20   ("TAC").   On May 27, 2015, while at work in the basement of the MCC, Plaintiff started

21   sweating, coughing, feeling dizzy, and began vomiting.   ECF No. 65-2 ("Pl.'s Decl. ¶ 6")

22   at 2; ECF No. 47-2 ("Pl.'s Depo") at 30:6-11.   Plaintiff left work and went to an urgent

23   care facility where he was given medication for vertigo and motion sickness.  Pl.'s Depo at

24   32:14-33:10.    The next day, Plaintiff visited his primary care physician, Dr. Ellen Blando,

25   who  diagnosed  Plaintiff  with  a  viral  infection  in  his  inner  ear,  causing  Plaintiff  to

26   experience severe vertigo.  Pl.'s Decl. ¶ 7.  Plaintiff took sick leave and returned to work

27   on or about June 8, 2015.  *Id.* ¶ 8; Pl.'s Depo. at 33:17-18.

28        Upon  Plaintiff's  return  to  work,  he  experienced  dizziness,  a  scratchy  throat,

                                      1

wheezing in his chest, coughing, and equilibrium and memory issues.    Pl.'s Decl. ¶ 8. Plaintiff told his supervisor, Noel Fenlon, that he was feeling sick.    *Id.*    According to Plaintiff, he also had a conversation with his coworker who told Plaintiff that his wife had similar symptoms and was sick from mold.    *Id.*    A few days later, Plaintiff went to a hospital emergency room because he was feeling sick again.    *Id.*    Plaintiff then set out mold testing kits at the MCC that he purchased from Home Depot.    *Id.*    Those tests indicated the presence of mold, which Plaintiff showed to his supervisor.    *Id.*; Pl.'s Depo. at 45:1-25.    According to Plaintiff, his supervisor told him that a company would be hired to do mold testing at the MCC.    Pl.'s Depo. at 45:21-46:2.

The following week, on June 25, 2015, Plaintiff filed a worker's compensation claim styled as a "Notice of Traumatic Injury" with the U.S. Department of Labor's Office of Workers' Compensation Programs for exposure to mold on May 27, 2015, in the MCC basement.    ECF No. 65-3 ("Federman Decl.") ¶ 4.

On or about July 13, 2015, the MCC received mold air sampling test results from an independent contractor that confirmed there was mold in the basement.    Pl.'s Decl. ¶ 1.    Plaintiff then spoke to Associate Warden Salazar and told him that he needed to get out of the basement due to his becoming sick there.    *Id.* at ¶ 12.    On or about August 11, 2015, Plaintiff's workstation was moved from the basement to a first-floor conference room.    *Id.*

On August 17, 2015, Plaintiff began seeing an occupational medicine physician, Dr. Lawrence S. Pohl, in connection with his worker's compensation claim.    *Id.* ¶ 15; Pl.'s Depo. at 67:4-14; ECF No. 65-4 ("Pohl Decl.") ¶¶ 3, 4.    Dr. Pohl interviewed Plaintiff, reviewed his clinical history, examined him, and determined his symptoms "could be" attributed to the mold in the MCC's basement.    Pohl Decl. ¶ 4.    Dr. Pohl diagnosed Plaintiff with Rhinitis, nasopharyngitis, cough, shortness of breath, memory loss, and unspecified peripheral vertigo.    *Id.*    Dr. Pohl determined that "it was more probable than not that [Plaintiff's] respiratory symptoms were related to the overgrowth of mold in [the MCC], and that [Plaintiff] had an allergy to molds."    *Id.*    Dr. Pohl prepared a report

2

recommending that Plaintiff be accommodated at work by not working in the basement and away from mold exposure. *Id.* at ¶¶ 4-5.[1]

In late October 2015, according to Plaintiff, Associate Warden Salazar began telling him that he would have to move back to the basement. Pl.'s Decl. ¶ 17. On November 19, 2015, Plaintiff's primary care physician, Dr. Blando, referred him to have allergy testing, but he was not tested for mold allergies. *Id.* ¶ 18. Dr. Blando also wrote a letter stating that:

> [Plaintiff] has been suffering from recurrent allergies and asthma symptoms for years. He also has developed vertigo that makes him unsteady. When transferred to his current work area [on the first floor of the MCC], away from his old workplace [in the basement], his symptoms has [sic] dramatically improved. It is therefore requested that he be allowed to stay in his current location for maintenance of his health.

ECF No. 65-5 ("Damiani Decl."), Exh. 9. Plaintiff provided Dr. Blando's letter to the MCC, and he remained working on the first floor. Pl.'s Decl. ¶¶ 18-19.

Between July 26, 2016, and October 14, 2016, Plaintiff visited Dr. Pohl three times because he was coughing, had nasal congestion, had difficulty breathing, and was feeling dizzy, unbalanced, and unable to concentrate. Pl.'s Decl. ¶¶ 30-32. Dr. Pohl referred Plaintiff to see a neurologist and otolaryngologist for Plaintiff's vertigo and memory loss as related to sick building syndrome. Pohl Decl. ¶ 9; Pl.'s Decl. ¶¶ 31-32. On October 14, 2016, Dr. Pohl wrote a letter for Plaintiff to give to the MCC, explaining he had treated Plaintiff for over a year due to issues from exposure to mold and opining Plaintiff "should not be allowed to work in areas that have been tested positive for mold by the Safety Officer or Union." Pohl Decl. ¶ 10, Exh. 2.

On October 18, 2016, Plaintiff gave Dr. Pohl's letter to the MCC's Safety Department. Pl.'s Decl. ¶ 33. Plaintiff also took a leave of absence and requested that the

---

[1] Plaintiff continued to see Dr. Pohl and his colleague, Dr. Chandri Raval, for a series of follow up appointments from August 24, 2015 to April 30, 2018. Pohl Decl. ¶¶ 6-17.

3:19-cv-02138-JAH-DTF

first-floor office and other areas on the first floor be tested for mold because he was continuing to feel sick. *Id.* According to Plaintiff, while on leave on November 2, 2016, a representative of the MCC's Safety Department called Plaintiff and stated that the basement is clear, and Plaintiff needed to return to work in the basement per the orders of Associate Warden Salazar and Mr. Fenlon. *Id.* ¶ 34. Plaintiff then sent an email to the Warden, Associate Warden, the MCC's Safety Department, and Mr. Fenlon, requesting accommodations for Plaintiff's disability as provided by his doctors and requested a written response. *Id.* Plaintiff remained on leave.

On November 18, 2016, Plaintiff reported to Dr. Pohl that he was still experiencing symptoms, but they improved with being away from the mold at the MCC for a month. *Id.* ¶ 36; Pohl Decl. ¶ 11. Dr. Pohl wrote another letter stating Plaintiff "should not be allowed to work in areas that may or may not have tested positive for mold. [Plaintiff] may not walk by/below/above/next to areas that have had mold until remediation is complete. [Plaintiff] has a very low tolerance to the physical effects of mold and this mold exposure has caused him much distress and is harmful to his medical health." *Id.*, Exh. 3.

On November 25, 2016, Plaintiff requested leave without pay from the MCC so that he could receive workers' compensation, which the MCC approved 28 business days after receiving the request. Pl.'s Decl. ¶ 37. While on leave, Plaintiff continued seeing Dr. Pohl for follow-up appointments. *Id.* ¶¶ 39, 43. Overall, Dr. Pohl assessed Plaintiff for Bronchospasm, Rhinitis, and exposure to mold. Pohl Decl. at ¶ 14. On June 7, 2017, Plaintiff visited Dr. Pohl and reported that he was feeling better overall, but still had occasional haziness. *Id.* ¶ 15; Pl.'s Decl. ¶ 43. Dr. Pohl determined that Plaintiff could return to work, but needed to avoid areas where mold was present. Pohl Decl. ¶ 15. On July 25, 2017, Plaintiff visited Dr. Pohl again and Dr. Pohl assessed him for exposure to mold, Rhinitis, throat irritation, and persistent headaches. Pl.'s Decl. ¶ 44; Pohl Decl. at ¶ 16. Dr. Pohl determined that Plaintiff "had reached a period of maximal medical improvement but still needed future medical care in the form of medication for Rhinitis and throat irritations and follow up visits with a pulmonary specialist or occupational

4

specialist," and Plaintiff "still needed to avoid areas where mold was present."  *Id.*

On August 18, 2017, Plaintiff received a memorandum from Marco Sanchez, Union Vice President of the American Federation of Government Employees, that explained:

> The majority of identified mold found throughout the MCC has not been remediated.  Approximately 80% of identified mold still exist [sic] in the building.  A large amount of mold exist [sic] in the approx. 296 plumbing closets/air plumes located throughout the building.  This remediation project is expected to start in November and last approx. 200 days plus.  I have requested to Associate Warden R. Garcia and Safety Manager J. Hendrickson (July 19, 2017) that the Union be provided with a written procedure on how these areas are going to be cleared/deemed safe for staff to work/occupy upon completion of this remediation project.  As of today, no procedure or plan has been provided to the union.

Damiani Decl., Exh. 50.

On September 1, 2017, Plaintiff contacted Equal Employment Opportunity ("EEO") Counselor Jose Bautista to start the process of filing a formal complaint of discrimination, harassment, and retaliation against the Bureau of Prisons ("BOP").   Pl.'s Decl. ¶ 46.  He filed a formal complaint of discrimination and retaliation with the United States Department of Justice ("DOJ") on October 17, 2017.   Damiani Decl., Exh. 5.

On December 6, 2017, Plaintiff saw Dr. Edward C. Federman, a pulmonologist, in connection with his worker's compensation claim, at the request of the Department of Labor.  Pl.'s Decl. at ¶ 49; Federman Decl. ¶ 4.   Dr. Federman conducted an examination of Plaintiff to provide a pulmonary second opinion related to his occupational injury and illness.  Federman Decl. ¶ 4.  Dr. Federman determined that Plaintiff "had allergic asthma with mild reversibility on pulmonary function testing, consistent with [Plaintiff's] clinical history and symptomatology from mold exposure." *Id.* ¶ 7.  Dr. Federman also determined that Plaintiff had "mild obstructive airway disease, which explains his symptoms of coughing, wheezing, shortness of breath, and tightness in his chest. *Id.* ¶ 8. Dr. Federman further determined that Plaintiff continues to suffer from fatigue and dyspnea (shortness of breath) with exertion; limited exercise tolerance on the basis of his coughing and wheezing; and Plaintiff's allergic asthma and mild obstructive airway disease impaired his

ability to breath.  *Id.*   Based on Plaintiff's medical history and diagnostic test results, Dr. Federman determined that the most probable cause of Plaintiff's condition was workplace exposure to mold and recommended that Plaintiff avoid mold exposure.   *Id.* ¶¶ 9-10.   Dr. Federman also noted "[a] person can have a toxic reaction to mold without necessarily having an allergy to mold." *Id.* ¶ 10.

On March 26, 2018, Plaintiff received a letter from Associate Warden Dulgov in which he proposed that Plaintiff be removed from his position for excessive absences.  Pl.'s Decl. ¶ 50; Damiani Decl., Exh. 19.   On April 25, 2018, Plaintiff met with Warden Williams regarding Associate Warden Dulgov's letter, and no action was taken to remove him.  Pl.'s Decl. ¶ 51.

Plaintiff received a letter, dated April 18, 2019, from his new supervisor, Facilities Manager Kyle Ball, demanding that Plaintiff return to work.   *Id.* ¶ 54; Damiani Decl., Exh. 30.   In response, Plaintiff sent a memorandum to the Warden and Mr. Ball, dated April 22, 2019, requesting the institution test any areas he will be working in for mold before he returned to work.  Damiani Decl., Exh. 23.   The next day, Plaintiff met with the Warden. Pl.'s Decl. ¶ 55.

On September 3, 2019, the DOJ issued a Final Agency Decision on Plaintiff's employment discrimination complaint against the BOP.   Damiani Decl., Exh. 17.   The DOJ found that the BOP did not fulfill its obligations to Plaintiff under the Rehabilitation Act, as the BOP did not adequately engage in the interactive process with Plaintiff to devise reasonable accommodation.   *Id.*   As such, the DOJ determined Plaintiff was subjected to disability discrimination when BOP officials failed to fully engage in the interactive process by not responding to Plaintiff's requests for certification showing that the mold in the workplace had been remediated.   *Id.*   The DOJ instructed the BOP and Plaintiff to promptly resume the interactive process and exchange information and documentation relating to the MCC's mold remediation and Plaintiff's medical condition, to restore to Plaintiff twenty-eight (28) days of medical leave, and directed the BOP to submit a report on the status of the implementation of the relief ordered within ninety (90) days of the

6

decision.  *Id.*

## I.  Procedural History

Plaintiff originally filed a complaint against Attorney General William Barr, the Federal Bureau of Prisons, Director Kathleen Hawk Sawyer, the United States Department of Justice, and DOES 1-100, on November 6, 2019, for disability discrimination, failure to engage in interactive process, failure to accommodate disability, and retaliation.  ECF No. 1.  On April 13, 2020, the parties filed a joint motion for leave for Plaintiff to file a first amended complaint, which the Court granted.  ECF Nos. 9, 11.  Plaintiff then filed a first amended complaint.  ECF No. 16.

Defendants moved to dismiss Plaintiff's first amended complaint.  ECF No. 19.  The Court denied the motion to dismiss and granted Plaintiff's request for leave to file a second amended complaint to name the proper defendant.  ECF No. 24.  On May 28, 2021, Plaintiff filed a second amended complaint and the parties later filed a joint motion for leave for Plaintiff to file a third amended complaint, which the Court granted.  ECF Nos. 25-27.

On June 10, 2021, Plaintiff filed the operative third amended complaint ("TAC") alleging claims for disability discrimination, harassment based on disability, and retaliation.  ECF No. 28.  Defendant filed an answer.

On October 19, 2022, Defendant filed a motion for summary judgment ("MSJ") and two motions to exclude expert testimony from trial.  ECF Nos. 47-49.  On March 13, 2024, the Court issued an order granting in part and denying in part Defendant's MSJ.  *See* ECF No. 73 ("MSJ Order").  The Court granted Defendant's MSJ as to Plaintiff's retaliation claim for compensatory damages and denied it as to Plaintiff's other claims.  *Id.* at 20.

On November 22, 2024, the Parties filed a combined twelve motions in limine.  *See* ECF Nos. 92-102, 105.  An opposition was filed in response to each of the motions, and several replies thereto.

//

//

## **LEGAL STANDARD**

There is no express authority in either the Federal Rules of Civil Procedure ("FRCP") or the Federal Rules of Evidence ("FRE") for motions in limine, but such motions are recognized in practice and in case law. *See Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000); *United States v. Cook*, 608 F.2d 1175, 1186 (9th Cir. 1979). Authority for these motions may also be implied through "the court's inherent power to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). A motion in limine is "any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered." *Id.* at 40 n.2. The purpose of a motion in limine is to avoid the futile attempt to "unring the bell" when highly prejudicial evidence is offered and then stricken at trial. *See McEwen v. City of Norman*, *Okla.*, 926 F.2d 1539, 1548 (10th Cir. 1991). The trial court has broad discretion to grant or deny motions in limine and the decision is rarely disturbed on appeal. *See United States v. Rambo*, 74 F.3d 948, 955 (9th Cir. 1996); *Galindo v. Tist*, 971 F.2d 1427, 1429 (9th Cir. 1992). A decision on a motion in limine is not binding on the trial judge; the decision may be altered based on evidence presented at trial. *See Ohler*, 529 U.S. at 758. Thus, an objection may be made, or the evidence may be offered, at trial even if it falls within the scope of the court's in limine ruling. *See United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989).

## **DEFENDANT'S MOTIONS IN LIMINE**

**I. Defendant's Motion to Exclude Final Agency Decision (ECF No. 92)**

### **A. Factual Background**

Prior to filing this lawsuit, Plaintiff participated in an administrative process to resolve the issues between him and the MCC. As part of that administrative process, on September 3, 2019, the Department of Justice issued a Final Agency Decision ("FAD"). ECF No. 92-1 ("FAD"). The FAD found that Plaintiff "was subjected to disability discrimination when BOP officials failed to fully engage in the interactive process by not responding to

[Plaintiff's] repeated requests for certification showing that the mold in the workplace had been remediated." *Id.* at 35. The FAD also concluded Plaintiff was not entitled to compensatory damages because there was no evidence of "bad faith." *Id.* at 36.

The FAD instructed the Parties to resume the interactive process, requiring the DOJ to provide Plaintiff with the most recent mold remediation certification and requiring Plaintiff to provide the DOJ with medical documentation detailing the threshold of mold that affects his condition. Defendant claims it complied with the FAD and Plaintiff did not. Plaintiff filed this lawsuit on November 6, 2019.

## B. Discussion

Defendant argues the FAD should be excluded, first, because the Plaintiff chose to reject the FAD and subject his claim to de novo review by filing this lawsuit, and second, because it has the potential to cause delay and prejudice against Defendant in violation of FRE 403. ECF No. 92 ("MIL 1"). The Court will discuss each issue in turn.

### i. Whether Plaintiff Can Use the FAD as Evidence After Choosing to File Lawsuit

Defendant argues Plaintiff cannot use the FAD as a sword or shield because Plaintiff "chose to reject the FAD when he filed this lawsuit, exposing every element of his claims to de novo review." MIL 1 at 3. In support, Defendant cites a myriad of cases demonstrating courts are to review agency decisions de novo when a federal employee challenges an administrative disposition of his discrimination claim. *Id.*

Defendant cites to *Carver v. Holder* in support, where the Ninth Circuit held "[A] civil action [challenging a FAD] must be de novo, putting at issue both the [administrative agency's] liability determination - i.e., its decision that an agency has acted in a discriminatory manner - and its finding with regard to remedies." 606 F.3d 690, 696 (9th Cir. 2010). Plaintiff does not contest that his claims are subject to de novo review. This Court acknowledged that "[t]his discrimination action is a civil action that requires a de novo review" in its Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment. MSJ Order at 11. The fact that

9

Plaintiff's action is entitled to de novo review and the FAD is not binding in this lawsuit does not automatically preclude the FAD from being admissible.  *See Plummer v. Western Int'l Hotels Co.*, 656 F.2d 502, 504 (9th Cir. 1981) (reversing the district court's exclusion of an EEOC reasonable cause determination as evidence of discrimination, and holding "while prior administrative determinations are not binding, they are admissible evidence").  Therefore, the Court looks to FRE 403 considerations to determine whether the FAD is admissible in this case.

### ii.  Whether FAD is Unfairly Prejudicial Under FRE 403

Defendant argues the admission of the FAD would require Defendant to "attempt to expose the weaknesses of the report," which may "confuse or mislead the jury and result in an undue waste of time."  MIL 1 at 5.  Defendant further claims the FAD creates "substantial prejudice by allowing Plaintiff to argue that discrimination has already been established and is likely to mislead the jury into believing they have no duty to independently evaluate the evidence." *Id.* at 4-5.  Finally, Defendant argues the FAD will create a "trial within a trial" as to "what the FAD means, what evidence was in front of the Adjudication Officer when the FAD was decided, and whether the relief ordered was appropriate."  *Id.* at 5.  Plaintiff fails to directly respond to Defendant's prejudice argument, but Plaintiff does distinguish most of Defendant's cases, asserting that those cases involve decisions made by a third-party administrative agency (such as the EEOC), whereas here, the administrative agency responsible for the FAD is the Defendant itself.   ECF No. 108 ("MIL 1 Opp'n") at 4.

FRE 403 allows the court to exclude relevant evidence only if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time or needlessly presenting cumulative evidence." FED. R. EVID. 403.  Though the Ninth Circuit held the district court erred in excluding the EEOC's probable cause determination in *Plummer*, it drew a distinction between the potential for unfair prejudice when introducing a probable cause determination as opposed to a FAD.

Defendant cites the following cases to support its argument that any probative value of the FAD is substantially outweighed by the risk of unfair prejudice.

In *Gilchrist v. Jim Slemons Imports*, *Inc*., the plaintiff began working for the defendant as a car salesman but was later promoted to manager. 803 F.2d 1488, 1491 (9th Cir. 1986). After ten years, the defendant consolidated two of its locations into one and decided only one of the managers was necessary to operate both locations. *Id.* The defendant consequently terminated the plaintiff, who was fifty-eight years of age, after which the plaintiff sued for age-based discrimination. At trial, the district court admitted an EEOC letter of violation, which determined the defendant "discriminated against" the plaintiff. *Id.* at 1499. On appeal, the Ninth Circuit distinguished its holding in *Plummer* (that plaintiffs have a right to introduce an EEOC probable cause determination in Title VII lawsuits), and held that letters of violation pose a greater risk of prejudice because "a jury may find it difficult to independently [evaluate] evidence of age discrimination after being informed that the EEOC has already examined and found a violation." *Id.* at 1500. However, in light of the district judge's instruction that "the letter need be given no greater weight than any other evidence in deciding the age discrimination claim" and that "the jury, and not the EEOC are the sole judges of whether or not there was a violation," the Ninth Circuit found no error. *Id.*

In *Beachy v. Boise Cascade Corp.*, the plaintiff worked for the defendant as an accountant. 191 F.3d 1010, 1011-12 (9th Cir. 1999). Thirteen years into her employment, the plaintiff was involved in an automobile accident that caused serious injuries. *Id.* at 1012. Shortly thereafter, the defendant began imposing reprimands for plaintiff's poor attitude and performance at work, eventually leading to an unfavorable annual performance review and her termination. *Id.* Before trial, the plaintiff sought to exclude an Oregon Bureau of Labor and Industries "Notice of Dismissal," the equivalent of a FAD, that determined the agency would not proceed with her case. *Id.* at 1014. The plaintiff argued the agency decision would be unfairly prejudicial and confuse the jury. *Id.* at 1015. The trial court admitted the agency decision over the plaintiff's objection. *Id.* On appeal, the

11

Ninth Circuit distinguished its holding in *Plummer*, holding: "[t]here is a much greater risk of unfair prejudice involved in introducing a final agency ruling as opposed to a probable cause determination, because a jury might find it difficult to evaluate independently evidence of discrimination after being informed of the investigating agency's final results." *Id.* at 1015 (citing *Gilchrist*, 803 F.2d at1500).   Nevertheless, the Ninth Circuit affirmed the judgment of the district court, explaining any error in admitting the agency decision was harmless. *Id.* at 1016.

In *EEOC v. Manville Sales Corp.*, the plaintiff worked for the defendant as a fiberglass sales representative.   27 F.3d 1089, 1091 (5th Cir. 1994).   Later, the defendant hired a new manager, who decided that the area covered by three sales representatives could be covered effectively by only two.   *Id.*   The new manager decided the plaintiff would be terminated and the remaining two would absorb his territory.   *Id.* at 1092.   Plaintiff filed a complaint with the EEOC, claiming his termination was motivated by age discrimination.   *Id.*   At trial, the district court granted the defendant's request to exclude a "letter of violation" from the EEOC.   *Id.* On appeal, the Fifth Circuit agreed with the Ninth Circuit's holding in *Gilchrist* that a letter of violation "represents a determination by the EEOC that a violation of the Act has occurred and thus results in a much greater possibility of unfair prejudice" and that "[t]he probative value of a letter of violation may not, in every case, outweigh the potential for prejudice."   *Id.* at 1095 (quoting *Gilchrist* 803 F.2d at 1500).   The Fifth Circuit then upheld the district court's decision to exclude the letter, explaining there was no abuse of discretion.   *Id.*

In *Lang v. Kohl's Food Stores, Inc.*, the plaintiff representing a class of women working in the bakery and deli departments of the defendant's grocery store sued defendant asserting they were paid less than the male-dominated produce department workers.   217 F.3d 919, 922 (7th Cir. 2000).   Before trial, the plaintiff obtained a favorable motion in limine decision excluding an EEOC report that determined there was no discrimination.   *Id.* at 926.   However, at trial, the plaintiff's counsel opened

12

the door and put the EEOC report at issue. *Id.* After plaintiff's counsel told the jury that the defendant had reduced the salary gap across men and women workers "under pressure of this lawsuit," the defendant sought to enter the EEOC report that found no discrimination on the part of the defendant in order to rebut plaintiff's contention. *Id.* at 925-26. The district court agreed with the defendant and informed the jury about the EEOC's conclusion that the defendant had not engaged in discrimination. *Id.* at 926. The district court was careful to explain that the EEOC's determination had been previously rescinded by the EEOC at plaintiff's request and that, in light of plaintiff's decision to proceed with the action in federal court, no further determination had since been issued by the EEOC as of the date of trial. *Id.* On appeal, the Seventh Circuit found "decisions by public bodies do not vanish into thin air or [cease to] become []documents when parties ask for reconsideration or settle their differences." *Id.* at 927. The Seventh Circuit went on to explain that "doubtless there was a risk that the jury would overestimate the significance of the EEOC's ruling; this is why such conclusions generally are not admitted (on behalf of either side) in jury trials." *Id.* Nevertheless, the Seventh Circuit affirmed the verdict because the plaintiff opened the door and because the district judge's instructions "ensured that the jury focused on . . . the right questions." *Id.* at 927-28.

In *Amantea-Cabrera v. Potter*, the plaintiff had a confrontation with a male co-worker resulting in the co-worker deliberately pushing a large metal mail cart toward the plaintiff who was pregnant at the time. 279 F. 3d 746, 748 (9th Cir. 2002). The plaintiff later filed a sex discrimination claim with the EEOC. *Id.* The plaintiff alleged that, in similar incidents, management followed internal investigative protocols and suspended the alleged aggressor pending the results of the investigation, neither of which occurred in her incident. *Id.* The Administrative Law Judge ("ALJ") issued a recommended decision finding there was discrimination because of sex. The defendant rejected the ALJ findings in its own Final Agency Decision. *Id.* At a de novo jury trial to determine damages, the district judge excluded the EEOC decision that determined there was discrimination. *Id.*

13

at 749.   On appeal, the Ninth Circuit again distinguished *Plummer* and cited to *Gilchrist*, explaining district courts have discretion to determine admissibility of EEOC decisions and orders, unlike EEOC probable cause determinations.   *Id.*   Therefore, the district court's decision to exclude the EEOC decision was affirmed as failing to rise to an abuse of discretion. *Id.*

In *Arizona*, *Department of Labor*, *Civil Rights Division v. ASARCO, L.L.C.*, the plaintiff worked as a laborer for a mining company. 844 F. Supp. 2d 957, 961 (D. Ariz. 2011). The plaintiff reported to management that there were pornographic drawings in the restroom, including one that identified her.   *Id.*   The plaintiff also alleged her supervisor sexually harassed her.   *Id.*   After no action was taken by management, the plaintiff felt compelled to quit.   *Id.*   Before trial, the defendant filed a motion in limine to exclude a reasonable cause determination from the State of Arizona, which found there was evidence of discrimination and harassment.   *Id.* at 980.   The district court found that, because the State of Arizona was a party to the case, the reasonable cause determination "simply vouch[ed] for the [State's] litigation position, which both reduces its probative value and increases its potential for prejudice." *Id.* at 981.   In light of this tipping of the scales, the district court excluded the reasonable cause determination. *Id.*; *but see Heyne v. Caruso*, 69 F.3d 1475, 1482-1484 (9th Cir. 1995) (holding that district court's decision to exclude the Nevada Equal Rights Commission's probable cause determination was reversible error).

The Parties also cite two trial court decisions from the Southern District of New York.   Defendant discusses *Sulton v. Lahood* at length. 2009 WL 3815764 (S.D.N.Y. Nov. 6, 2009).   In *Sulton*, the plaintiff brought an employment discrimination claim against the Federal Aviation Administration after his application for a position as an air traffic controller was denied.   *Id.* at *1.   The plaintiff filed an administrative claim with the Department of Transportation, which issued a final agency decision, finding the "plaintiff had been discriminated against on the basis of race."   *Id.*   There, like here, the plaintiff sought de novo adjudication of his dispute, which meant the final agency decision ceased

14

to be dispositive.  *Id.*    The district court granted the defendant's motion in limine to exclude the final agency decision, explaining, "the [final agency decision] does not make it more or less probable that defendant discriminated against plaintiff.  To conclude otherwise undermines the concept of de novo review by the trier of fact."  *Id.*  at *2.  And even if the final agency decision had probative value, "it would be substantially outweighed by the dangers of unfair prejudice to the defendant and jury confusion."  *Id.*

Plaintiff argues that *Accely v. Consolidated Edison Co. of N.Y., Inc.*, 2023 WL 3045795 (S.D.N.Y. Apr. 20, 2023) is more analogous to the instant case.  First, according to Plaintiff, *Accely* is distinct from the other cases cited by Defendant because it did not involve a third-party agency decision.  Instead, it involved a corporate investigation conducted by the defendant, which concluded the defendant had violated defendant's Equal Employment Opportunity Policy.  *Id.* at *1-2.  The defendant moved to have the decision excluded on the grounds that it would "impermissibly tell the jury what result to reach," confuse the jury because the report found violations of the defendant's policy rather than violations of the law, and created "multiple mini-trials within" the trial.  *Id.* at *2.  The district court found the report was clearly relevant, the circumstances of the report's preparation suggested it was reliable, the report was not dispositive, and the jury could decide, based on all the evidence, whether to accept its findings and whether to conclude the defendant violated the law.  *Id.*  at *3.  Furthermore, the district court concluded the report satisfied the party-opponent statement exception to the rule against hearsay as to the corporation.  *Id.*

This Court finds *Accely* more persuasive than *Sulton*.  Plaintiff correctly notes that *Accely* involved an investigative report prepared by the defendant rather than a third-party agency.  *Id.* at *3.  There, the court reasoned that the "trustworthiness [of the report]," which contained findings "adverse to [Defendant's] interests," was "bolstered by the fact" that the FAD was prepared by Defendant because "it is especially unlikely [that Defendant] would have intentionally or knowingly commissioned, accepted, or acted upon a report containing falsehoods."  *Id.*

The Court finds that Ninth Circuit precedent leans in favor of admitting FAD evidence where the Court exercises its discretion based upon the particular facts of the case and provides jury instructions relating to the weight to be given to the evidence so that the jury may abide by its responsibility to consider all of the evidence in reaching its verdict. The Court also finds that the FAD is admissible pursuant to Rule 801(d)(2). The Court further finds that the probative value of this evidence substantially outweighs any Rule 403 considerations, including undue prejudice. The Parties shall submit proposed curative and final jury instructions to the Court designed to eliminate any Rule 403 concerns before the beginning of the jury trial as ordered by the Court.

Accordingly, Defendant's motion to exclude the FAD evidence is DENIED.

## II. Defendant's Motion to Exclude Alleged Economic Damages (ECF No. 93)

### A. Factual Background

Plaintiff hired an economic expert, Paul Zimmer, to calculate Plaintiff's damages. Mr. Zimmer compiled a report, which contains two scenarios. The first totals Plaintiff's economic loss "without a reduction for workers' compensation benefits," and the second scenario totals Plaintiff's economic loss "with a reduction for workers' compensation benefits." ECF No. 93-1 at 5. The totals in these scenarios are $1,016,821 and $693,508, respectively, representing a $323,313 difference. *Id.*

### B. Discussion

Defendant moves to bifurcate Plaintiff's economic damages claims, as they are an equitable remedy. ECF No. 93 ("MIL 2") at 2. In the alternative, Defendant moves to limit the testimony of Plaintiff's economic expert contending that the expert's report "does not take into account the hundreds of thousands of dollars in workers' compensation payments Plaintiff has received pursuant to the Federal Employees Compensation Act (FECA)." *Id.* In opposition, Plaintiff argues that even if the economic damages claims are bifurcated, the economic expert's testimony about his lost wages and employment benefits will be necessary for the jurors to understand his compensatory damages, which the jury will decide. ECF No. 109 ("MIL 2 Opp'n") at 3. Plaintiff explains the reasons

16

for his "reputational injury, mental anguish, emotional distress, and loss of job responsibilities stem from the loss of income and employment benefits." *Id.*

### i. Bifurcation of Economic Damages

Under FRCP 42(b), the Court may "[f]or convenience, to avoid prejudice, or to expedite and economize . . . order a separate trial of one or more separate issues." FED. R. CIV. P. 42(b). In claims brought against government agencies for workplace discrimination and retaliation, back pay and front pay are both equitable remedies to be determined by the court. *See Lutz v. Glendale Unified High Sch.*, 403 F.3d 1061 (9th Cir. 2005) (holding that "there is no right to have a jury determine the appropriate amount of back pay under Title VII, and thus the ADA" and that "back pay remains an equitable remedy to be awarded by the district court in its discretion"); *Gladle v. U.S. Dep't of Veterans Affs.*, 2020 WL 6743734, at *1 (C.D. Cal. Nov. 16, 2020) (finding that *Lutz also* applies to claims under the Rehabilitation Act); *Dykzeul v. Charter Commc'ns, Inc.*, 2021 WL 4522545, at *9 (C.D. Cal. Feb. 3, 2021) (reasoning that, under *Lutz*, only the district court determines an award of back or front pay under Title VII).

These decisions are consistent with a traditional understanding of the collateral source rule. Under the collateral source rule, "benefits received by the plaintiff from a source collateral to the defendant may not be used to reduce that defendant's liability for damages." 1 DAN B. DOBBS, LAW OF REMEDIES § 3.8(1) at 372-73 (2d ed. 1993). The Ninth Circuit has held the collateral source rule does not apply to workers' compensation from federal agencies because the benefits are "ultimately paid entirely by [the agency] and thus are not derived from a collateral source." *McLean v. Runyon*, 222 F.3d 1150, 1156 (9th Cir. 2000) (explaining "FECA workers' compensation benefits are paid from an Employees' Compensation Fund (ECF), which is ultimately reimbursed entirely by the appropriate federal agency or instrumentality for each payment made for an injury to one of its employees"). Therefore, there is no windfall if Plaintiff's damages are offset by his workers' compensation benefits. *See id.*

In *Mort v. DeJoy*, 2022 WL 3229298 (E.D. Cal. Aug. 10, 2022), a United States

17

Postal Inspector sued for discrimination and retaliation after he was terminated.   During motions in limine, the plaintiff sought to exclude all evidence of the retirement benefits he received after his termination.   *Id.* at *13.   There, like here, the economic damages claims were left for the court to decide.   *Id.* at *14.   Therefore, the district court held evidence of the plaintiff's retirement benefits received after termination only related to the non-economic damages to be decided by the jury "if [the plaintiff] claims that the state of his finances, due to his firing, caused him emotional distress damages."   *Id.*   The court confirmed that where the plaintiff did not make that claim, the evidence could not be presented to the jury unless "some other basis for the admission of the evidence" became apparent.   *Id.*

Here, Plaintiff claims: "[i]n order to have an accurate understanding of Mr. Romero's lost wages and benefits and his future lost wages and benefits, the trier of fact must know the gross amount before any deductions for worker's [sic] compensation payments."   MIL 2 Opp'n at 3.   However, Plaintiff fails to explain why the jury needs to know the gross amount.   Plaintiff asserts Mr. Zimmer cannot discuss the scenario which accounts for and deducts the workers' compensation benefits without first discussing the scenario which does not deduct the workers' compensation benefits.   Plaintiff also fails to offer any explanation as to why the lost wages cannot be discussed using only the model that accounts for the workers' compensation benefits he received.

Accordingly, the Court GRANTS Defendant's motion to exclude evidence of Plaintiff's economic loss without reduction for the worker compensation payments he received.   Because compensatory damages are unavailable for Plaintiff's ADA and RA claims, *see* MSJ Order at 19-20, the only damages available to Plaintiff at this stage appear to be (1) economic damages including back pay and/or front pay under the ADA; (2) incidental losses Plaintiff may have incurred, including penalties and prejudgment interest on damages accrued; and (3) reasonable attorney's fees.   *See*, *e.g.*, *Barrios v. Cal. Interscholastic Fed'n*, 277 F.3d 1128, 1134 (9th Cir. 2002) (holding that "[t]he ADA, specifically 42 U.S.C. § 12205, permits the 'prevailing party' to seek attorneys' fees and

18

costs" and explaining that "[t]he Supreme Court has held that a prevailing plaintiff under a statute so worded 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'") (citation omitted).

The district court may order bifurcation of a trial between the liability phase and the damages determination when doing so may "avoid prejudice," and "expedite and economize" the trial proceedings. FED. R. CIV. P. 42(b). "Rule 42(b) of the Federal Rules of Civil Procedure confers broad discretion upon the district court to bifurcate a trial[.]" *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004) (citation omitted). "[I]t is clear that Rule 42(b) gives courts the authority to separate trials into liability and damage phases." *Est. of Diaz v. City of Anaheim*, 840 F.3d 592, 601 (9th Cir. 2016) (citing to *De Anda v. City of Long Beach*, 7 F.3d 1418, 1421 (9th Cir. 1993)); s*ee also* 9A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2390 (3d ed. 2016) ("The separation of issues of liability from those relating to damages is an obvious use for Federal Rule 42(b)."). Because Plaintiff's overall economic loss, before reduction of the worker compensation payments he received, is not relevant to any determination the jury will make regarding damages, such evidence shall be bifurcated for the Court's sole determination.

Accordingly, the Court GRANTS Defendant's motion to bifurcate Plaintiff's economic damages in this case from the jury trial on liability pursuant to Federal Rule of Civil Procedure 42(b) because "bifurcation avoids wasting jury time and eliminates potential confusion." MIL 2 at 2.

### ii. Plaintiff's Request for Reconsideration

In addition to opposing Defendant's MIL in his Opposition, Plaintiff also attempts to relitigate the issue of compensatory damages for his retaliation claim, an issue this Court already decided in its Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment. *See* MSJ Order at 19-20. Civil Local Rule 7.1.i.2 requires any motion for reconsideration (1) be filed within twenty-eight days after the entry of the ruling, and (2) be accompanied by an affidavit specifying what new facts and circumstances exist.

Plaintiff failed to comply with both requirements and his attempt at revisiting the issue is entirely improper. *See Lauzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013) ("Allowing a party to litigate matters" in a motion in limine "that have been or should have been resolved at an earlier stage not only allows those dissatisfied with the court's initial ruling a chance to relitigate, but also deprives their opponents of the procedural protections that attach at summary judgment"); *Dominguez v. City of Los Angeles*, 2018 WL 6164278, at *11 (C.D. Cal. Oct. 9, 2018) (denying a motion in limine as "nothing more than an attempt to relitigate the Court's Summary Judgment Order"); *Am. Airlines Flow-Thru Pilots Coal. v. Allied Pilots Assoc.*, 2018 WL 11365515 at *1 (N.D. Cal. June 28, 2018) (explaining motions in limine are a procedural mechanism to "limit in advance testimony or evidence in a particular area," not to "relitigate matters presented in [a] motion for summary judgment.").

Accordingly, Plaintiff's untimely request for reconsideration will not be entertained. Defendant's request for bifurcation is GRANTED.

## III.    Motion to Admit LabCorp Test Report (ECF No. 94)[2]

### A. Factual Background

Before filing this lawsuit, Plaintiff had not been tested to determine if he was allergic to mold.   ECF No. 94 ("MIL 3") at 2-3.   In October 2021, Plaintiff took a voluntary test involving a blood draw from a clinic.  *Id.* at 3.   The results indicated Plaintiff is not allergic to mold.   *Id.*[3]   Defendant subpoenaed LabCorp, the company responsible for testing Plaintiff's blood, and eventually received a copy of the results from LabCorp, along with

---

[2] Defendant's third motion in limine seeks to admit the same evidence that Plaintiff seeks to exclude in his first motion in limine (ECF No. 99).  *See infra* Section VIII.  Accordingly, the Court's ruling and analysis is the same for both sections.

[3] According to Defendant, Plaintiff failed to share a copy of the results with his attorney prior to his deposition on May 19, 2022, and Defendant did not receive a copy until June 7, 2022.

a declaration from LabCorp's Records Administrator. *Id.* The declaration states the lab report is a "true and correct" copy of Plaintiff's results and was prepared by LabCorp employees "in the ordinary course of business, at or near the time of the acts, conditions, or events recorded." *Id.*

**B. Discussion**

Defendant moves to allow admission of the LabCorp test results. Defendant argues the report falls under the business records exception to the rule against hearsay contained in FRE 803(6). MIL 3 at 3. Plaintiff opposes the motion, asserting "the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." FED. R. EVID. 803(6)(E).

To satisfy the "Records of a Regularly Conducted Activity" exception to the rule against hearsay, Defendant must demonstrate (1) "the record was made at or near the time by—or from information transmitted by—someone with knowledge;" (2) "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;" (3) "making the record was a regular practice of that activity;" (4) "all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification;" and (5) "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." FED. R. EVID. 803(6).

Defendant cites in support, *Shelton v. Consumer Product Safety Commission*, 277 F.3d 998, 1010 (8th Cir. 2002), where the Eighth Circuit acknowledged laboratory test reports typically constitute business records that comply with FRE 803(6). Thus, the *Shelton* Court held such "records are deemed admissible, unless problems of untrustworthiness appear." *Id.* As an example, Defendant illustrates *United States v. Farmer*, 820 F. Supp. 259 (W.D. Va. 1993). In *Farmer*, the defendant was arrested for driving under the influence of alcohol after she caused a collision on a federal roadway. *Id.* at 261. Within an hour of the accident, the defendant consented to a blood draw at an

emergency room.    *Id.*    The defendant was convicted at trial before a magistrate judge. *Id.* at 266.  On appeal to the district court, the defendant challenged the magistrate judge's admission of the blood alcohol test results under Rule 803(6),  *id.* at 264, as well as the trustworthiness of the blood test.  The district court laid out the legal framework for establishing a blood test is trustworthy:

> Establishing a chain of custody is one form of proof sufficient to support a finding that evidence is trustworthy. The prosecution need prove only a rational basis from which one could conclude that the Certificate of Analysis reflected an analysis of Appellant's blood. Proof of the connection of the blood sample to Appellant may be made by circumstantial evidence.  "The ultimate question," according to the Fourth Circuit, is whether the authentication testimony is sufficiently complete so as to make it "improbable that the original item had been exchanged with another or otherwise tampered with.

*Farmer*, 820 F. Supp. at 265 (citations omitted).    The *Farmer* court upheld the magistrate judge's decision to admit the blood test into evidence.    *Id.* at 266.

Plaintiff distinguishes *Farmer* in his Opposition, pointing out that, in *Farmer*, a law enforcement officer was present for the blood draw and marked the vial with the defendant's name, the defendant's social security number, and the date alongside his own initials.  ECF No. 110 ("MIL 3 Opp'n") at 2-3.  In reply, Defendant points out that while the Ninth Circuit has yet to explicitly hold evidence of chain of custody is not required to satisfy Rule 803(6), other circuits have adopted the reasoning presented by the Fourth Circuit in *Thomas v. Hogan*, 308 F.2d 355 (4th Cir. 1962), finding that:

> Human life will often depend on the accuracy of the entry, and it is reasonable to presume that a hospital is staffed with personnel who competently perform their day-to-day tasks. To this extent at least, hospital records are deserving of a presumption of accuracy even more than other types of business.

*Thomas*, 308 F.2d at 361; *see also Pieters v. B-Right Trucking, Inc.*, 669 F. Supp. 1463, 1465 (N.D. Ind. 1987) (rejecting plaintiff's state law-based argument that chain of custody must be proven to admit a blood test, and affirming Rule 803(6) "does not

22

impose an additional requirement that chain of custody be demonstrated"); *Ortiz v. Adams*, 2018 WL 3410027, at *5-6 (D.N.J. July 13, 2018) (rejecting plaintiff's argument that chain of custody must be demonstrated for a blood test result to satisfy Rule 803(6)); *Stroud v. Roper Corp.*, 1990 WL 115610 (S.D.N.Y. Aug. 9, 1990) (holding a hospital blood test record is entitled to a "strong presumption" of reliability, and that presumption "obviate[s] any need to demonstrate chain of custody"); *Rivers v. Union Carbide Corp.*, 426 F.2d 633, 637-39 (3d Cir. 1970) (citing *Thomas* extensively and concluding the district court erred by excluding a hospital record); *Ballou v. Henri Studios, Inc.*, 656 F.2d 1147, 1154-55 (5th Cir. 1981) (where plaintiff drove automobile involved in collision, trial court's exclusion of hospital records noting results of plaintiff's blood test was reversible error as the "question [of] whether proponent of evidence has proved an adequate chain of custody goes to weight rather than admissibility").

The proponent of the evidence has the burden of establishing the predicate foundation to satisfy the requirements for the business records exception under FRE 803(6). Plaintiff argues that <u>no witness</u> will be able to testify as to the LabCorp test's authenticity, that "[n]one of the doctors or technicians involved in the purported testing will be called at trial and none of them were named as witnesses in this case." ECF No. 99 ("MIL 8") at 5. Defendant responds by contending that the LabCorp test is a business record, ECF No. 125 at 2-3, and Defendant has also argued that the LabCorp test, "[a]s a document identified by Plaintiff in his deposition and produced by Plaintiff in discovery" is authentic as a document offered by a party-opponent. ECF No. 106 at 2.

The Court agrees that by producing the document in discovery, Plaintiff has offered it as a statement by a party opponent. However, Plaintiff may elicit testimony relating to the issues pertinent to the LabCorp test, including the source of information relied upon by LabCorp and/or the circumstances of preparation or testing indicative of a lack of trustworthiness of the blood test. Accordingly, the Court GRANTS Defendant's motion to admit the LabCorp results, contingent upon Defendant laying a proper foundation.

//

**IV.    Defendant's Motion to Exclude Testimony of Plaintiff Witness Deanna Cosso (ECF No. 97)**

### A. Factual Background

Defendant seeks to exclude evidence of witness Deanna Cosso's unrelated discrimination case[4] as irrelevant and improper character evidence pursuant to Rule 404(b). ECF No. 97 ("MIL 6") at 2.  Defendant argues that Ms. Cosso's testimony constitutes improper "me too" propensity evidence given that Ms. Cosso "has not alleged that a workplace injury caused her disability" and Ms. Cosso's "lawsuit does not involve mold exposure within MCC," thus, Ms. Cosso's testimony would be more prejudicial than probative.  MIL 6 at 4-7.

Defendant cites to the factors proposed by *Hayes v. Sebelius*, 806 F. Supp. 2d 141, 144-145 (D.D.C. 2011) and outlines several factual differences to argue that Ms. Cosso is not a similarly situated employee to Plaintiff, and that Ms. Cosso's testimony fails to meet the standard for evidence of a discriminatory pattern or practice.  *Id.* at 5.  For example, Defendant argues that, unlike Plaintiff, Ms. Cosso had a pre-existing disability not caused by workplace injury.  *Id.*  Defendant also argues that Ms. Cosso requested to wear an N95 mask and did not request remote work, held a different position (case manager) at MCC, was passed over for a promotion, requested accommodations in a different time period after the conclusion of Plaintiff's interactive process, and "retired after not being selected for a managerial position."  *Id.*

Plaintiff responds in opposition by contending that Ms. Cosso's testimony would corroborate a pattern of "disability-related animus," "discriminatory atmosphere," and "corporate mindset" surrounding accommodation requests by the Defendant.  ECF No. 113 ("MIL 6 Opp'n") at 2-3.  Plaintiff argues that, here, the cause of each employee's

---

[4] Defendant attaches the complaint of Ms. Cosso's unrelated case, Case No. 24-cv-1886-L-DDL, filed October 16, 2024, as Exhibit 1.  MIL 6, Exh. 1 ("Cosso Compl.") at 3.

respiratory condition may not be dispositive in a discrimination claim, since both employees claim to possess qualifying disabilities requiring accommodation. MIL 6 at 1. Plaintiff argues that Ms. Cosso's case is "nearly identical" to his case based on the similar manner in which Defendant purportedly engaged in disability discrimination involving long-time employees. *Id.* Moreover, Ms. Cosso alleges in the separate FAD that she read a 2012 Department of Justice letter stating the MCC had sick building syndrome, witnessed other employees experiencing physical ailments from mold exposure, and experienced mold-related sinus injuries herself. Cosso Compl. at 12. Thus, Plaintiff clarifies he seeks to use Ms. Cosso's testimony to demonstrate a pattern or practice of discrimination and retaliation at the MCC and to demonstrate that "others were similarly retaliated against." MIL 6 Opp'n at 4.

Plaintiff also points out that Ms. Cosso was a long-term employee at the MCC who served in her position for fourteen years. MIL 6 Opp'n at 2. Plaintiff contends Ms. Cosso was "forced into retirement" in 2020 due to alleged discrimination, harassment, and retaliation based on her disability. *Id.* For example, Plaintiff argues that, despite having a chronic asthmatic condition and providing a physician's note requiring an N95 mask, Cosso Compl. at 3, Defendant: (1) forced Ms. Cosso to use unpaid leave while awaiting accommodations, *id.* at ¶ 10-11; (2) failed to engage in a good-faith interactive process by delaying responses, *id.* at ¶ 29; and (3) offered inadequate job modifications that constituted retaliation, including placement in a high-traffic phone room designated for employees accused of misconduct (making her ineligible for overtime/holiday pay), altered shift hours that would worsen her symptoms, and denial of a physician-recommended N95 mask, *id.* at ¶ 13, ¶ 32. Plaintiff argues that the same warden at the MCC responsible for disability accommodations from 2018 to 2021 refused to interact and reasonably accommodate either Plaintiff or Ms. Cosso's requests for accommodations. MIL 6 Opp'n at 2. Plaintiff contends that, like in his case, Ms. Cosso was unable to accept the conditions provided by the MCC. *Id.*

3:19-cv-02138-JAH-DTF

**B. Discussion**

Under FRE 404(b), district courts possess wide discretion in determining the admissibility of evidence of prior acts when offered for purposes other than proving character or propensity. Evidence of prior acts may be admitted, however, to prove motive, intent, and absence of mistake or accident. FED. R. EVID. 404(b)(2). An employer's treatment of similarly situated employees is relevant to whether the organization had an "atmosphere" of condoned discrimination in the workplace which "increases the likelihood of retaliation for complaints in individual cases." *Hawkins v. Hennepin Tech. Ctr.*, 900 F.2d 153, 156 (8th Cir. 1990). "[S]uch background evidence may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive." *Id.* at 155 (citation and quotation omitted).

"Factors that courts consider in the [relevance] inquiry include (1) whether past discriminatory or retaliatory behavior is close in time to the events at issue in the case, (2) whether the same decisionmaker was involved, (3) whether the witness and plaintiff were treated in the same manner, and (4) whether the witness and plaintiff were otherwise similarly situated." *Hayes v. Sebelius*, 806 F. Supp. 2d 141, 144-145 (D.D.C. 2011). Ultimately, the "question [of] whether evidence of discrimination by other supervisors is relevant in an individual case is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387-388 (2008).

Here, multiple parallels exist between Ms. Cosso's and Plaintiff's cases that suggest a discriminatory pattern: both were long-term employees at the MCC (Ms. Cosso: fourteen years; Plaintiff: thirteen years as an engineering technician), with respiratory conditions who allegedly faced discrimination from the same supervisory chain (direct supervisor, Warden, Associate Wardens, Human Resources Manager). *See* MIL 6 Opp'n at 1. Both experienced MCC's failure to follow physician recommendations, unreasonable work environment assignments that would exacerbate their conditions, extended unpaid leave pending accommodations, inability to return to work despite job capability, and placement

26

in disciplinary areas as part of the MCC's proposed job modifications.  *See* Cosso's Compl. at 4-6; ECF No. 1 ("Pl.'s Compl.") at 4-8.  After requesting accommodations, both employees allege they were isolated and shunned by their respective departments as a result, and both filed formal EEO complaints following over a year of experiencing aforementioned discrimination, harassment, and retaliation.  Cosso's Compl. ¶¶ 17, 40; Pl.'s Compl. ¶¶ 20, 29.

And, even if one of Ms. Cosso's supervisors was different from Plaintiff's, discrimination engaged by others may support Plaintiff's theory of discrimination by his supervisor based upon factors including how closely related the two employees are with respect to their treatment by the Defendant, whether the Defendant treated employees seeking disability accommodations in a similar way, and whether Defendant has a pattern of discrimination related to Plaintiff's circumstances and his theory of the case.  Where the defendant is an organization, evidence of other employees' treatment and organizational failures in human resources and/or disability accommodations may be highly relevant to the specific employee's claim to show an "atmosphere" of condoned discrimination or significant organizational deficiencies in the workplace.  *See Hawkins*, 900 F.2d at 156. Employees that are "closely related" in cases of discrimination do not require their cases to be so directly aligned as to exactly mirror one another.

### C. Conclusion

Accordingly, upon examining the proffered testimony of Ms. Cosso and how closely related it is in material ways to Plaintiff's circumstances and theory of the case, the Court finds that the probative value of Ms. Cosso's testimony outweighs any Rule 403 considerations, including any undue prejudice.   Defendant's motion to exclude Ms. Cosso's testimony is DENIED.  The Court will consider proposed curative and/or final jury instructions to alleviate any undue prejudice to the Defendant.

## V. Defendant's Motion to Exclude Other Employees' Health Conditions (ECF No. 95)

### A. Rule 26 Disclosures

Defendant's motion seeks to exclude testimony from witnesses Plaintiff failed to

disclose.  Defendant contends that Plaintiff "disclosed a dozen witnesses for the first time in the proposed Pretrial Order, listing a vague, identical description of testimony for each." ECF No. 129 ("MIL 4 Reply") at 2.    Defendant argues Plaintiff violated FRCP 26(a)(l)(A)(ii) by failing to disclose Aaron Jackson, Randy Rusch, Tom Bock, Kevin Costa, Roy Hernandez, Jack Orr, Robert Gankiewicz, Michael Tan, Sergio Zuniga, Karen Banks, Paz Lopez, and Edward Peterman in "Plaintiff's Initial or Amended Disclosures, or Plaintiff's discovery responses" prior to listing them in the proposed Pretrial Order.    ECF No. 95 ("MIL 4") at 7; MIL 4 Reply at 4.    Plaintiff does not respond to this argument. ECF No. 111 ("MIL 4 Opp'n").

Federal Rule of Civil Procedure 26(a)(1)(A) provides that:

> [A] party must, without awaiting a discovery request, provide to the other parties: (i) the name and, if known, the address and telephone number of each individual likely to have discoverable information - along with the subjects of that information - that the disclosing party may use to support its claims or defense, unless the use would be solely for impeachment[.]

In addition, the party must supplement or correct its disclosure in a timely manner if it learns the initial disclosure was incorrect or incomplete.  FED. R. CIV. P. 26(e)(l).  If a party fails to provide information or identify a witness under Rule 26(a) or (e), the party "is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."  FED. R. CIV. P. 37(c)(l).    The noncompliant party bears the burden of showing a lesser sanction is better under the circumstances, and that party must "'avail himself of the opportunity to seek a lesser sanction' by formally requesting one from the district court."  *Merch. v. Corizon Health, Inc.*, 993 F.3d 733, 741 (9th Cir.2021) (quoting *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 705 (8th Cir. 2021)).

A district court has "wide discretion" regarding discovery, and that discretion is "particularly wide" when a party moves for exclusion under Rule 37(c)(l).    *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 862 (9th Cir. 2014).    The Ninth Circuit has held that evidentiary exclusions are a harsh sanction, particularly when the exclusion

is fatal to a claim. *R & R Sails*, *Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1247 (9th Cir. 2012).

Therefore, when engaged in the harmlessness inquiry under Rule 37(c)(1), the court is

required to consider "whether the claimed noncompliance involved willfulness, fault, or

bad faith" and "the availability of lesser sanctions." *Id.*    In deciding whether to exclude

evidence under Rule 37, "district courts have identified several factors to guide the

determination of whether substantial justification and harmlessness exist, including (1)

prejudice or surprise to the party against whom the evidence is offered; (2) the ability of

that party to cure the prejudice; (3) the likelihood of disruption of trial; and (4) bad faith or

willfulness in not timely disclosing the evidence." *Liberty Ins. Corp. v. Brodeur*, 41 F.4th

1185, 1192 (9th Cir. 2022) (citations omitted).

### i. Undisclosed Witnesses

Of the twelve prospective witnesses listed by Defendant, which Plaintiff presents in

the proposed Pretrial Order, three of these witnesses—Aaron Jackson, Tom Bock, and

Kevin Costa—were previously disclosed in Plaintiff's First Set of Interrogatory Responses.

*See* MIL 4, Exh. 6.[5]    Defendant's motion to exclude witness testimony based upon

Plaintiff's failure to disclose as required by Rule 23(a)(1)(A(ii) is therefore DENIED as to

---

[5] This Court "is not required to sort through the record" to identify any evidence or
argument not directly submitted to the Court to support the claims or defenses of either
party. *U.S. Wholesale Outlet & Distribution*, *Inc. v. Innovation Ventures*, *LLC*, 89 F.4th
1126, 1138 (9th Cir. 2023) (citations omitted) ("There may have been a needle—or even
many needles—in the haystack []. It was not the district court's job to hunt for them."); *see
also Angelo v. Thomson Int'l*, *Inc.*, 2024 WL 3202513, at *19 (E.D. Cal. June 27, 2024)
(granting motion in limine to exclude undisclosed witnesses where "Plaintiffs provide[d]
no information as to when or how these witnesses were disclosed"). The Court expects the
Parties to accurately and clearly disclose information to the Court, which is also part of
counsel's ongoing duty of candor under the California Rules of Professional Conduct. *See*
Rule 3.3. A party's failure to respond to an argument, or to present clear and accurate
information, is sanctionable conduct that may result in an adverse ruling by the Court
pursuant to Rule 11.

29

these three previously disclosed witnesses.[6]

As to the nine undisclosed witnesses, Plaintiff does not proffer a reason for the nondisclosure or otherwise respond to Defendant's argument that the untimely disclosure of these witnesses would unfairly prejudice Defendant, including because fact discovery has long closed and Defendant is unable to depose or seek discovery from these witnesses in anticipation of trial.  MIL 4 at 7-8; *see generally* MIL 4 Opp'n.  Additionally, Plaintiff has not formally requested a lesser sanction in opposition to the motion.  *Merch.*, 993 F.3d at 741.  Absent a showing by Plaintiff that the nondisclosure of these witnesses is harmless or substantially justified, the  Court GRANTS Defendant's motion to  exclude testimony from the undisclosed witnesses[7]  pursuant to Rule 37(c)(1).

**B. Health-Related Testimony of Other Former Disclosed MCC Employees**

Defendant also seeks to exclude testimony of health conditions, including "statements regarding [] personal health conditions" and "health complaints," from sixteen other former MCC employees "designated to testify pursuant to Rule 26 about their own personal illnesses, which they believe were caused by mold exposure at MCC."  MIL 4 at 3-4.  Specifically, Defendant seeks to exclude witness testimony from "Adrian Cornist, Sam Potter, Gary Horton, Martha Davis, Deanna Cosso, Aaron Jackson, Tom Bock, Kevin Costa, Robert Pau, Roy Hernandez, Edna Robertson, Michael Tan, Sergio Zuniga, Paz Lopez, Michelle Navarro, Sammy Orozco."  MIL 4 at 4 n.1.  This Court has already addressed and denied Defendant's motion seeking to exclude witness testimony from Deanna Cosso as irrelevant and more prejudicial than probative due to unfair prejudice.  *See supra* Section IV.  Similarly, because the Court has already excluded testimony from

---

[6] Notwithstanding the Court's holding here, witness testimony from these three witnesses is EXCLUDED on other grounds.  *See infra* Section V(B)(ii), (iv).

[7] Randy Rusch, Roy Hernandez, Jack Orr, Robert Gankiewicz, Michael Tan, Sergio Zuniga, Karen Banks, Paz Lopez, and Edward Peterman.

Roy Hernandez, Michael Tan, Sergio Zuniga,[8] and Paz Lopez pursuant to Rule 37(c)(1) due to Plaintiff's nondisclosure of these witnesses, *see supra* Section V(A)(i), the Court's analysis herein will only apply to the remaining eleven witnesses.[9]

Defendant claims these eleven Rule 26 designated witnesses should be excluded because their testimony is irrelevant to the claims and defenses in this case and would be unfairly prejudicial to Defendant. MIL 4 at 3. Defendant argues that the testimony would constitute hearsay, would be speculative and unfounded, and constitutes expert testimony subject to Rule 702. *Id.* Plaintiff opposes the motion, contending the motion is "vague, ambiguous, and overbroad." MIL 4 Opp'n at 2. Plaintiff also argues that Defendant is impermissibly attempting to exclude a broad category of evidence: "evidence of non-party employees' personal health conditions." MIL 4 Opp'n at 2.

### i. Vague, Ambiguous, and Overbroad

"'Motions in limine . . . do not lie to exclude broad categories of evidence.' Rather, they 'must specifically identify the evidence at issue and state with specificity why such evidence is inadmissible.'" *Bahra v. City of San Bernadina*, 2021 WL 3914042, at *4 (C.D. Cal. June 24, 2021) (citations omitted).

---

[8] Although Plaintiff failed to disclose Mr. Zuniga in his pretrial disclosures, the Court notes that Defendant was given constructive notice of Mr. Zuniga's alleged mold-related health concerns and complaints to the MCC during the discovery process. *See*, *e.g.*, ECF No. 96-5 at 33 (T. Cleveland notes that Mr. Zuniga has been experiencing symptoms of "dizz[iness], vertigo, and [feeling like] his head is a saturated roof tile" and notes the ceiling of the "closet on the other side of where he sits . . . is wet and bubbling and has black spots"). Therefore, Plaintiff may not call Mr. Zuniga in his case-and-chief, but may call Mr. Zuniga to testify in rebuttal if Defendant opens the door to pattern or practice of discrimination issues as it relates to mold-related complaints reported to Safety Managers and Administrators. If Plaintiff seeks to introduce Mr. Zuniga's testimony in his case-in-chief for a separate purpose, Plaintiff may seek leave from the Court based on a showing of good cause as to Plaintiff's failure to timely disclose the witness.

[9] Adrian Cornist, Sam Potter, Gary Horton, Martha Davis, Aaron Jackson, Tom Bock, Kevin Costa, Robert Pau, Edna Robertson, Michelle Navarro, and Sammy Orozco.

3:19-cv-02138-JAH-DTF

As discussed below, Defendant fails to cite to the record or provide specific arguments as to why the witnesses' proffered testimony is vague, ambiguous, and overbroad. Although the Court agrees that Plaintiff's proffers as stated in the proposed Pretrial Order are lacking, the record does support the relevance of some of these witnesses, and Defendant could have been more specific regarding its challenge to other former employees' health conditions by first reviewing matters of record in this case.

### ii. Rule 401 Relevance

Defendant argues that the testimony of the eleven former employees is irrelevant because none of these witnesses worked "closely with Mr. Romero or in the same office within the MCC." MIL 4 at 4. Defendant also claims "[t]here is no evidence that any other individual sought medical treatment, was diagnosed with a mold-related illness, or requested workplace accommodations as a result." *Id.* Therefore, Defendant contends, "the evidentiary value of such testimony . . . is lacking." *Id.* In opposition, Plaintiff argues the testimony of other employees who witnessed or experienced the mold problem and the Defendant's inaction, then lodged their own individual complaints with Defendant are relevant to show Defendant's "biased policies, discriminatory animus, and retaliatory intent." MIL 4 Opp'n at 3-4.

Plaintiff also argues that, in harassment cases, "me too" evidence—evidence of an employer's treatment of similarly situated employees—is probative of Defendant's discriminatory intent and therefore relevant to show an employer's pattern and practice of harassment. *Id.* Defendant argues that "me too" evidence is inapplicable here because the eleven witnesses will only testify to their "health concerns related to the mold, requests for accommodation, and the defendant's disregard of those complaints, requests, and concerns." MIL 4 Reply at 3 (citing MIL 4 Opp'n at 3-4). Specifically, Defendant claims that testimony from these witnesses is not analogous to "me too" testimony because "Defendant is unaware of[] any allegation of discrimination based on an alleged disability by any other employee." MIL 4 Reply at 4. Defendant argues that "Plaintiff has failed to disclose the details of any other employees' allegations" and has thereby failed to show

32

that the employees are "similarly situated in all respects." *Id.*  Plaintiff counters that these witnesses are relevant because they show "others were afraid to come forward for fear of retaliation, which in turn supports [Plaintiff's] claims."  MIL 4 Opp'n at 5.

The "question [of] whether evidence of discrimination by other supervisors is relevant in an individual [employment discrimination] case is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case."  *Sprint*, 552 U.S. at 388.  The Ninth Circuit has held that "in discrimination and retaliation cases, plaintiffs may rely upon comparisons with 'similarly situated employees' if the comparison supports an inference that retaliation was the motive." *Brown v. Simpson Strong-Tie Co.*, 2022 WL 2135340, at *2 (E.D. Cal. May 16, 2022).  The Ninth Circuit has also held that "evidence of an employer's sexual harassment of female employees other than the plaintiff . . . [is] relevant to a discriminatory discharge claim[.]"  *Heyne v. Caruso*, 69 F.3d 1475, 1480 (9th Cir. 1995); *Howard v. Raytheon Co.*, 2011 WL 13177257, at *3 (C.D. Cal. Mar. 28, 2011) (explaining that "the admissibility of ["me too"] evidence must be evaluated within the context of the case").   In addition, the Eighth Circuit has held that, in a discrimination case, circumstantial evidence of an employer's unflattering history and work practices may be "critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive," *Hawkins*, 900 F.2d at 155 (citation omitted), and the Seventh Circuit has also allowed plaintiffs to present testimony from other women who experienced sexual harassment in the workplace to demonstrate a pattern of harassment.  *See*, *e.g.*, *Horn v. Duke Homes*, 755 F.2d 599 (7th Cir. 1985).

Moreover, pattern or practice testimony by other employees may be relevant to a plaintiff's claim of discrimination and/or retaliation to demonstrate a discriminatory or retaliatory intent or motive by a defendant.  This is because, after a defendant offers a non-discriminatory explanation for the alleged disparate treatment, the burden shifts to the plaintiff to demonstrate that those reasons are pretextual.  *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1091 (9th Cir. 2008) (finding that "a series of discriminatory comments" was

"specific and substantial circumstantial evidence that the reasons [defendant] proffered for [plaintiff's] allegedly disproportionate hazardous work assignments were pretextual").

For example, in *Obrey v. Johnson*, Plaintiff sought to introduce witness testimony from three shipyard workers who were prepared to testify that the defendant had discriminated against them on the basis of race in the defendant's promotion decisions. 400 F.3d 691, 697-98 (9th Cir. 2005). The district court excluded the witnesses' testimony on the basis of its inability to conduct "three abbreviated employment discrimination trials" to assess the claims of the three other employees. *Id.* The Ninth Circuit reversed, finding that the district court's decision to exclude other employees from testifying at plaintiff's trial constituted an abuse of discretion because the testimony of those employees "was likely to be relevant" to plaintiff's claim of discrimination. *Id.* The court reasoned that the anecdotal evidence of those other employees was likely relevant to plaintiff's claims because such evidence "c[ould] be used to establish a general discriminatory pattern" by the defendant. *Id.* at 698-699. Thus, the court explained that the plaintiff could offer pattern or practice evidence in a discrimination case because "[s]uch a discriminatory pattern is probative of motive and can therefore create an inference of discriminatory intent with respect to the individual employment decision at issue." *Id.* at 694 (citations and quotations omitted).

Here, Plaintiff may call other similarly situated employees at the MCC as witnesses to demonstrate a pattern or practice of discrimination and/or retaliation by Defendant. Pattern or practice testimony by other employees is relevant to Defendant's intent and the credibility of Defendant's alternative explanation for the conduct at issue, which will be determined at trial by the jury. *See*, *e.g.*, *Sprint*, 552 U.S. at 388 (holding that the district court had discretion to admit the testimony of five other employees called to testify in support of plaintiff's age discrimination claim even though those employees did not share the same supervisor as plaintiff); *Hawkins*, 900 F.2d at 155-156 (finding that "[b]ecause an employer's past discriminatory policy and practice may well illustrate that the employer's asserted reasons for disparate treatment are a pretext for intentional discrimination, this evidence should normally be freely admitted at trial.").

Additionally, although Plaintiff provided a "nearly identical" description of the witnesses' proffered testimony in Plaintiff's proposed Pretrial Order and pretrial disclosures, upon review of the broader record, including the Parties' briefing as to what the proposed witnesses will testify to and the evidence attached thereto, the Court finds that the testimony of certain witnesses may be probative as to a pattern or practice of disability-related discrimination and/or retaliation by Defendant. Specifically, the Court finds that the proffered testimony of the following witnesses is relevant based on the following factual basis, as identified in the record as indicated below:

| WITNESS | FACTUAL BASIS FOR TESTIMONY |
|---|---|
| Adrian Cornist | Plaintiff seeks to call Adrian Cornist as a witness to testify to "health problems associated with mold in the workplace," and to "MCC San Diego's reaction to" Mr. Cornist's accommodations request, "including retaliatory conduct." *See* Pretrial Order at 18. The Court finds that there is sufficient evidence in the record in support. *See, e.g.*, ECF No. 65-5 at 248-50 (discussing retaliation allegations against Mr. Cornist for documenting mold growth in the MCC); *id.* at 211 (Union representative outlines Mr. Cornist's leave use, worker's compensation claim, requests for accommodations, and the MCC's response); *see also id.* at 225 (regarding complaints of mold and associated health claims); Brown Report ¶ 12 (discussing likelihood that Mr. Cornist's health issues are tied to MCC mold exposure); *see generally* FAD at 6-10. |
| Sam Potter | Plaintiff seeks to call Mr. Potter as a witness to testify as to "health problems associated with mold in the workplace[, ] requested accommodations, and MCC San Diego's reaction to [his request]." *See* Pretrial Order at 18. The record indicates that Mr. Potter may testify to unique factual circumstances of his health issues and the MCC's response as relevant to a purported pattern or practice of discrimination by the Defendant. *See* FAD at 14 (Mr. Potter claims he "experienced the same symptoms of vertigo" in February 2016 and was diagnosed with a respiratory disease in October 2016, also discusses status of remediation in the plumbing closet where he works); Brown Report ¶ 12 (discussing likelihood that Mr. Potter's health issues are tied to MCC mold exposure); *see also* FAD at 13 (discussing personal perception of mold in the basement when Mr. Romero was asked to return to his office by Mr. Fenlon); ECF No. |

| WITNESS | FACTUAL BASIS FOR TESTIMONY |
|---|---|
| | 65-5 at 211 (regarding Mr. Potter's accommodation requests, worker's compensation claim, and MCC's response to it). |
| Gary Horton | Plaintiff seeks to call Mr. Horton as a witness to testify that he "complained about leaks and mold and the health problems associated with mold in the workplace and requested accommodation and MCC San Diego's reaction to it." *See* Pretrial Order at 18. The Court finds that there is sufficient evidence in the record in support. *See, e.g.*, FAD at 14 (after Horton complained of mold and "management tested the [lock shop] and discovered [it]" he claims management retaliated against him by emailing Lieutenants not to use him and assigning him to custody post, functionally changing his job duties); *see also* ECF No. 65-5 at 211 (regarding Mr. Horton's accommodation request, worker's compensation request, and leave use for mold-related health claims); Brown Report ¶ 12 (discussing likelihood that Mr. Horton's health issues, as well as other employees, are tied to MCC mold exposure). |
| Martha Davis | Plaintiff seeks to call Ms. Davis as a witness to testify that "she complained about health problems associated with mold in the workplace and requested accommodation and MCC San Diego's reaction to it." *See* Pretrial Order at 19. The Court finds Ms. Davis's testimony is probative as to Defendant's discriminatory motive and intent. *See, e.g.*, FAD at 12-13 (other employees speak to Ms. Davis's perceived breathing issues associated with mold in her basement workspace pre- and post- MCC abatement); Brown Report ¶ 12 (discussing the likelihood that toxic mold exposure caused Ms. Davis and other employees' varied health issues); *see also* ECF No. 65-5 at 211 (outlining Ms. Davis's unpaid leave use in relation to mold exposure issues, worker's compensation claims for workplace injury, and MCC's handling of requests); ECF No. 59-5 at 12-14 (regarding HR Manager Pfannenstiel's mindset surrounding Ms. Davis's use of sick leave and, more broadly, mold-related complaints and requests for related accommodations). |
| Michelle Navarro | The Court finds that there is sufficient foundation in the record showing that Ms. Navarro's proffered testimony is relevant and not cumulative. *See* Pretrial Order at 20 (Plaintiff outlines the testimony |

3:19-cv-02138-JAH-DTF

| WITNESS | FACTUAL BASIS FOR TESTIMONY |
|---|---|
| | description for Ms. Navarro). Specifically, Dr. Brown notes that Ms. Navarro was one of five MCC employees whose "significant and varied health effects," could have resulted from elevated mold exposure. *See* Brown Report ¶ 12 (emphasis added). Ms. Navarro also formally reported her own mold-related injury to the MCC and requested accommodations. *See* ECF No. 65-5 at 211 (Union reports that Ms. Navarro filed a worker's compensation claim, had to use leave, and received insufficient response from MCC management); ECF 95-1 at 2 (Defendant's witness Craig Allen corroborates she told MCC that she was "becoming ill because of the mold"). Finally, Ms. Navarro's testimony is probative of retaliatory conduct and discriminatory motive as it relates to Mr. Romero. *See*, *e.g.*, FAD at 12 (Ms. Navarro reports that MCC's HR manager said both Mr. Romero, and every other employee's black mold health concerns are "all bullshit;" *see also* ECF No. 65 at 11 (Ms. Navarro claims that because Romero was one of the first to get sick he "was treated like the black sheep" at work). |
| Deanna Cosso | *See supra* Section IV (discussing Ms. Cosso's personal allegations of retaliation and disability discrimination, as well as the Court's analysis of the relevance of her proffered testimony). |

As to the remaining six witnesses,[10] the Court finds that neither the record nor Plaintiff's proffers provide sufficient information to show whether and to what extent testimony from them is relevant to Plaintiff's claims. For example, as to Aaron Jackson, Tom Bock, Kevin Costa, and Robert Pau, Plaintiff fails to provide a specific description of the purpose behind the testimony for these four witnesses besides the same boilerplate description Plaintiff has proffered for other witnesses: "he complained about health problems associated with mold in the workplace and requested accommodation and MCC San Diego's reaction to it." *See* Pretrial Order at 18-20. Moreover, although these four

---

[10] Aaron Jackson, Tom Bock, Kevin Costa, Robert Pau, Sammy Orozco, and Edna Robertson.

3:19-cv-02138-JAH-DTF

witnesses were listed as witnesses for Plaintiff's EEO investigation, *see* ECF No. 65-5 at 119, Plaintiff fails to cite to any portions of a EEO testimony transcribed describing what the witnesses testified to, or any other pleadings or discovery materials showing a pattern of discriminatory motive or intent experienced and/or observed by these four witnesses. Given that the EEO investigation is the sole point of reference for all four witnesses and Plaintiff has offered no additional explanation as to their proffered testimony, the Court is unaware of any arguments or evidence showing that the proffered testimony is relevant to Plaintiff's claims. Thus, the Court finds that Plaintiff has failed to show how witness testimony from Aaron Jackson, Tom Bock, Kevin Costa, and Robert Pau is relevant to Plaintiff's claims. Accordingly, the Court GRANTS Defendant's motion to exclude witness testimony from these four witnesses.

Similarly, Plaintiff proffers witness testimony from Sammy Orozco and Edna Robertson on a nearly identical basis (i.e. mold-related health complaints in the workplace, accommodation requests, and MCC's response). *See* Pretrial Order at 18 (Plaintiff seeks to call Ms. Robertson to "testify about the plaintiff's condition and damages"). Here, however, neither witness is identified as an employee who complained about mold-related issues in the FAD, the EEO investigation, Union correspondence, or any deposition transcripts available to the Court. Absent more, a generic description of witness testimony, without reference to the record, is insufficient to establish relevance, especially where Plaintiff fails to show how the testimony is not cumulative of other witnesses' proffered testimony. *See infra* Section V(B)(iv). For these reasons, the Court also GRANTS Defendant's motion to exclude witness testimony from Sammy Orozco and Edna Robertson.

### iii. Lay Witness Testimony

Defendant also argues Plaintiff's plan to elicit testimony "about health problems associated with mold in the workplace" from the now six remaining former MCC

employees[11] would constitute improper medical diagnoses and opinions from lay witnesses.  MIL 4 at 5.

"A lay witness's opinion testimony necessarily draws on the witness's own understanding, including a wealth of personal information, experience, and education, that cannot be placed before the jury." *United States v. Gadson*, 763 F.3d 1189, 1208 (9th Cir. 2014).  It follows that, in the Ninth Circuit, "lay witness testimony is 'incompetent' when it consists of a medical diagnosis, because 'medical diagnoses are beyond the competence of lay witnesses' to make." *Tobeler v. Colvin*, 749 F.3d 830, 833 (9th Cir. 2014).  Additionally, not only can lay witnesses not opine about medical diagnoses, they also cannot relay statements from treating physicians regarding diagnoses. *See Gilmore v. Lockard*, 2017 WL 11604670, at *1 (E.D. Cal. Feb. 17, 2017) (holding that plaintiff "may not personally testify regarding a diagnosis, opinions, inferences or causation, and may not offer any opinions or inferences from any medical records"); *Exmundo v. Scribner*, 2014 WL 4249133, at *1 (E.D. Cal. Aug. 27, 2014) ("As to Plaintiff's medical conditions, he may not testify as to any medical matter which requires scientific, technical, or other specialized knowledge, which generally includes any ultimate diagnosis [and] a cause and effect relationship.").

However, under FRE 701, a lay witness may provide opinions that are "(a) rationally based on the witness's perception; (b) helpful to understanding the witness' testimony or to determine a fact in issue; and (c) not based on scientific, technical, or specialized knowledge within the scope of Rule 702."  Thus, although testimony regarding a "medical diagnoses is beyond the competence of lay witnesses," the Ninth Circuit has held that a witness may testify as to their "perception of symptoms," including physical and mental conditions, response to symptoms, and other personal knowledge "based upon

---

[11] Adrian Cornist, Sam Potter, Gary Horton, Martha Davis, Michelle Navarro, and Deanna Cosso.

39

[their] own perceptions." *Stevenson v. Holland*, 504 F. Supp. 3d 1107, 1121 (E.D. Cal. 2020); *United States v. Lloyd*, 807 F.3d 1128, 1154 (9th Cir. 2015) (holding that a lay witness may present testimony based on matters for which he or she has "firsthand knowledge or observation") (citation omitted); *Burchill v. Kearney-National Corp., Inc.*, 468 F.2d 384, 386 (3d Cir. 1972) ("[I]t is quite plainly wrong that one must be an expert to identify the rusted and unrusted parts of a cast iron fitting. The expression of such an 'opinion' is nothing more than the expression of the perception of the witness of a phenomenon within the common experience of most persons–even judges."). Accordingly, the six remaining employee witnesses may testify, pursuant to Rule 701, only as to their own perceptions regarding their health (excluding any medical opinions or diagnoses), their perceptions in observation of other employees, and their personal experiences with management, relevant employer motives, and discrimination-related matters regarding workplace health-related accommodations.

### iv. Cumulative Evidence

Finally, Defendant argues the testimony of the six witnesses is cumulative because Plaintiff "listed a nearly identical description of the expected testimony from the sixteen complaints." MIL 4 at 6. Except for witness testimony from Adrian Cornist and Martha Davis,[12] Defendant does not provide specific arguments explaining why the proffered testimony is cumulative. *Id.* at 6-7. Rather, Defendant simply concludes that "[n]one of the complainants were deposed, raising doubts about their substance and significance." *Id.* Plaintiff does not respond to Defendant's arguments. *See* MIL 4 Opp'n.

"Evidence is 'cumulative' when it adds very little to the probative force of the other

---

[12] Defendant fails to explain the relevance of Adrian Cornist's alleged "history of heart attack and [] a lifetime [as a] chain smoker" and Martha Davis' alleged "history of excessive and improper use of sick leave" to the Court's analysis of whether the proffered testimony of these witnesses is cumulative of other witness testimony proffered by Plaintiff. MIL 4 at 7.

3:19-cv-02138-JAH-DTF

evidence in the case, so that if it were admitted its contribution to the determination of truth would be outweighed by its contribution to the length of the trial . . . ." *United States v. Kizeart*, 102 F.3d 320, 325 (7th Cir. 1996). "As a practical matter, the court [has discretion] to impose some limitation on the number of witnesses testifying about a particular fact . . . [which is] left to the sound discretion of the judge." *Loux v. United States*, 389 F.2d 911, 917 (9th Cir. 1968). A court's decision to allow multiple witnesses to testify about different aspects of the facts at issue does not lead to cumulative witness testimony where "each [witness] provided independent and valuable corroborating evidence." *United States v. Henry*, 560 F.2d 963, 965-966 (9th Cir. 1977) (finding that witnesses called at trial were not cumulative). The key analysis under a court's discretion to strike witnesses as "cumulative" is whether the witness will testify to the same "particular fact" at issue, *Loux*, 389 F.2d at 917, or whether the witness will provide additional and broader facts that provide "independent and valuable corroborating evidence" for the plaintiff. *Henry*, 560 F.2d at 965-966.

When testimony is offered to establish a pattern or practice of discrimination, such evidence remains relevant even where witnesses describe the same fact pattern that, in isolation, appears minimally probative. For instance, comparable interactions with the same manager or consistent practices across different departments may be highly relevant to Plaintiff's demonstration of a pattern or practice of discrimination and/or retaliation in order to rebut the Defendant's alternative explanation of the conduct at issue. *See*, *e.g.*, *Obrey*, 400 F.3d at 694. However, it is within the discretion of the district court to determine when pattern or practice evidence offered by the Plaintiff through "me too" testimony crosses the line between a sufficient demonstration of a discriminatory pattern or practice, and cumulative testimony that may result in unfair prejudice to Defendant. *See Henry*, 560 F.2d at 965-66; *Sprint*, 552 U.S. at 388; *see also Sprint*, 552 U.S. at 388 (the Court must balance "me too" testimony under the rules of relevance and unfair prejudice).

Thus, Defendant's motion is DENIED without prejudice as to witnesses Adrian Cornist, Sam Potter, Gary Horton, Martha Davis, Michelle Navarro, and Deanna Cosso, as

the Court finds the testimony of these witnesses to be admissible pattern or practice evidence.[13]

### C. Other Rule 403 Considerations

Defendant seeks to exclude evidence of other employees' health conditions on the basis that the "minimal probative value" of the witnesses' testimony is substantially outweighed by the danger that the jury will confuse the issues at trial:

> If a jury hears that multiple employees believe they became ill because of mold—regardless of how thin on substance these claims are—the jury may improperly infer that Mr. Romero's symptoms were caused by mold. The jury could also decide to punish the Defendant for other employees' illnesses rather than render a verdict based on the interaction between the parties.

MIL 4 at 4. Thus, Defendant argues that the evidence presented at trial "should be focused on [Plaintiff's] claims" rather than "similar evidence for each employee Plaintiff calls at trial" to prevent "multiple mini-trials within the trial," which can cause undue delay. MIL 4 at 7. However, because Plaintiff must demonstrate a discriminatory and/or retaliatory motive by the Defendant to succeed on his claims, the testimony of similarly situated employees at the MCC who had health conditions and reported them to their supervisors, or failed to do so out of fear of retaliation, is likely relevant to motive and probative of "discriminatory intent with respect to the individual employment decision at issue." *See Obrey*, 400 F.3d at 694. Thus, even though this Court is "properly concerned with the

---

[13] Plaintiff must be prepared to show how each of the six witnesses' mold-related health concerns constitute distinct facts at issue, other perceptions evidence, and/or how the testimony of these witnesses will demonstrate a discriminatory pattern or practice. To avoid a potential of cumulativeness that may be caused by any one or more of these witnesses, Plaintiff shall provide notice to the Court and opposing counsel of a more complete proffer as to the witnesses' testimony and what specific theory of the case the evidence will support before calling each witness to the stand and consider in his strategy to call witnesses with the most significant evidence early in his line-up to avoid exclusion of the testimony of any of them at trial due to unfair prejudice.

prospect of mini-trials on the [six] witnesses' own claims of discrimination," the Court acknowledges that, prior to excluding witness testimony, "[a] trial court should [] first address[] these concerns with the parties through other, less restrictive means." *Obrey*, 400 F.3d at 694*; see*, *e.g.*, *supra* note 10.

Accordingly, and in light of the Court's reasoning above, the Court finds the probative value of witness testimony from Adrian Cornist, Sam Potter, Gary Horton, Martha Davis, Deanna Cosso, and Michelle Navarro substantially outweighs any Rule 403 considerations, including undue prejudice. The Court will entertain any proposed curative or final instructions presented by Defendant and/ or Plaintiff to address concerns of undue prejudice involving the testimony of these witnesses.

### D. Conclusion

The Court GRANTS in part Defendant's motion and EXCLUDES testimony from the witnesses that were not timely disclosed pursuant to Rule 26. As for the witnesses that were properly disclosed, the Court GRANTS in part and DENIES in part Defendant's motion to exclude witness testimony based on the above findings of fact and law.

## VI. Defendant's Motion to Exclude General Evidence of Mold Within MCC (ECF No. 96).

### A. Factual Background

Defendant seeks to exclude "general evidence of mold" found in the MCC. ECF No. 96 ("MIL 5"). Defendant asserts that Plaintiff's exhibits are irrelevant, unfairly prejudicial, and constitute hearsay based on two general grounds: (1) "[e]vidence of mold in areas of the facility where Plaintiff did not work is irrelevant to [Plaintiff's] disability claim" and (2) some of Plaintiff's exhibits "predate Plaintiff's allegations by several years." *See* MIL 5 at 4-5. As to the location of relevant evidence, Defendant contends that Plaintiff worked in the "facilities office" in the lower basement of the MCC and worked almost exclusively at his desk. MIL 5 at 2. Thus, Defendant claims many of Plaintiff's "thousands of pages of correspondence, memoranda, and reports of suspected mold" are irrelevant because they relate to "locations of the facility where Plaintiff did not work."

43

MIL 5 at 4.  Defendant claims such evidence is inadmissible because mold is only relevant to this case to the extent that Plaintiff claims to be legally disabled based on his exposure and sensitivity to mold.  MIL 5 at 4.  Defendant also moves to exclude evidence of mold beyond the mold testing conducted at "Mr. Romero's work area during the relevant time frame."  MIL 5 at 3.  Defendant argues that "Plaintiff seeks to bias the jury against MCC for conduct from a different time, involving people other than Plaintiff,[14] and maintenance issues throughout the building" which would "put [Defendant] in the position of having to rebut each complaint through a mini trial."  ECF No. 127 ("MIL 5 Reply") at 3.

Defendant's motion specifically refers to some but not all of Plaintiff's proposed evidence it claims may be subject to Rules 401 and 801 regarding admissibility, including Plaintiff's Exhibit 16 ("a log reflecting . . . a list of 16 distinct complaints" concerning "asbestos, availability of hand sanitizer, signage in the medical unity, elevator and door inspections, exhaust fans, ventilation, rust on sprinkler heads, and expired ammunition") and Exhibit 17 (a 2012 Mold Survey Report).  MIL 5 at 4.  Defendant alleges these exhibits contain hearsay within hearsay and are thus inadmissible under Rule 801(c).[15]  *Id.*  In support of its argument that evidence of mold in locations where Plaintiff did not work is not relevant, Defendant makes reference to the expected testimony of its expert witness, Dr. Saxon, who will testify that, in the areas in and around Plaintiff's office, there were low levels of mold.  MIL 5 at 5-7.  Defendant points out that Plaintiff does not have an expert qualified to opine on how mold in remote locations of the MCC could cause

---

[14] The Court has addressed evidentiary matters relating to other employees in Sections IV and V above and will not discuss those matters here.

[15] Defendant lists the challenged exhibits in Exhibit 3.  *See* MIL 5, Exh. 3.  To the extent Defendant fails to provide specific objections and supporting arguments to Plaintiff's proffered exhibits listed therein explaining why the evidence may be inadmissible under any rule of evidence, Defendant's motion(s) to exclude these exhibit(s) is DENIED without prejudice.

Plaintiff's medical symptoms. *Id.*

In opposition, Plaintiff argues that Defendant's motion seeks to exclude broad categories of evidence that are "vague, ambiguous, and overbroad." ECF No. 112 ("MIL 5 Opp'n") at 2. Plaintiff also contends that the challenged evidence is highly probative of Defendant's intent and cover-up of the MCC's mold issue. *Id.* Specifically, Plaintiff argues that evidence of mold in the MCC as early as 2012—or beginning three years before Plaintiff got sick in 2015—is admissible to demonstrate Defendant's knowledge of the mold as early as 2012 and show that Plaintiff "had been working in a building with mold since at least 2012." *Id.* at 1.

**B. Discussion**

Following this Court's Summary Judgment Order, several genuine issues of material facts remained, including:

- Whether Plaintiff is disabled, MSJ Order at 16;

- Whether Defendant's conduct constitutes intentional discrimination, MSJ Order at 17;

- Whether Defendant's conduct qualifies as an "adverse employment action," including whether Defendant's conduct created a hostile work environment, MSJ Order at 18, and;

- Whether physically responding to emergencies was an essential function of Plaintiff's role as an engineering technician, MSJ Order at 22.

At issue here is the scope of mold evidence relevant to Plaintiff's claims. In light of this Court's analysis of the evidence in its Summary Judgment Order, and as further explained below, the Court finds that general evidence of mold—at a certain point in time or at a specified location—goes to the weight of the evidence rather than admissibility, which is best left to the jury.

**i. Location of Mold Evidence at MCC**

As an initial matter, Defendant contends that Plaintiff worked almost exclusively at his desk such that mold in "locations of the facility where Plaintiff did not work" are

45

irrelevant to Plaintiff's claims.    MIL 5 at 4.    However, in its Motion for Summary Judgment, Defendant argued that its non-discriminatory reason for rejecting Plaintiff's accommodation request to work outside the facilities was that Plaintiff's job duties required him to physically respond to emergencies at the MCC.[16]    MSJ Order at 20, 22 (citing Defendant's Exhibit D, ECF No. 47-5 (Engineer Tech. Position Description)). Accordingly, a determination of which mold-infested areas of the MCC are relevant to Plaintiff's claims depends on, at a minimum, a factual determination at trial of the scope of Plaintiff's duties while employed at MCC.

Second, evidence of mold in places beyond Plaintiff's immediate area of work may be relevant to show the extent of Plaintiff's disability due to mold exposure.    For example, letters written by Plaintiff's expert, Dr. Lawrence Pohl, to management of the MCC, dated October 14, 2016, and November 18, 2016, indicate that Dr. Pohl may testify that mold growth in areas other than the limited areas suggested by the Defendant may have contributed to Plaintiff's overall mold exposure.    Pohl Decl. at 10, 12.    Specifically, in Dr. Pohl's November 18, 2026, letter to the MCC, Dr. Pohl found that Plaintiff had significant issues pertaining to mold exposure and made the following request:

> From my medical stand point, this patient should not be allowed to work in areas that may or may not have tested positive for mold.  Patient may not walk by/below/above/next to areas that have had mold until remediation is complete.  Patient has a very low tolerance to the physical effects of mold and this mold exposure has caused him much distress and is harmful to his medical health.

Pohl Decl. at 12 (emphasis added).

Another of Plaintiff's expert witnesses, Dr. Edward Federman, is expected to testify that "the most probable cause of [Plaintiff]'s condition [] was workplace mold

---

[16] Defendant also concedes that, aside from Plaintiff's role as an Engineer Technician, Plaintiff's duties as a Correctional Officer involved conducting "visual searches of inmate work and living areas for contraband" and were therefore not limited to the basement or perimeter of the MCC.  *See* ECF No. 47 at 9-10.

exposure" and that, in his medical judgment, Plaintiff was required to avoid mold exposure in order to maintain his health. Federman Decl. at 3. Such evidence also challenges Defendant's claim that it was safe for Plaintiff to return to work at the MCC. Dr. Federman's expertise has not been challenged by Defendant.

Lastly, Plaintiff seeks to offer testimony from another expert, Dr. Eric Brown, on occupational hazards associated with mold exposure, such as how mold exposure occurs. Defendant contends, however, that Dr. Brown is not qualified to opine on Plaintiff's medical condition to explain how mold in remote locations of the MCC could have caused Plaintiff's symptoms. MIL 5 at 6-7. In support, Defendant cites this Court's Summary Judgment Order granting in part Defendant's motion to exclude certain aspects of Dr. Brown's testimony. MIL 5 at 6n.5. Plaintiff opposes Defendant's contention that Dr. Brown is unqualified and should be excluded from testifying as an expert witness on those topics.

In the Court's Summary Judgment Order, the Court ruled on the admissibility of Dr. Brown's expert testimony. The Court found:

> As an industrial hygienist with about 25 years of work experience in the environmental health and safety field, a doctorate degree and master's degree in public health, and a bachelor's degree in pre-medicine/philosophy, the Court finds that Dr. Brown is qualified to testify generally as to the health effects of mold. However, the Court finds that Dr. Brown is not a medical doctor or expert qualified to interpret Plaintiff's medical records and give expert opinions that are medical in nature and specific to Plaintiff.

MSJ Order at 29-30. Pursuant to the Court's Order regarding Defendant's Motion for Summary Judgment, it is beyond Dr. Brown's expertise to opine on whether occupational mold exposure at the MCC actually caused or contributed to the development of Plaintiff's medical symptoms. However, for the reasons stated above, the Court agrees with Plaintiff's position on the scope of Dr. Brown's testimony and finds that Defendant understates Dr. Brown's qualifications to testify as an expert witness and misstates the Court's order limiting his testimony at trial. In addition, Dr. Brown's may corroborate Dr.

Pohl's testimony that Plaintiff's symptoms were aggravated by cumulative exposure to mold in areas other than at his desk. *See, e.g.*, ECF No. 48-4 ("Brown Expert Report") at ¶¶ 1-4, 9. Dr. Brown's testimony also appears to be relevant to corroborate the testimony of Dr. Federman.

Having reviewed the relevant portions of Dr. Brown's Expert Report, the Court finds that Dr. Brown's testimony regarding the health effects of mold is relevant, subject to scope considerations. Specifically, Dr. Brown may testify as to the following:

- Whether the mold present in one location of the MCC may have exposed Plaintiff to an occupational health and safety risk in the areas in which Plaintiff worked or accessed, Brown Expert Report at ¶ 1;

- Whether the MCC "has multiple ongoing documented ventilation and water intrusion issues, creating chronic, long-term areas of toxic, allergenic, and/or opportunistic mold growth," Brown Expert Report at ¶ 1;

- The short-term water loss events "that have created additional areas of this hazardous mold growth" and "a number of hazardous sources of mold contamination," Brown Expert Report at ¶¶ 1, 5-8;

- "[T]he extent of indoor mold at the MCC San Diego, the hazards associated with mold levels similar to those at the MCC San Diego, the proper detection and remediation of the mold, and related topics as outlined in his extensive report," MIL 5 Opp'n at 5;

- Whether Plaintiff may have been exposed to mold at the MCC, including whether Plaintiff's movement within the MCC subjected him to such exposure, Brown Expert Report at ¶¶ 10, 12; and,

- Whether the occupational risks that remained at the MCC are relevant to Defendant's theory that there was no occupational harm present to prevent Plaintiff's return to work, Brown Expert Report at ¶ 13.

Third, the Court finds that the challenged evidence of mold or mold exposure is

relevant to Plaintiff's claims for discrimination, retaliation, and harassment, including the purported failure by the Defendant to provide reasonable accommodations to Plaintiff in light of the presence of mold.[17]   For example, evidence showing whether and when Defendant was put on notice of mold—and, more importantly, of the effects of mold on Plaintiff and other individuals—is probative to show that Defendant acted with discriminatory and/or retaliatory intent or motive. *See*, *e.g.*, SJ Order at 16.   Similarly, evidence relating to Defendant's response to complaints by other employees is probative of Defendant's retaliatory motive, MSJ Order at 17-18, and may also be relevant as evidence showing a pattern and practice of harassment. *See*, *e.g.*, ECF No. 65 (Pl. Opp'n to MSJ) at 8.   Accordingly, for the reasons discussed above, the Court finds that Dr. Brown's expected testimony on the following is also relevant:

- Proper detection and remediation of the mold, including, for example, how mold may travel from one location to another through ventilation and shared walls;
- Factual disputes regarding mold detection analyses conducted at Plaintiff's area of work;
- Factual disputes regarding the overall scope of mold exposure Plaintiff faced; and,
- Whether the MCC and Plaintiff's work site met occupational health and safety standards to allow Plaintiff to safely return to work.

In sum, the Court finds Defendant argues a narrow construction of the potential scope of Plaintiff's mold exposure.   In light of the evidence to be provided by Plaintiff's experts, Drs. Brown, Pohl, and Federman, such testimony makes it more probative than not that Plaintiff's mold exposure went beyond the physical unit of his desk, which may include, among other sources, the areas in which Plaintiff may have

---

[17] The Court in its Summary Judgment Order ruled that Dr. Brown may not testify that these instances, taken together, demonstrate "negligence" or "gross negligence" by the MCC.  MSJ Order at 27-28.

3:19-cv-02138-JAH-DTF

moved about within the facility to perform his duties and other activities (e.g. lunch breaks and bathroom breaks) and his potential exposure due to contaminated air from ventilation systems.

### ii. Timing of Mold Evidence at MCC

The timing of Defendant's knowledge of mold in the MCC is also relevant to Plaintiff's discrimination, harassment, and retaliation claims. Plaintiff intends to introduce photographs of mold taken by a co-worker, Adrian Cornist, within the MCC, including the fact that Defendant reprimanded Mr. Cornist for taking the photos. MIL 5 at 4. Plaintiff asserts that the reprimand of Mr. Cornist was part of a broader effort by Defendant to conceal the existence of mold in the workplace and to utilize concealment measures to support false statements that no mold existed in the MCC. MIL 5 Opp'n at 3. This evidence is relevant to challenge or rebut Defendant's evidence relating to its denials of mold being present in certain locations in the MCC accessed by Plaintiff in order to perform his work, as well as to show Defendant's knowledge and intent with respect to discrimination, harassment, and retaliation. At a minimum, this evidence is admissible as circumstantial evidence under Rule 404(b)(2), an evidentiary rule of inclusion for permitted uses, not exclusion, to show intent, motive, or absence of mistake or accident.

The same or similar analysis applies to the other evidence challenged by Defendant, such as: a complaint sent to Defendant in May 2016 regarding black mold growing throughout the MCC; an October 2016 notice by OSHA regarding unsafe and unhealthy work conditions; statements made by John Liechty, an Assistant Safety Manager at MCC, on or about December 20, 2016; and mold conditions as reported by a Union Vice President on or about August 18, 2017, relating to the MCC's lack of mold remediation efforts, *see* MIL 5 Opp'n at 3-4, all of which shall be subject to scope-related parameters evidence to which experts are permitted to testify.

Defendant also moves to exclude evidence Plaintiff seeks to admit relating to mold test results and/or mold-related information obtained by and/or known to the Defendant after October 18, 2016, when Plaintiff left his position at the MCC, should be excluded.

This Court finds that test results or information known to Defendant up to the mold conditions reported by the Union Vice President on or about August 18, 2017, are admissible as relevant to establish the extent of Defendant's knowledge of mold-related issues, including Defendant's lack of mold remediation efforts or to otherwise demonstrate Defendant's alleged motive or intent to discriminate or its retaliatory conduct. Thereafter, the probative value of such evidence after on or about August 17, 2027, becomes less relevant and is overcome by significant unfair prejudice.

However, the Court also notes that its rationale relating to the admission of mold-related evidence from which Plaintiff seeks to establish his mold-related symptoms, and which Plaintiff perceives to be "broad categories of evidence," is not boundless. *See generally* MIL 5 at 2. Instead, its admission is governed by the rules of evidence. Importantly, Plaintiff must be mindful of the "scope" of mold-related evidence determined by this Court. In order to reduce any unfair prejudice to Defendant, Plaintiff must provide reasonable notice[18] to the Court and Defendant of the areas or locations within the MCC to which his experts intend to testify that may have created a level of exposure to mold that, in the opinions of his experts, impacted or contributed to Plaintiff's mold-related symptoms. And Defendant and/or the Court, on its own motion may seek to address concerns raised by Plaintiff's notice prior to trial.

As such, Defendant's motion is GRANTED in PART and DENIED in PART.

## VII.    Defendant's Motion to Exclude Evidence of Home Mold Test Kits (ECF No. 98)

Defendant moves to exclude evidence of home mold test kits that Plaintiff placed in different areas of his workplace, which after a few days allegedly demonstrated mold growth. ECF No. 98 ("MIL 7"). Defendant seeks to exclude photographs of the home mold test kits with mold growth and any testimony regarding the results of the home mold test kits. *Id.* at 3-5.

---

[18] The timing of such notice will be determined at a later time.

3:19-cv-02138-JAH-DTF

**A. Factual Background**

After Plaintiff began exhibiting symptoms of dizziness and vertigo at work in May of 2015, a coworker, suggested to him that the cause of his symptoms could be mold in the workplace.  MIL 7 at 2.  Plaintiff, two co-workers, and facility manager Noel Fenlon thereafter went to Home Depot and bought home mold test kits, which they placed in the lower and upper basement levels of the MCC.  *Id.*, MIL 7, Ex. 1 at 2-3.  Plaintiff has listed as trial exhibits undated photographs of twelve home test kit petri dishes, which show dark green and black-colored growth.  *Id.*, MIL 7, Ex. 2 at 1-3.

Plaintiff testified at his deposition that he followed the instructions on the home test kits and left the test kits with their lids open for one hour in the lower and upper basement levels of the MCC, before closing the kits.  MIL 7, Ex. 1 at 3.  Plaintiff then placed the closed kits in a box within the facilities office for a few days, before returning to find mold growing in each home test kit.  *Id.*  Plaintiff showed the results to a supervisor, who indicated that the MCC would perform additional mold testing in light of Plaintiff's home mold test kit results.  *Id.*

**B. Discussion**

Plaintiff seeks to introduce testimony and photographs of the home mold test kits to help explain Plaintiff's investigation into his illness and the conditions of his workplace. Plaintiff claims he and an identified coworker will testify that "the substance [in the petri dishes] looked like mold," and not "as to whether [the substance] was in fact mold or what type of mold it was . . . ."  ECF No. 114 ("MIL 7 Opp'n") at 3.  Plaintiff argues that such testimony falls within the scope of permissible lay testimony "result[ing] from a process of reasoning familiar in everyday life, whereas an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field."  *Id.* at 2 (citing *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 240 (6th Cir. 2010) (finding that a lay witness may testify that he saw "a substance appeared to be blood") (citation omitted).

Defendant argues evidence of these home test kits is improper opinion testimony, irrelevant, and highly prejudicial to Defendant.  Defendant argues Plaintiff and his

52

coworkers are not experts in the field of industrial hygiene.  MIL 7 at 4.  Further, Defendant argues there is no evidence to support whether these tests were conducted correctly or if the method is reliable.  *Id.*  Defendant adds "Plaintiff [is] not qualified to identify strains of mold based on the photographs or offer any opinion regarding the potential of the spores shown in the photographs to cause illness."  *Id.*  In essence, Defendant argues that Plaintiff is not an expert of mold growth or microbiology and may not testify as to his observations of mold growth or the results of the home mold test kits.  *Id.*

### i.  Lay Witness Testimony

As discussed above, under FRE 701, a lay witness may provide opinions that are "(a) rationally based on the witness's perception; (b) helpful to understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or specialized knowledge within the scope of Rule 702."  FED. R. EVID. 701.  Lay testimony "results from a process of reasoning familiar in everyday life, whereas an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field."  *United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007) (internal quotations and citations omitted).  For example, a lay witness may testify "'a footprint in snow looked like someone slipped, or that a substance appeared to be blood[,]' but cannot testify that 'skull trauma caused the bruises on a victim's face.'"  *Id.*

Here, Plaintiff seeks to offer testimony that the substance found in the home test kits, placed in the lower and upper basement levels of the MCC, appeared to be mold.  MIL 7 Opp'n at 2-4.  Observations about whether a substance appears to be mold are observations that are made through "a process of reasoning familiar in everyday life" and do not require heightened skills or subject-matter expertise to assess.  *Harris*, 627 F.3d at 240.  Whereas an expert would be necessary to testify as to whether the substance was in fact mold, the exact type of mold growing on the mold test kits, Plaintiff here may testify as to his observations and perceptions.  *See Lloyd*, 807 F.3d at 1154 (holding that a lay witness may present testimony based on matters for which he or she has "firsthand knowledge or observation.").  Thus, while Plaintiff cannot opine that the substance found in the petri

53

dishes was actually mold—as such a conclusion may only be proffered by a qualified expert—Plaintiff may nevertheless testify that his *perception* of the substance found in the petri dishes appeared to be mold.

Plaintiff's lay testimony, along with any other corroborating witness testimony, regarding their personal knowledge of the reasons for his purchase of the test kits, their following instructions for their use, and their observations or perceptions of the results, is admissible under the hearsay exception found at Rule 803(3) regarding effect on the listener, as to the co-worker's suggestion that the mold growth may be determined through the results of the mold test kits and Plaintiff's decision to purchase the Home Depot mold testing kits, and to provide a foundation to establish a sequence of events that occurred thereafter, such as why Plaintiff made statements to his supervisor after Plaintiff presented the results of the test kits to the supervisor that then led to his supervisor's decision to have the basement tested by an independent contractor.

### C. Conclusion

For all the reasons stated above, the Court finds the relevance of this evidence more probative than prejudicial.

Accordingly, Defendant's motion to exclude home mold test kits as unqualified expert testimony is DENIED.  The Court will also entertain proposed curative and/or final jury instructions to ensure the jury makes its decision based upon all of the evidence to avoid unfair prejudice and/or other Rule 403 considerations.

## PLAINTIFF'S MOTIONS IN LIMINE

### VIII.  Plaintiff's Motion to Exclude LabCorp Records (ECF No. 99)

Plaintiff's first motion seeks to exclude the LabCorp records demonstrating that Plaintiff is not allergic to mold.  ECF No. 99 ("MIL 8").[19]  This issue was resolved by the

---

[19] Plaintiff identifies the LabCorp records as Defendant's Exhibits O, P, and Q, but notes

Court's ruling on Defendant's third motion in limine. *See supra* Section III. For the same reasons presented in this Order as to Defendant's motion to admit the LabCorp records, Plaintiff's motion is DENIED without prejudice.

## IX. Plaintiff's Motion to Exclude Defendant's Experts' Reports (ECF No. 100)

Plaintiff's second motion seeks to exclude Defendant's expert reports (Exhs. S, T, and U) as inadmissible hearsay. ECF No. 100 ("MIL 9") at 1. Defendant represents that it intends to offer testimony from "Dr. Andrew Saxon, MD, a licensed physician specializing in Clinical Immunology and Allergy; Laura Dolan, MBA, an economic expert; and Daniel Farcas, an Industrial Hygienist." ECF No. 115 ("MIL 9 Opp'n") at 1. However, Defendant's Opposition clarifies that Defendant marked its expert reports "for identification purposes" only, in the event Defendant introduces an expert report for impeachment purposes, and Defendant does not seek to otherwise offer its expert reports into evidence. *Id.* at 2. Plaintiff did not file a Reply.

Because Defendant does not seek to offer its expert reports as evidence in its case-in-chief, the Court finds that Plaintiff's motion is premature. Accordingly, the motion is DENIED without prejudice.

## X. Plaintiff's Motion to Exclude Third-Party Mold Test Reports (ECF No. 101)

Plaintiff's third motion seeks to exclude third-party reports from SM Inspections (Ex. A), EM Lab P&K, LLC (Exhs. B and C), and KRW Environmental Consulting (Ex. I) discussing the results of testing on mold conditions in the MCC. Plaintiff asserts that they constitute inadmissible hearsay, lack foundation, and that Defendant has not properly authenticated the documents. ECF No. 101 ("MIL 10") at 1.

### A. Hearsay

Hearsay is any out of court statement being offered for the truth of the matter asserted. FED. R. EVID. 801(c). Hearsay is inadmissible unless otherwise provided by a

---

that Defendant erroneously listed the exhibits as Exhibits N, O, P. MIL 8 at 1.

federal statute, the Federal Rules of Evidence, or the U.S. Supreme Court.  FED. R. EVID. 802.

Plaintiff objects that the third-party reports constitute inadmissible hearsay. Defendant claims these mold test results fall under the "Records of a Regularly Conducted Activity" exception to the rule against hearsay, as discussed below.

### B. Lack of Foundation and Authenticity

Plaintiff argues that the third-party reports lack foundation and cannot be authenticated because Defendant cannot establish chain of custody demonstrating the mold spore samples were collected properly from the MCC and maintained "with proper procedures sufficient to provide reliable evidence for the jurors."  MIL 10 at 3.  Plaintiff also argues Defendant has not named an expert from EM Lab P&K, LLC, to authenticate the lab reports for Exhibits B and C.  *Id.* at 5.

Authentication of evidence is satisfied when "evidence sufficient to support a finding that the item is what the proponent claims it is."  FED. R. EVID. 901(a).  Evidence is considered authentic when the party asserts "the original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court."  FED. R. EVID. 902(11).  To satisfy the Rule 803(6)'s "Records of a Regularly Conducted Activity" exception to the rule against hearsay, Defendant must demonstrate (1) "the record was made at or near the time by – or from information transmitted by – someone with knowledge;" (2) "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;" (3) "making the record was a regular practice of that activity;" (4) "all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification;" and (5) "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."  FED. R. EVID. 803(6).

Here, each of these reports was prepared by third-party testing laboratories in their regular course of business. ECF No. 117 ("MIL 10 Opp'n") at 5. Plaintiff has not offered any argument to suggest otherwise. Defendant claims it has "listed witnesses in the Pretrial Order to testify regarding the authenticity of each report or otherwise provide[d] a certification if Plaintiff persists in these make-work objections." *Id.* at 6. However, Defendant does not directly refute Plaintiff's argument that Defendant has listed representatives from two of the three third-party companies as lay witnesses to authenticate Exhibits A and I,[20] but Defendant has not listed a witness from EM Lab P&K, LLC to authenticate Exhibits B and C. MIL 10 at 5.

As to the third-party reports from SM Inspections and KRW Environmental Consulting, the Court finds that Defendant's proffered witnesses are sufficient to authenticate the records at trial. As to third-party reports from EM Labs, the Court may choose to exclude the reports at a later time upon a showing that Defendant is unable to properly authenticate the reports. *See N.L.R.B. v. First Termite Control Co., Inc.*, 646 F.2d 424, 427 (9th Cir. 1981) (Rule 803(6) requires "'the testimony of the custodian or other qualified witness' [to] insure[] the presence of some individual at trial who can testify to the methods of keeping the information").

Accordingly, the Court DENIES Plaintiff's motion to exclude Exhibits A and B. And the Court denies Plaintiff's motion to exclude the ELM Lab Reports, contingent on Defendant properly authenticating the EM Lab reports.

## XI. Plaintiff's Motion to Limit Use of Deposition Transcripts (ECF No. 102)

Plaintiff's fourth motion seeks to "limit[] Defendant's use of depositions transcripts, other than Mr. Romero's transcript, [for] impeachment of witnesses or in lieu of the testimony of witnesses who are unavailable to testify at the time of trial." ECF No. 102

---

[20] Defendant seeks to offer lay testimony from Sean Myers from SM Inspections and Kent Wells from KRW Environmental Consulting to authenticate Exhibits A and I respectively. *See* Proposed Order at 25; MIL 10 at 2.

("MIL 11") at 1. Defendant claims the motion is premature because, like Plaintiff, Defendant has not yet confirmed which witnesses will be available to testify live. ECF No. 116 ("MIL 11 Opp'n") at 2. Defendant explains, "[s]everal of the witnesses deposed in this case no longer reside in the San Diego area and their availability to travel to testify at trial will depend on when the trial takes place." *Id.* at 2; *see also* MIL 9 Opp'n (confirming that Defendant marked "deposition transcripts" for "identification purposes" only, and not to introduce them as evidence). It appears the Parties agree on this point. Plaintiff is essentially requesting the Court to issue an advisory opinion on the use of deposition transcripts, which is not necessary or appropriate at this stage of the proceedings.

Accordingly, Plaintiff's motion is DENIED without prejudice.

## XII.  Plaintiff's Motion to Preclude Evidence and Argument Relating to Failure to Mitigate Damages (ECF No. 105)

Plaintiff's final motion seeks to preclude testimony from Defendant's expert, Laura Fuchs Dolan, and argument that Plaintiff failed to mitigate his damages. ECF No. 105 ("MIL 12") at 1. Plaintiff argues "there is no statutory provision nor common law principle providing for a duty to mitigate damages where the plaintiff has not been discharged." *Id.* at 2. Plaintiff also argues the issue is not relevant to a determination of liability in this case. *Id.* Plaintiff contends that introduction at trial of testimony on Plaintiff's failure to mitigate his damages would be highly prejudicial and would unnecessarily confuse the jury because failure to mitigate is not relevant to Plaintiff's liability claims for disability, retaliation, harassment, and/or discrimination. *Id.* at 3-4.

Defendant argues that testimony of mitigation is relevant to the equitable remedy analysis the Court will decide, if necessary, after the liability stage. ECF No. 107 ("MIL 12 Opp'n") at 4. Defendant argues that "Plaintiff's alleged economic damages are equitable remedies that must be determined solely by the Court." *Id.* (emphasis added). Defendant points to caselaw that supports its position that, "[a]s a matter of law, mitigation is always part of an equitable remedy analysis," such that equitable remedies like back pay and front pay are evaluated and determined by the Court, not the jury. *Id.* (citing *Giles v. Gen. Elec.*

*Co.*, 245 F.3d 474, 492 (5th Cir. 2001) ("Because it is an equitable remedy, back pay is subject to a duty to mitigate damages."); *Madison v. IBP*, *Inc.*, 149 F. Supp. 2d 730, 785 (S.D. Iowa 1999) ("In setting the amount of [an equitable remedy for employment discrimination], a court may consider any relevant factors, including the plaintiff's duty to mitigate and the availability of employment opportunities."); *Szedlock v. Tenet*, 139 F. Supp. 2d 725, 735 (E.D. Va. 2001), *aff'd*, 61 Fed. Appx. 88 (4th Cir. 2003) (finding that "while plaintiff's disability warrants consideration in setting a reasonable time to find suitable employment, it does not justify ending plaintiff's duty to mitigate damages")). Relatedly, Defendant's second motion in limine requests that the Court bifurcate the issue of damages so that the jury may be able to focus first on deciding the issue of liability before the Court decides the damages.  MIL 2 at 2; *see also supra* Section II.

"[T]here is no right to have a jury determine the appropriate amount of back pay under Title VII, and thus the ADA, even after the Civil Rights Act of 1991." *Lutz v. Glendale Union High Sch.*, 403 F.3d 1061, 1069 (9th Cir. 2005).  "Instead, back pay remains an equitable remedy to be awarded by the district court in its discretion."  *Id.* "Because it is an equitable remedy, back pay is subject to a duty to mitigate damages." *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 492 (5th Cir. 2001).  "A court awarding front pay should consider a plaintiff's ability to mitigate her damages by finding other employment in the future."  *Gotthardt v. Nat'l R.R. Passenger Corp.*, 191 F.3d 1148, 1157 (9th Cir. 1999).  In determining back pay and/or front pay, district courts consider "any relevant factors, including the plaintiff's duty to mitigate and the availability of employment opportunities" in arriving at the final damages amount.  *Madison v. IBP*, *Inc.*, 149 F. Supp. 2d 730, 785 (S.D. Iowa 1999).

In this Court's Summary Judgment Order, the Court held that Ms. Dolan's testimony was relevant to the equitable damages analysis of back pay and/or front pay in this matter. MSJ Order at 38-39.  Because this determination is made solely by the Court, the Court agrees with Plaintiff's argument that expert testimony on mitigation damages will unnecessarily confuse the jury and prejudice the Plaintiff, because Plaintiff's duty to

mitigate is not relevant to his claim of disability or Defendant's liability for discrimination, retaliation, and/or harassment. In addition, the Court has ordered the bifurcation of damages in its decision on Defendant's second motion in limine. *See supra* Section II.

Accordingly, Plaintiff's motion is GRANTED.

## CONCLUSION

For the reasons stated above, the Court HEREBY ORDERS:

1. Defendant's Motion to Exclude Final Agency Decision (ECF No. 92) is DENIED;

2. Defendant's Motion to Exclude Alleged Economic Damages (ECF No. 93) is GRANTED;

3. Defendant's Motion to Admit LabCorp Test Report (ECF No. 94) is GRANTED;

4. Defendant's Motion to Exclude Testimony of Plaintiff Witness Deanna Cosso (ECF No. 97) is DENIED;

5. Defendant's Motion to Exclude Other Employees' Health Conditions (ECF No. 95) is:

   a) GRANTED in part and DENIED in part as to undisclosed witnesses pursuant to Rule 26;

   b) GRANTED in part and DENIED in part as to relevant and cumulative testimony from certain witnesses;

   c) DENIED as to lay testimony of six witnesses; and,

   d) DENIED without prejudice as to Rule 403 considerations relating to testimony of six witnesses.

6. Defendant's Motion to Exclude General Evidence of Mold Within MCC (ECF No. 96) is DENIED without prejudice;

7. Defendant's Motion to Exclude Home Mold Test Kits (ECF No. 98) is DENIED;

8. Plaintiff's Motion to Exclude LabCorp Documents (ECF No. 99) is GRANTED in part and DENIED in part;

9. Plaintiff's Motion to Exclude Defendant's Experts' Reports (ECF No. 100) is DENIED without prejudice;

3:19-cv-02138-JAH-DTF

10. Plaintiff's Motion to Exclude Third-Party Mold Test Reports (ECF No. 101) is DENIED without prejudice;

11. Plaintiff's Motion to Limit Use of Deposition Transcripts (ECF No. 102) is DENIED without prejudice;

12. Plaintiff's Motion to Preclude Evidence and Argument Relating to Failure to Mitigate Damages (ECF No. 105) is GRANTED; and,

13. The Parties shall submit proposed curative jury instructions and proposed final jury instructions specifically where noted to do so in this Order, or as otherwise deemed necessary on any issue by either Party, no later than ten (10) days before the jury trial date set by this Court or otherwise upon further order by this Court.

**IT IS SO ORDERED.**

DATED: November 6, 2025

_____
JOHN A. HOUSTON
UNITED STATES DISTRICT JUDGE